**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>CERCA TROVA RESTAURANT GROUP HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11749<br><br>(Joint Administration Requested) |

**DECLARATION OF DAVID GORONKIN IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, David Goronkin, hereby declare under penalty of perjury as follows:

**PRELIMINARY STATEMENT**

1. Cerca Trova Restaurant Group Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "**Debtors**," and, together with their non-Debtor affiliates, the "**Company**") operate sixty-one (61) Outback Steakhouse restaurants in California, Arizona, Colorado, Nevada, and New Mexico and employ approximately 3,669 people. The Company's restaurants make the steakhouse experience accessible to the everyman—offering full-service, sit-down dining well-known for signature dishes like steak, ribs, seafood, and, of course, the Bloomin' Onion®. A diverse customer base frequents the Company's many locations seeking generous portions of quality food, affordable prices, and friendly service in a casual, welcoming environment.

2. The Company traces its roots to the T-Bird Restaurant Group, a restaurant company incorporated in 1994 to develop the Outback Steakhouse® franchise in California. For

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cerca Trova Restaurant Group Holdings, Inc. (5725); Out West Restaurant Group, Inc. (0849); Cerca Trova Steakhouse, Inc. (8902); Cerca Trova Steakhouse, L.P. (2006); and Cerca Trova Southwest Restaurant Group, LLC (8835). The Debtors' mailing address is 8885 Rio San Diego Drive, Suite 360, San Diego, California 92108.

its first twenty (20) years, the Company grew one California restaurant at a time. Each expansion location was facilitated through partnership with local investors eager to bring the Outback experience to their community. Every restaurant was owned through its own limited partnership, with local investors, a managing partner who ran the restaurant, and a joint venture partner who oversaw a group of restaurants.

3. By 2014, the Company had expanded considerably, with approximately fifty-six (56) restaurants serving communities throughout California. In January 2015, an affiliate of H.I.G. Capital, LLC (together with its affiliates, "**H.I.G**.") acquired the business. In April 2017, the Company acquired forty-five (45) company-operated Outback Steakhouse restaurants in Arizona, Colorado, Nevada, and New Mexico from Outback Steakhouse of Florida, LLC (the "**Franchisor**"), a subsidiary of Bloomin' Brands, Inc. ("**Bloomin'**"), and became the exclusive developer of Outback Steakhouse restaurants in all five (5) states. By 2018, the Company operated ninety-nine (99) restaurants with annual sales of more than $340 million, making it the largest franchisee in the Outback Steakhouse system.

4. The Company had taken on debt in order to finance its expansion, but sector-wide headwinds stymied the earnings growth that the debt assumed. Like the rest of the casual dining segment, the Company faced year-over-year declines in guest traffic. At the same time, its labor costs rose sharply, driven largely by successive minimum wage increases in California, where most of the Company's employees work. By the end of 2018, the Company could no longer satisfy the financial covenants under its senior credit facility.

5. Then came the COVID-19 pandemic. Although the pandemic and subsequent lockdowns hit nearly all segments of the economy, full-service, in-person dining was uniquely undermined. Industry-wide business plummeted as full-service restaurants reported an average

drop of 36% in sales revenue in 2020.[2] The Company was not spared from the immediate and devastating impact of the government-mandated shutdowns. With its dining rooms closed or severely restricted for much of the year, the Company's revenue fell by approximately 35%.

6. Recognizing the lasting effects the pandemic would have on its business, the Company began to actively engage with its lenders and the Franchisor, who responded with substantial support. In December 2020, the lenders agreed to forbear from exercising remedies and to capitalize interest, and the Franchisor waived approximately $5.7 million of royalty and marketing fees and deferred approximately $18.1 million of additional obligations. That support kept the Company's restaurants open and its employees working through the pandemic.

7. Sales recovered in 2021 and 2022, but the pandemic's damage had fatally undermined the Company's capital structure. Despite continued strength at most locations, the Company's senior loans could not be repaid or refinanced when they matured on April 25, 2022. Since then, the Company has operated under a series of forbearance agreements, and interest has accrued at the default rate and been added to the balance of the loans. As a result, while the principal amount of the loans has remained approximately $129.0 million, the Company's senior secured obligations have grown from approximately $140.0 million in November 2020 to approximately $319.9 million today. In fiscal year 2025, the Company's interest expense of approximately $45.9 million was more than five (5) times its covenant EBITDA.

8. The Company has repeatedly and proactively searched for solutions. Since 2018, it has pursued a sale four (4) times: in 2018, with North Point Advisors; in 2022, with Piper Sandler & Co.; in 2025, through extended negotiations with a prospective purchaser; and, since

---

[2] According to a November 2020 survey of approximately 6,000 restaurant operators conducted by the National Restaurant Association, 87% of full-service restaurants reported an average 36% decline in sales revenue during the COVID-19 pandemic. *See* Nat'l Rest. Ass'n, *Restaurant Industry in Free Fall; 10,000 Close in Three Months* (Dec. 7, 2020), https://www.restaurant.org/research-and-media/media/press-releases/restaurant-industry-in-free-fall%3B-10%2C000-close-in-three-months/.

June 2026, with Brookwood Associates, L.L.C. ("**Brookwood**"). None of the first three (3) efforts produced a transaction that could be completed out of court, and as the Company's financial performance continued to decline, so did the value available to its stakeholders.

9. The Company has also reduced its restaurant footprint. It closed three (3) underperforming restaurants in early to mid-2026 and, shortly before filing these chapter 11 cases, closed ten (10) additional restaurants that are not part of the proposed sale.

10. By 2026, the pressures on the business had converged. Guest traffic and earnings continued to decline, while food, labor, and other production costs continued to rise. On April 14, 2026, the Prepetition Agent (as defined below) delivered a notice of events of default and reservation of rights, leaving the Company's forbearance subject to termination at the lenders' election. In August 2026, a California court granted final approval of the settlement of a long-running wage-and-hour class action that requires a payment of $1.6 million, which the Company cannot make without significantly impacting its liquidity, and two (2) new wage-and-hour class actions were filed against the Company in California during the summer of 2026. The Company's cash in its bank accounts declined from approximately $9.7 million at the end of fiscal year 2023 to approximately $5.7 million as of October 25, 2026, and the Debtors project that they will have approximately $3.4 million of cash on the Petition Date.

11. The Debtors commenced these chapter 11 cases to complete a sale of substantially all of their restaurant assets as a going concern. Following a marketing process led by Brookwood, the Debtors entered into an asset purchase agreement with the Franchisor, which will serve as the stalking horse bidder at a cash purchase price of $26.3 million plus the assumption of certain liabilities, subject to higher or otherwise better offers. The proposed sale would transfer the restaurants to the operator of the Outback Steakhouse system, preserving thousands of jobs, providing continuity for the Company's guests, landlords, and vendors, and

allowing the Company's many beloved Outback locations to continue to serve their communities. Meanwhile, the court-approved sale process, including the opportunity for higher or otherwise better bids, will test the market one final time to ensure that the Company's creditors receive as much value as possible. To fund their operations through the sale process, the Debtors seek authority to use cash collateral, with the consent of their prepetition secured lenders, and to obtain a postpetition revolving credit facility of up to $5.5 million from the Franchisor, which bears no interest and will be credited against the purchase price at closing.

12. I have worked alongside the Company's managing partners, joint venture partners, and restaurant teams for seven (7) years. Their commitment through the pandemic and the years that followed is the reason these restaurants remain open today. The Debtors intend to move through these chapter 11 cases efficiently, with the sale process as their priority, to preserve and enhance the value of the business for the benefit of all stakeholders.

## BACKGROUND AND QUALIFICATIONS

13. I am the Chief Executive Officer of each of the Debtors, a position I have held since October 2019. I am also a member of the board of directors of Debtor Cerca Trova Restaurant Group Holdings, Inc. ("**Holdings**") and of certain of the other Debtors. In those capacities, I am responsible for the Company's day-to-day operations and its relationships with its lenders and the Franchisor, and, together with the Debtors' advisors, for the Debtors' sale process.

14. I have spent my entire professional career working in the restaurant industry. My journey began more than fifty (50) years ago, serving ice cream cones at Dairy Queen when I was fourteen (14). Since then, I have been fortunate enough to serve in a variety of leadership roles throughout the industry. Prior to joining the Debtors, I served as President and Chief Operating Officer of Mastodon Ventures Amanth ("**MVA**"), a strategic advisory firm that

specializes in the restaurant and hospitality sectors, from 2016 to 2019. Before MVA, I served in executive leadership positions for numerous restaurant groups and food and beverage brands, including: Chief Executive Officer of My Fit Foods, from 2014 to 2016; Chief Executive Officer of Garden Fresh Restaurant Corporation, from 2012 to 2014; President, Chief Executive Officer, and Chairman of the Board of Real Mex Restaurants, from 2011 to 2012; President and Chief Executive Officer of Bennigan's, from 2009 to 2011; Board Member of Redstone American Grill, from 2005 to 2008, and its President and Chief Executive Officer, from 2007 to 2008; President and Chief Executive Officer of Famous Dave's of America, from 2003 to 2007; and Executive Vice President and Chief Operating Officer of Buffets, Inc., from 1994 to 2003. I have also served on the board of several restaurant associations, including the National Restaurant Association Educational Foundation, the National Restaurant Association, and the Texas Restaurant Association.

15. On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). I submit this declaration (this "**Declaration**") to assist the Court and parties in interest in understanding the Debtors' business and the circumstances that led to these chapter 11 cases, and in support of the Debtors' petitions and the motions and applications seeking first day relief filed concurrently herewith (collectively, the "**First Day Motions**").

16. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring efforts, or my opinion based upon my experience and knowledge of the Debtors' business. I am over the age of eighteen (18) and

authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

17. This Declaration is organized in four (4) parts. Part I describes the Company's history and business operations. Part II describes the Debtors' corporate and capital structure. Part III describes the circumstances that led to these chapter 11 cases, the Debtors' efforts to market their business, and the path forward. Part IV sets forth facts in support of the First Day Motions.

## I. CORPORATE HISTORY AND BUSINESS OPERATIONS

### A. History of the Company

18. The Company's story begins with the founding of its predecessor, T-Bird Restaurant Group ("**T-Bird**"). T-Bird was incorporated in 1994 by Thomas J. Shannon, Jr., with the goal of bringing the Outback Steakhouse experience to California. The Company's focus on providing a casual, friendly dining experience was well received by California diners and quickly proved to be a success. In 1997, T-Bird began operating seven (7) additional California restaurants on behalf of their third-party owners, and over the following years it operated additional restaurants throughout California.

19. The Company has always emphasized ground-up leadership and support for the people who operate its restaurants, without whom it could not operate. Historically, each of the Company's California restaurants was owned by its own limited partnership, with a focus on recruiting local investors as partners. Each partnership had a general partner controlled by the Company's founder, outside investors as limited partners, a managing partner responsible for the restaurant's day-to-day operations, and a joint venture partner responsible for a group of restaurants. The managing partner and joint venture partner programs remain central to the Company's operations today, as described below.

20. In 2011, the Company obtained exclusive rights to develop Outback Steakhouse restaurants in California, which were later extended through November 22, 2031.

21. By the end of 2014, the Company's operations had expanded significantly, with fifty-six (56) locations providing Outback's signature service to their communities. On January 9, 2015, pursuant to an Acquisition Agreement dated as of November 21, 2014, an affiliate of H.I.G. acquired the business, including the limited and general partnership interests in fifty-six (56) restaurant partnerships and the Company's management company, for an aggregate purchase price of approximately $112 million. In connection with the acquisition, the founder transitioned out of the business, and certain of the former owners received earn-out notes.

22. On April 25, 2017, pursuant to an Asset Purchase Agreement dated as of February 3, 2017, Debtor Cerca Trova Southwest Restaurant Group, LLC (then known as T-Bird Southwest Restaurant Group, LLC) acquired forty-five (45) Outback Steakhouse restaurants in Arizona (14), Colorado (16), Nevada (10), and New Mexico (5) from the Franchisor for a purchase price of approximately $31.1 million, plus inventory and certain assumed liabilities. At the same time, the Company and the Franchisor entered into the Master Franchise Agreement (as defined below), under which the Company became the exclusive developer of Outback Steakhouse restaurants in Arizona, Colorado, Nevada, and New Mexico, in addition to California. The acquisition was financed with the proceeds of the Prepetition Credit Agreement (as defined below) and a $5.0 million subordinated note from an affiliate of H.I.G.

23. Following the acquisition, the Company rebranded its entities under the "Cerca Trova" name and, effective December 31, 2017, merged its restaurant partnerships into Debtors Cerca Trova Steakhouse, L.P. and Cerca Trova Steakhouse, Inc. The Company also invested in its restaurants, completing more than forty (40) remodels, opening three (3) new restaurants,

including the first new Outback Steakhouse restaurant to open in California in nearly a decade, and relocating a fourth. By the end of 2018, the Company operated ninety-nine (99) restaurants.

24. Since 2018, the Company has closed underperforming restaurants as their economics required or their leases expired. By the end of fiscal year 2025, the Company operated seventy-four (74) restaurants. The Company closed three (3) additional restaurants in early 2026 and, shortly before the Petition Date, closed ten (10) more, as described in <u>Part III.E</u> below. A chart outlining the timeline of restaurant closures is illustrated below:

**Company Restaurants Operated, Fiscal Year-End 2018 through Petition Date**




**B. Business Operations**

25. As of the Petition Date, the Debtors operate sixty-one (61) Outback Steakhouse restaurants: thirty-one (31) in California, eight (8) in Arizona, eight (8) in Colorado, nine (9) in Nevada, and five (5) in New Mexico (collectively, the "**Restaurants**"). The Restaurants offer a casual dining, steak-focused menu with a full bar, and generate revenue from in-restaurant dining, take-out, and third-party delivery. The Restaurants serve approximately 7.9 million guests a year, with an average ticket of approximately $37. Alcoholic beverages account for

approximately 8.7% of sales, and the Debtors hold a liquor license for each of the Restaurants. A list of the Restaurants is attached hereto as Exhibit 2.

26. For the twelve (12) months ended August 23, 2026, the Company generated approximately $321 million of revenue and approximately $16.1 million of restaurant-level EBITDA.

27. As of the Petition Date, the Debtors employ approximately 3,669 people (excluding employees of the Closed Restaurants, as defined below), including approximately 3,489 hourly employees and 180 salaried employees, approximately 54% of whom work in California. Debtor Out West Restaurant Group, Inc. ("**OWRG**") employs approximately 278 people, including the Debtors' corporate staff and salaried restaurant managers; Debtor Cerca Trova Steakhouse, L.P. ("**CTS LP**") employs approximately 1,836 hourly employees in California; and Debtor Cerca Trova Southwest Restaurant Group, LLC ("**CT Southwest**") employs approximately 1,555 hourly employees outside California. The Debtors' restaurant support center is located at 8885 Rio San Diego Drive, Suite 360, San Diego, California 92108.

28. Each Restaurant is generally led by a managing partner (each, a "**Managing Partner**"), and joint venture partners (each, a "**JVP**") oversee groups of Restaurants. Managing Partners and JVPs are at-will employees whose incentive compensation is tied to the profits of the Restaurants they manage: Managing Partners receive periodic bonuses based on the distributable cash flow of their Restaurants, and JVPs receive monthly incentive payments equal to 1.5% of the EBITDAR of the Restaurants they oversee. This aligns their compensation with the performance of their Restaurants.

29. The Debtors lease the premises for all of the Restaurants. The Debtors do not own any real property, other than improvements at certain Restaurants located on leased land. Affiliates of Bloomin' are the landlord or sublandlord for fourteen (14) of the Restaurants.

30. The Debtors purchase substantially all of their food and supplies from suppliers approved by the Franchisor. Kenneth O. Lester Company, Inc. d/b/a PFG Customized Distribution ("**PFG**") is the Debtors' sole broadline food and supply distributor and delivers to the Restaurants approximately twice each week, and the Debtors procure fresh produce through C.H. Robinson Worldwide, Inc. ("**C.H. Robinson**"), which acts as the Debtors' agent and arranges delivery to the Restaurants through regional produce distributors. Beef is the Debtors' largest food cost.

31. The Restaurants participate in the Outback Steakhouse system-wide gift card program administered by the Franchisor. Because most gift cards redeemed at the Restaurants are sold elsewhere in the Outback Steakhouse system, the monthly gift card settlements with the Franchisor have historically resulted in net payments to the Debtors, totaling approximately $16.4 million over the twelve (12) months ended September 2026.

**C. The Franchise Relationship**

32. Outback Steakhouse is a casual dining steakhouse concept founded in Tampa, Florida, in 1988. Bloomin', a publicly traded company, owns the Outback Steakhouse, Carrabba's Italian Grill, Bonefish Grill, and Fleming's Prime Steakhouse & Wine Bar restaurant concepts. As of June 28, 2026, there were 659 Outback Steakhouse restaurants in the United States, of which Bloomin' owned and operated 544 and franchisees operated 115. The Debtors operated seventy-one (71) of those franchised restaurants, or more than 60% of the Outback Steakhouse restaurants in the United States that Bloomin' does not own.

33. The Debtors operate the Restaurants under the Amended and Restated Outback Steakhouse® Restaurant Territorial Master Franchise Agreement, dated as of April 25, 2017 (as amended, the "**Master Franchise Agreement**"), among the Franchisor, non-Debtor Cerca Trova Restaurant Group, Inc. ("**CT RG**"), as developer, and a restaurant addendum for each Restaurant

(each, a "**Restaurant Addendum**").[3] The Company's development rights are further governed by an Amended and Restated Development Agreement, dated as of January 9, 2015 (as amended), and a Development Rights Rider, dated as of April 25, 2017.

34. Under the Master Franchise Agreement and its related documents, the Debtors pay the Franchisor a royalty of 3.5% of sales for the Restaurants in California and 5.0% of sales for the Restaurants in the other states, as well as national and local marketing contributions. Since December 31, 2023, the Debtors' advertising fees have been reduced to 2.25% of gross sales under their agreements with the Franchisor described in Part II below. In total, franchise fees represent approximately 6.3% of the Debtors' sales. The franchise agreements also impose remodeling and development obligations on the Company.

35. In connection with the Prepetition Credit Agreement, the Franchisor, the Prepetition Agent, and certain of the Debtors entered into a Franchisor Consent and Agreement, dated as of April 25, 2017, under which the Franchisor consented to the Prepetition Agent's liens and agreed to certain notice, cure, and standstill arrangements.

36. Bloomin' and its affiliates thus play several roles in the Debtors' business. The Franchisor is the Debtors' franchisor and a significant creditor; affiliates of Bloomin' are landlords or sublandlords of certain Restaurants; Bloomin' is a co-defendant with certain of the Debtors in certain pending putative class actions; and, as described in Part III.F below, the Franchisor is the proposed stalking horse purchaser and has agreed to provide postpetition financing to the Debtors as described in Part IV below.

---

[3] I previously served as a member of the board of directors of non-Debtor Cerca Trova Restaurant Group, Inc., the sole stockholder of Holdings. I resigned effective October 15, 2026, and no longer hold any position with that entity.

## II. ORGANIZATIONAL AND CAPITAL STRUCTURE

### A. Corporate Structure

37. Holdings, a Delaware corporation, is wholly owned by CT RG, a Delaware corporation that is not a Debtor. CT RG is owned by the T-Bird Restaurant Group Trust, an affiliate of H.I.G. Holdings owns all of the equity interests in Debtors OWRG, a California corporation, Cerca Trova Steakhouse, Inc., a California corporation ("**CTS Inc.**"), and CT Southwest, a Florida limited liability company. CTS LP, a California limited partnership, is owned approximately 59.4% by CTS Inc., as general partner, and approximately 40.6% by Holdings. A chart of the Debtors' organizational structure is attached hereto as Exhibit 1.

### B. Governance

38. The board of directors of each of Holdings, OWRG, and CTS Inc. consists of John Bittner, David Barr, and me, and the three of us are also the managers of CT Southwest. CTS Inc. is the general partner of CTS LP. The Debtors' officers are me, as Chief Executive Officer; Matthew Vitorino, as Chief Financial Officer and Secretary; Steve Muhlbaum, as Chief Operating Officer; and Zahira Amezcua, as Vice President of Human Resources.

39. The equity of Holdings and of each of the other Debtors is pledged to the Prepetition Agent under the Prepetition Credit Documents (as defined below). On April 28, 2020, following the occurrence of events of default under the Prepetition Credit Agreement, the Prepetition Agent exercised its rights with respect to the pledged equity and, acting as proxy holder, reconstituted the boards of directors of Holdings, OWRG, and CTS Inc. and the managers of CT Southwest, retaining me and appointing Mr. Bittner and Mr. Barr. Since then, the Prepetition Agent has voted the pledged equity at the Debtors' annual stockholder meetings, most recently on July 29, 2025.

40. Mr. Bittner and Mr. Barr bring substantial restructuring and restaurant industry experience to the Debtors' boards. Mr. Bittner is a Senior Managing Director at Accordion Partners, LLC, with more than twenty-five (25) years of restructuring advisory experience, including service as lead restructuring advisor and as interim chief executive officer, chief financial officer, and chief restructuring officer of companies in transition, including companies in the retail and restaurant industries. He was previously a partner in the restructuring practices of PricewaterhouseCoopers LLP and Grant Thornton LLP, and he is a certified public accountant and a certified turnaround professional. Mr. Barr is the founder and chair of PMTD Restaurants, a franchisee and operator of KFC and Taco Bell restaurants, and has served on the boards of directors of several restaurant companies, including Del Frisco's Double Eagle Steakhouses, Sullivan's Steakhouses, Mrs. Fields Cookies, TCBY, and Don Pablo's Mexican Grill.

**C. Prepetition Secured Debt**

41. The Debtors' principal funded debt arises under that certain Credit and Guaranty Agreement, dated as of April 25, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, including by the Forbearance Agreements (as defined below), the "**Prepetition Credit Agreement**" and, together with the related loan and security documents, the "**Prepetition Credit Documents**"), among Holdings, OWRG, CT Southwest, CTS Inc., and CTS LP, as borrowers, CT RG, as guarantor, the lenders party thereto from time to time (the "**Prepetition Lenders**"), and Goldman Sachs Specialty Lending Group, L.P., as administrative agent and collateral agent (in such capacities, the "**Prepetition Agent**").

42. The Prepetition Credit Agreement originally provided for senior secured credit facilities of up to $135.0 million, consisting of a $120.0 million term loan, a $7.5 million revolving credit facility, and a $7.5 million delayed-draw term loan facility, which was never drawn. The proceeds of the term loan were used to fund the 2017 acquisition, to refinance the

first- and second-lien debt incurred in connection with the 2015 acquisition, and to pay related fees and expenses. The current Prepetition Lenders are Goldman Sachs Specialty Lending Group, L.P. and its affiliates, funds managed by Comvest Partners, and GSP Steak Finance, LLC.

43. As of the Petition Date, approximately $122.5 million in principal amount of term loans and $6.5 million in principal amount of revolving loans were outstanding under the Prepetition Credit Agreement,[4] together with approximately $190.9 million of accrued and capitalized interest, fees, and other obligations (the "**Lender Accrued Obligations**"), for a total of approximately $319.9 million (collectively, the "**Prepetition Secured Obligations**"). The loans currently bear interest at the base rate (currently 7.00%) plus 8.25%, plus paid-in-kind interest of 0.50% and default interest of 2.00%.

44. The Prepetition Secured Obligations are secured by liens on substantially all of the Debtors' assets, including pledges of the equity interests in each of the Debtors (including CT RG's pledge of the equity of Holdings), deposit account control agreements over the Debtors' principal bank accounts, and leasehold deeds of trust on certain of the Debtors' restaurant leases.

45. The Prepetition Credit Agreement has been amended and supplemented several times, including by (a) the Waiver, Consent and First Amendment, dated as of September 25, 2018; (b) the Forbearance Agreement and Second Amendment, dated as of December 27, 2020 (the "**2020 Forbearance Agreement**"); (c) the Third Amendment, dated as of April 7, 2021; (d) Amendment No. 1 to Forbearance Agreement, dated as of November 20, 2023; and (e) the Forbearance Agreement and Fourth Amendment, dated as of December 31, 2023 (the "**2023**

---

4 The outstanding principal amount of the term loans exceeds the original $120.0 million principal amount because it includes amounts capitalized to the term loans on or before November 30, 2020.

**Forbearance Agreement**" and, together with the 2020 Forbearance Agreement, the "**Forbearance Agreements**"). These agreements are described in Part III.B below.

### D. Obligations to the Franchisor

46. In December 2020, the Debtors and the Franchisor entered into a Holistic Resolution Agreement and a Deferred Payment Agreement, each of which was amended and restated effective December 31, 2023 (as amended and restated, the "**Holistic Resolution Agreement**" and the "**Deferred Payment Agreement**," respectively). As of the Petition Date, approximately $13.9 million of royalties, marketing fees, and other obligations remains deferred under the Deferred Payment Agreement (the "**Deferred Franchisor Obligations**"). The Deferred Franchisor Obligations do not bear interest and become due upon a sale of the Company or the termination of the Holistic Resolution Agreement. Under the Stalking Horse APA (as defined below), upon the closing of the sale to the Stalking Horse Bidder (as defined below), the Franchisor will waive any cure costs owed to it and release the Debtors from all claims under the franchise agreements, the Holistic Resolution Agreement, and the Deferred Payment Agreement, including on account of the Deferred Franchisor Obligations. Under the Holistic Resolution Agreement, the proceeds of a sale of the Company are shared between the Prepetition Lenders and the Franchisor in accordance with an agreed waterfall.

### E. Unsecured and Subordinated Obligations

47. In addition to the Deferred Franchisor Obligations, the Debtors' unsecured and subordinated obligations include: (a) a $5.0 million subordinated promissory note issued to an affiliate of H.I.G. in 2017, which matured on October 25, 2022, and remains outstanding, together with accrued interest of approximately $1.75 million through the Petition Date, for a total of approximately $6.75 million; (b) accrued and unpaid management fees owed to an affiliate of H.I.G. of approximately $2.1 million, the payment of which is restricted under the

Prepetition Credit Documents;[5] (c) promissory notes payable to current and former Managing Partners and JVPs of approximately $0.5 million (the MP Buyout Obligations described in Part IV below); (d) accounts payable of approximately $5.9 million owed to approximately 240 vendors and landlords as of October 29, 2026; (e) claims arising from the litigation described in Part III.C below; and (f) obligations to employees, landlords, taxing authorities, and other creditors. In total, excluding the Deferred Franchisor Obligations and any other amounts owed to the Franchisor or its affiliates, any deficiency claim of the Prepetition Lenders, and contingent, unliquidated, or disputed claims, the Debtors estimate that they owe approximately $27 million on account of unsecured claims.

**F. Equity Interests**

48. As described above, Holdings is wholly owned by non-Debtor CT RG.

## III. EVENTS LEADING TO THESE CHAPTER 11 CASES

**A. Industry and Operating Headwinds**

49. The casual dining segment of the restaurant industry is highly competitive and sensitive to consumer discretionary spending. Over the past several years, the Debtors have experienced sustained declines in guest traffic. Traffic at the Restaurants declined approximately 3.1% in fiscal year 2023, 3.0% in fiscal year 2024, and 2.7% in fiscal year 2025, and declined by approximately 3.6% more in the first half of fiscal year 2026. The Debtors raised menu prices by approximately 7.8%, 5.0%, and 3.7% in fiscal years 2023, 2024, and 2025, respectively, but price increases no longer offset the loss of traffic and changes in menu mix, and same-store sales declined in fiscal year 2024 and fiscal year 2025.

---

5 Per H.I.G.'s estimate, the management fees reflect fees accrued through April 28, 2020, the date on which the Prepetition Agent exercised its rights with respect to the pledged equity. H.I.G. has not calculated management fees for any later period.

50. At the same time, the Debtors' labor costs have risen substantially. Approximately 54% of the Debtors' employees work in California, where successive increases in state and local minimum wages have raised the Debtors' hourly wage rates. From 2019 to 2022 alone, the Debtors' average back-of-house and front-of-house wage rates increased by approximately 26% and 23%, respectively. Restaurant labor costs increased from approximately 30.7% of sales in fiscal year 2019 to approximately 34.4% of sales for the twelve (12) months ended August 23, 2026. High employee turnover, which is characteristic of the industry, adds hiring and training costs.

51. Food and commodity costs have also increased. Beef is the Debtors' largest food cost, and the Debtors experienced commodity inflation of approximately 15% to 20% in 2022 and approximately 4% to 5% annually since then.

52. Other restaurant operating costs, including insurance, technology, and maintenance, increased from approximately $33.4 million in fiscal year 2019 to approximately $47.4 million in fiscal year 2025. Because many of the Debtors' other costs, including rent and franchise fees, are fixed or tied to sales, declining traffic has further compressed the Debtors' margins.

53. As a result, the Debtors' restaurant-level EBITDA margin declined from approximately 8.8% in fiscal year 2023 to approximately 5.0% for the twelve (12) months ended August 23, 2026, and the Debtors' consolidated adjusted EBITDA, as calculated under the Prepetition Credit Agreement, declined from approximately $22.1 million in fiscal year 2023 to approximately $8.4 million in fiscal year 2025 and approximately $6.3 million for the twelve (12) months ended August 23, 2026. A chart chronicling these fluctuations is illustrated below:

**Revenue, Labor Costs, and Restaurant-Level EBITDA Margin,**
**Fiscal Year 2019 through the Twelve Months Ended August 23, 2026**




## B. The Capital Structure and the Forbearance Agreements

54. The Debtors' current capital structure was established in connection with the 2017 acquisition, when the Company obtained $135.0 million of senior secured commitments to refinance its existing debt and fund the purchase of the Southwest restaurants. Beginning with the fiscal quarter ended December 30, 2018, the Debtors were unable to satisfy the financial covenants under the Prepetition Credit Agreement, and beginning in June 2019, interest under the Prepetition Credit Agreement accrued at the default rate.

55. The COVID-19 pandemic then severely disrupted the Debtors' business. Beginning in March 2020, government orders closed or restricted the Debtors' dining rooms, and the Debtors' revenue declined by approximately 35% in fiscal year 2020, from approximately $336.0 million to approximately $217.0 million. At the same time, the Debtors were unable to make scheduled payments of principal and interest under the Prepetition Credit Agreement. In

April 2020, the Prepetition Agent exercised its rights with respect to the pledged equity of Holdings, as described in Part II.B above.

56. In December 2020, the Debtors, the Prepetition Lenders, and the Franchisor reached a comprehensive agreement that allowed the Debtors to continue operating through the pandemic. Under the 2020 Forbearance Agreement, the Prepetition Lenders agreed to forbear from exercising remedies through December 31, 2023, including with respect to the April 25, 2022 maturity of the loans, and agreed that accrued interest would be capitalized rather than paid in cash. In exchange, the Debtors agreed to new minimum liquidity and minimum EBITDA covenants and to apply excess cash to the Prepetition Secured Obligations. Under the Holistic Resolution Agreement, the Franchisor waived approximately $5.7 million of royalty and marketing fees, deferred approximately $18.1 million of unpaid fees and other obligations, accepted payment of approximately $3.6 million of rent in installments, and permitted the Debtors to close certain restaurants. I believe that the support of the Prepetition Lenders and the Franchisor allowed the Debtors to keep their restaurants open and their employees working through the pandemic.

57. The Debtors' sales recovered in 2021 and 2022. The loans under the Prepetition Credit Agreement nonetheless matured on April 25, 2022, without being repaid or refinanced, and the Debtors continued to operate under the 2020 Forbearance Agreement. In 2023, the Debtors did not satisfy the minimum EBITDA covenant, and in November and December 2023, the parties entered into Amendment No. 1 to the 2020 Forbearance Agreement and the 2023 Forbearance Agreement, which extended the forbearance period to December 27, 2026 and reset the minimum EBITDA covenant to $15.0 million. At the same time, the Debtors and the Franchisor amended and restated the Holistic Resolution Agreement and the Deferred Payment

Agreement, which reset the Deferred Franchisor Obligations at approximately $13.9 million and extended their term to December 27, 2026.

58. Because interest under the Prepetition Credit Agreement has accrued at the default rate and been capitalized, the Debtors' obligations to the Prepetition Lenders have continued to grow. The Lender Accrued Obligations increased from approximately $11.0 million in November 2020 to approximately $172.5 million as of June 28, 2026. The Debtors' interest expense increased from approximately $21.0 million in fiscal year 2019 to approximately $45.9 million in fiscal year 2025, more than five (5) times the Debtors' covenant EBITDA for that year. The chart below highlights the growth of the Debtors' obligations:

**Growth of Prepetition Secured Obligations, December 2020 Forbearance through August 2026**




59. The Debtors did not satisfy the $15.0 million minimum EBITDA covenant for the fiscal quarters ended in June, September, and December 2025. On April 14, 2026, the Prepetition Agent delivered a Notice of Events of Default and Reservation of Rights. Although the Prepetition Agent has not elected to terminate the forbearance period, the notice left the

Debtors' forbearance subject to termination at the Prepetition Lenders' election, and the forbearance period expires by its terms on December 27, 2026.

**C. California Employment Litigation**

60. Like many restaurant operators in California, the Debtors have faced recurring wage-and-hour litigation, including class and representative actions under the California Labor Code and the Private Attorneys General Act of 2004. These matters have imposed significant costs on the Debtors over many years, including a $3.5 million class settlement in 2015, approximately $1.3 million in individual settlements of California employment claims from 2020 to 2026, and substantial defense costs. The Debtors dispute the allegations in the pending matters described below.

61. In 2019 and 2020, former employees filed putative class and representative actions against certain of the Debtors in the Superior Court of California, County of Los Angeles, captioned *Rejniak v. Cerca Trova Restaurant Concepts, Inc.*, No. 19STCV31099, and *Cano v. Cerca Trova Restaurant Concepts, Inc.*, No. 20STCV19516, which were later consolidated (together, the "**Cano Action**"). To resolve the Cano Action without any admission of liability, the parties agreed in 2024 to a class settlement under which the Debtors would pay $1.6 million, plus the employer's share of payroll taxes, to resolve the claims of approximately 18,900 current and former employees. The court granted final approval of the settlement on August 13, 2026, and the settlement payment will come due following entry of judgment and the expiration of the time to appeal. The Debtors cannot fund the settlement payment without significantly impacting their liquidity, as described in Part III.D below.

62. In the summer of 2026, two (2) additional putative wage-and-hour class actions were filed against certain of the Debtors in the Superior Court of California, County of Los Angeles: *Garcia v. Cerca Trova Steakhouse, L.P.*, No. 26STCV20517 (filed June 29, 2026), and

*Hernandez v. Out West Restaurant Group, Inc.*, No. 26STCV27635 (filed August 31, 2026). The *Hernandez* complaint asserts claims on behalf of all hourly employees who worked for the defendant Debtors in California during the four (4) years before the complaint was filed. These actions renew the Debtors' exposure to class-wide wage-and-hour claims and impose additional demands on the Debtors' management and liquidity at a critical time.

63. The Debtors are also defendants in three (3) other putative class actions relating to accessibility, menu representations, and gift cards, in two (2) of which Bloomin' is a co-defendant.

**D. The Debtors' Liquidity**

64. These pressures have exhausted the Debtors' liquidity. The cash in the Debtors' bank accounts declined from approximately $9.7 million at the end of fiscal year 2023 to approximately $5.4 million at the end of fiscal year 2025, and was approximately $5.7 million as of October 25, 2026. The Debtors project that they will have approximately $3.4 million of cash on the Petition Date, against weekly payroll and benefits of approximately $2.5 million and weekly food and liquor purchases of approximately $1.5 million. The Debtors' revolving credit facility is fully drawn, and the Debtors have no other source of financing. To preserve cash, the Debtors reduced capital expenditures from approximately $4.5 million in the first half of fiscal year 2025 to approximately $1.9 million in the first half of fiscal year 2026. As a result, the Restaurants have not received the level of capital investment needed to keep them in good condition, and many of them now require significant maintenance, repair, and remodeling. I estimate that this deferred investment totals approximately $21.4 million.

65. At the same time, the Debtors face significant near-term obligations, including the settlement payment in the Cano Action and the expiration of the forbearance period on December 27, 2026. Without a sale, the Debtors cannot meet these obligations while continuing

to operate the Restaurants, and without the use of cash collateral and the DIP Facility (as defined below), the Debtors could not continue to operate the Restaurants through the sale process.

**E. Restaurant Rationalization**

66. As part of their efforts to improve performance ahead of a sale, the Debtors have closed underperforming restaurants. In early 2026, the Debtors closed their restaurants in Brea and Pittsburg, California, in March and in Westminster, California, in June. Shortly before the Petition Date, the Debtors closed ten (10) additional restaurants that are not part of the proposed sale (the "**Closed Restaurants**") between October 11 and October 25, 2026, terminated the restaurant addenda to the Master Franchise Agreement for the Closed Restaurants with the Franchisor's consent, and, on or before the Petition Date, surrendered the premises to the landlords. The Debtors paid, or issued checks for, final wages, including accrued and unused vacation where applicable law requires, to the approximately 400 employees of the Closed Restaurants whose employment ended in connection with the closures, on or about their last day of work, and offered separation and release agreements providing for severance payments to approximately twenty-five (25) management employees of the Closed Restaurants, as described in Part IV.B below. The leases for the Closed Restaurants are the subject of the Debtors' first omnibus lease rejection motion filed concurrently herewith.

**F. The Debtors' Marketing Efforts and the Stalking Horse Bid**

67. The Company has sought a sale repeatedly over the past eight (8) years. In 2018, the Company conducted a sale process with the assistance of North Point Advisors. In 2022, the Company conducted a further sale process with the assistance of Piper Sandler & Co., in which the Company received several offers, none of which were economically viable. Neither process resulted in a transaction.

68. In 2025, the Company engaged in extended negotiations with a prospective purchaser regarding an out-of-court sale of substantially all of the Company's assets. The prospective purchaser delivered letters of intent in February, July, and October 2025, the last of which contemplated a purchase price of approximately $52.0 million, including the assumption of certain liabilities. The parties extended the prospective purchaser's exclusivity period through December 14, 2025, but no definitive agreement was reached as the Company's financial performance continued to decline.

69. On June 29, 2026, the Debtors engaged Brookwood as their investment banker to conduct a marketing process for the sale of the Company. Before Brookwood's engagement, on May 22, 2026, an affiliate of Bloomin' delivered a letter of interest to the Debtors. Brookwood prepared marketing materials and a virtual data room and, beginning the week of August 17, 2026, contacted 177 potential purchasers, consisting of 115 strategic parties and sixty-two (62) financial sponsors. Twenty (20) parties executed confidentiality agreements and received a confidential information memorandum and access to the data room. By September 17, 2026, the Debtors had received three (3) letters of intent, two (2) from third parties and one (1) from Bloomin'. Bloomin' submitted a revised letter of intent on September 25, 2026. Following arm's-length negotiations, Brookwood and the Debtors obtained significant improvements to Bloomin's proposal, and the parties executed a revised letter of intent on October 2, 2026. The marketing process is described more fully in the declaration of Anish Gandhi of Brookwood filed in support of the Bidding Procedures Motion (as defined below) (the "**Gandhi Sale Declaration**").

70. Following negotiations, the Debtors and the Franchisor (in such capacity, the "**Stalking Horse Bidder**") entered into an asset purchase agreement, dated as of November 1, 2026 (the "**Stalking Horse APA**"), under which the Stalking Horse Bidder will acquire

substantially all of the Debtors' restaurant assets for a cash purchase price of $26.3 million, plus an additional cash amount of up to $6.1 million to the extent certain specified liabilities assumed at closing are less than that amount, plus the assumption of certain liabilities, including the Debtors' gift card and other customer program obligations, plus the payment of cure costs for assumed contracts and leases, subject to certain limitations (including that, for restaurant leases, the Stalking Horse Bidder will pay only accrued and unpaid property taxes and percentage rent, up to $1.0 million and $600,000, respectively, in the aggregate), and subject to higher or otherwise better offers. The Stalking Horse Bidder will provide a deposit of $2.63 million within two (2) business days after the later of entry of an order approving the bidding procedures and execution of the Stalking Horse APA, and the Stalking Horse APA provides for a break-up fee of $790,000 (the "**Break-Up Fee**"), which is payable only if the Debtors consummate an alternative transaction and solely from its cash proceeds. The Stalking Horse APA does not provide for any expense reimbursement. If the Franchisor provides postpetition financing to the Debtors, amounts outstanding under that financing at closing will be credited dollar-for-dollar against the cash purchase price, and the Franchisor may credit bid those amounts at any auction. The cash purchase price includes $1.3 million that the Debtors must reserve in a segregated account and use solely to pay accrued but unpaid employee severance, bonuses, paid time off, and other accrued employee compensation for periods through the closing.

71. I believe that the Stalking Horse APA represents the best available path to maximize the value of the Debtors' business. The Stalking Horse Bidder is the Franchisor, and its bid is not subject to a financing contingency. The sale would preserve the Restaurants as going concerns, require the Stalking Horse Bidder to offer employment to substantially all of the Debtors' restaurant-level employees, subject to its normal hiring practices, and provide for the assumption of the Debtors' gift card and other customer program obligations. Because liquor

license approvals may not be obtained in every jurisdiction by the closing, the Stalking Horse APA contemplates interim management agreements, at the Stalking Horse Bidder's expense, under which, to the extent permitted by applicable law, the Stalking Horse Bidder may operate affected Restaurants pending those approvals for up to one hundred twenty (120) days after the closing. The proposed bidding procedures will permit any qualified party to submit a higher or otherwise better offer and, if the Debtors receive more than one (1) qualified bid, provide for an auction. Any competing bid must exceed the Stalking Horse Bidder's bid by at least the amount of the Break-Up Fee plus $250,000.

72. The purchase price under the Stalking Horse APA is lower than the values discussed in 2025. That decline reflects the continued deterioration in the Debtors' financial performance described above: the Debtors' covenant EBITDA declined from approximately $12.4 million for the twelve (12) months ended September 28, 2025 (the end of the last fiscal quarter before the October 2025 letter of intent) to approximately $6.3 million for the twelve (12) months ended August 23, 2026, a decline of nearly one-half.

**G. The Path Forward**

73. The Debtors commenced these chapter 11 cases to complete a value-maximizing sale of substantially all of their assets through a court-approved process. Concurrently herewith, the Debtors filed a motion seeking, among other things, approval of bidding procedures and of the sale (the "**Bidding Procedures Motion**"), which contemplates a bid deadline of December 8, 2026, an auction (if necessary) on December 11, 2026, and a sale hearing on December 15, 2026. Those dates are consistent with the sale milestones in the DIP Orders (as defined below), which require entry of an order approving the bidding procedures within fourteen (14) days after the Petition Date, and the Debtors have therefore also asked the Court to consider the bidding procedures on shortened notice. The Debtors intend to fund these chapter 11 cases with cash on

hand, cash generated by their operations, the use of cash collateral, and, to the extent necessary, advances under the DIP Facility, as described in Part IV below.

74. Throughout these chapter 11 cases, the Debtors will continue to operate the Restaurants in the ordinary course, pay their employees, and honor gift cards and other customer programs, subject to the Court's approval of the First Day Motions. I believe that the relief requested in the First Day Motions is necessary to maintain the Debtors' operations and the value of their business while the sale process proceeds.

75. The Restaurants have served their communities across five (5) states for more than three (3) decades. With the support of the Court and their stakeholders, the Debtors hope that these chapter 11 cases will allow the Restaurants to continue to do so under new ownership.

## IV. FACTS IN SUPPORT OF FIRST DAY MOTIONS

76. To minimize disruption to their operations and preserve the value of their business, the Debtors have filed the First Day Motions. I have reviewed each of the First Day Motions, including the exhibits thereto, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information, and belief. I believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption and is in the best interests of the Debtors' estates and their stakeholders. Where the Debtors request relief on an interim basis, I believe that the relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. Capitalized terms used in this Part IV and not otherwise defined have the meanings given to them in the applicable First Day Motion.

### A. Joint Administration Motion

77. Pursuant to the Debtors' *Motion for Entry of an Order Authorizing and Directing the Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* (the "**Joint**

**Administration Motion**"), the Debtors request that their chapter 11 cases be jointly administered for procedural purposes only under the case of Holdings.

78. The Debtors are affiliates. Holdings directly or indirectly owns all of the equity interests in each of the other Debtors, the Debtors are under common management, and each of the Debtors is a credit party under the Prepetition Credit Agreement. The Debtors share many creditors and other parties in interest. With five (5) affiliated Debtors, separate administration would require duplicative pleadings, notices, and orders to be filed in five (5) dockets and served on separate service lists.

**B. Wages Motion**

79. Pursuant to the Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Employee Wages, Tips, and Other Compensation, (II) Authorizing Honoring of Certain Prepetition Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Reimbursement for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments, and (VI) Scheduling Final Hearing* (the "**Wages Motion**"), the Debtors request authority to pay certain prepetition wages, tips, and other compensation, to honor and continue their employee benefit programs, and to remit related withholdings and payroll taxes, in each case subject to the caps set forth in the Wages Motion.

80. *Workforce.* As of the Petition Date, the Debtors employ approximately 3,669 individuals, excluding employees of the Closed Restaurants (the "**Employees**"), including approximately 180 salaried and 3,489 hourly Employees. Approximately thirty (30) Employees work in corporate and administrative roles, and the remainder work at or in support of the Restaurants. OWRG employs approximately 278 Employees, including the Debtors' corporate

staff, Managing Partners, JVPs, and salaried restaurant managers; CTS LP employs approximately 1,836 hourly Employees in California; and CT Southwest employs approximately 1,555 hourly Employees outside California. None of the Employees is represented by a union or covered by a collective bargaining agreement.

81. *Payroll.* The Employees are paid biweekly in arrears, on the Friday following the close of each two-week pay period ending on a Sunday, through the Debtors' payroll processor, InfoSync Services (the "**Payroll Processor**"). During fiscal year 2026 through October 2026, the Debtors' average gross payroll, excluding tips and the Closed Restaurants, has been approximately $3.4 million per pay period, and employer payroll taxes are approximately $410,000 per pay period. The Debtors' last prepetition payroll was paid on October 23, 2026, for the pay period ended October 18, 2026. As a result, substantially all of the compensation earned by the Employees for the pay period from October 19 through November 1, 2026, which will be paid on November 6, 2026, was earned before the Petition Date. I estimate that approximately $3.43 million of wages and salaries, including approximately $225,000 of prepetition payroll checks that had not cleared as of the Petition Date, was earned but unpaid as of the Petition Date (the "**Unpaid Compensation**"). Except for accrued paid time off that applicable state law requires to be paid upon the termination of a non-insider Employee, no Employee will receive more than $17,150 on account of prepetition compensation under the Wages Motion, and amounts remitted on account of Tips, which are not property of the Debtors' estates, do not count against that cap.

82. *Tips.* Servers, bartenders, and certain other restaurant Employees receive tips from guests, which are pooled and distributed among eligible Employees in accordance with each Restaurant's tip-pooling policy and applicable state law. Credit and debit card tips are paid to Employees daily through pay cards administered by Netspend or through payroll on the next

regular pay date. As of the Petition Date, approximately $630,000 of tips with respect to Employees had been collected but not yet remitted. Tips are paid by guests for the benefit of the Employees. Through Rain Technologies Inc. ("**Rain**"), under the Debtors' agreement with Netspend, Employees may also receive a portion of their earned but unpaid wages before the regular pay date; those advances, approximately $90,000 per pay period, are deducted from the Employees' paychecks and remitted to Rain.

83. *Managing Partner Program.* Each Restaurant is generally led by a Managing Partner, and JVPs oversee groups of Restaurants. In addition to base salary, Managing Partners receive periodic bonuses based on the distributable cash flow of their Restaurants and may receive supplemental performance payments, and JVPs receive monthly incentive payments equal to 1.5% of the EBITDAR of the Restaurants they oversee. The Managing Partners and JVPs are employed at will. Before the closure of the Closed Restaurants, there were approximately sixty-nine (69) Managing Partners and six (6) JVPs; following the closures and the transfer of Managing Partners to fill vacancies, there are currently fifty-nine (59) Managing Partners. During the twelve (12) months ended with fiscal period 9 of 2026, Managing Partner bonuses averaged approximately $19,400. None of the Managing Partners or JVPs is a director, officer, or person in control of the Debtors, a relative of any such person, or a holder of any equity interest in any Debtor. Before the Debtors adopted the current program, Managing Partners held equity interests in the limited partnerships that owned their Restaurants and served under five-year contracts. Upon the expiration of those contracts, the Debtors issued promissory notes to certain current and former Managing Partners on account of those interests, each payable in five (5) annual installments with interest (the "**MP Buyout Obligations**"). As of the Petition Date, approximately $145,000 of incentive payments under the Managing Partner program had been earned but not paid. As of November 1, 2026, the Debtors estimate that the

aggregate MP Buyout Obligations total approximately $522,000, payable in installments through January 2029, of which approximately $168,000 is owed to former Managing Partners and approximately $354,000 is owed to current Managing Partners and JVPs. The Debtors are not seeking authority to pay obligations under the MP Buyout Obligations, which the Debtors anticipate will be addressed, as to current Managing Partners and JVPs hired by the Stalking Horse Bidder, in connection with the proposed sale. Under the Stalking Horse APA, the Stalking Horse Bidder will pay the MP Buyout Obligations owed to certain Managing Partners and JVPs whom it hires, as listed on a schedule to the Stalking Horse APA.

84. *Paid Time Off and Benefits.* The Debtors provide eligible Employees with paid vacation, sick leave, and other leave in accordance with their policies and applicable law. As of the Petition Date, Employees (other than former Employees of the Closed Restaurants) had accrued approximately $1.1 million of unused vacation. The Debtors do not seek authority to pay any insider more than $17,150 on account of prepetition compensation. In California and Colorado, the Debtors pay accrued and unused vacation upon separation. The Debtors also provide medical and dental coverage through Aetna; vision coverage through VSP; life, accidental death and dismemberment, and disability coverage through Mutual of Omaha; health savings accounts; an employee assistance program; voluntary benefits; an employee meal program; and a 401(k) plan administered by Principal Life Insurance Company, to which the Debtors do not make matching contributions. The plan year for these benefits runs from October 1 through September 30, and the Debtors renewed their coverage for the plan year that began October 1, 2026. Workers' compensation coverage is addressed in the Insurance Motion, and the Wages Motion requests that the automatic stay be modified, to the extent applicable, solely to permit Employees to proceed with claims under the Debtors' workers' compensation program in the appropriate judicial or administrative forum.

85. *Severance.* The Debtors do not maintain a severance plan for non-insider Employees. In connection with the closure of the Closed Restaurants, the Debtors offered separation and release agreements to approximately twenty-five (25) non-insider management employees of the Closed Restaurants, providing for lump-sum severance payments totaling approximately $204,000, each payable only after the employee has executed the agreement and any period to consider or revoke the release has expired. No individual severance payment exceeds approximately $13,340. Before the Petition Date, the Debtors paid two (2) of these severance payments, totaling approximately $21,700, and the Debtors expect that the remaining payments, totaling approximately $182,000, will become payable after the Petition Date. The Debtors request authority to make them in an aggregate amount not to exceed $75,000 on an interim basis and $225,000 on a final basis, subject to the $17,150 per-individual cap.

86. *Corporate Bonus Program.* The Debtors maintain an annual bonus program for corporate Employees (the "**Corporate Bonus Program**"). Approximately twenty (20) non-insider salaried corporate Employees participate in the Corporate Bonus Program. Bonuses are determined after the end of each fiscal year based on the Debtors' performance and individual performance, are approved by the Debtors' board of directors, and are paid in February of the following fiscal year. The Debtors paid non-insider participants approximately $110,000 for fiscal year 2024 and approximately $117,000 for fiscal year 2025, and estimate that fiscal year 2026 bonuses of non-insider participants, which will be determined and become payable after the Petition Date, will total approximately $50,000. The Debtors request authority to continue the Corporate Bonus Program for non-insider Employees and to pay those bonuses only on a final basis and subject to the $17,150 per-individual cap, in an aggregate amount not to exceed $60,000. The Wages Motion does not seek authority to make any payment under the Corporate Bonus Program to any insider.

87. *Manager Bonus Program.* Approximately ninety (90) restaurant managers (other than Managing Partners and JVPs) at the Restaurants in Arizona, Colorado, Nevada, and New Mexico participate in a quarterly bonus program under which a manager may earn up to $3,375 per fiscal quarter if his or her Restaurant meets objectives for sales per labor hour, net sales growth, and guest ratings (the "**Manager Bonus Program**"). The Debtors estimate that bonuses for the fourth quarter of fiscal year 2026, which will be determined and become payable after the Petition Date, will total approximately $130,000. The Debtors request authority to continue the Manager Bonus Program and, upon entry of a final order, to pay bonuses under it when due, in an aggregate amount not to exceed $150,000.

88. *Expenses, Withholdings, and Payroll Taxes.* The Debtors reimburse Employees for business expenses incurred on the Debtors' behalf, deduct from Employees' pay and remit to the appropriate parties amounts for taxes, benefit contributions, garnishments, and similar items, and pay employer payroll taxes. As of the Petition Date, approximately $37,000 had been withheld from Employees' pay but not yet remitted, and approximately $350,000 of employer payroll taxes on account of prepetition payroll was owing.

89. The Employees are essential to the Debtors' operations and to the value of the Restaurants being sold. Many of the Employees live paycheck to paycheck and would suffer significant hardship if the Debtors failed to pay their prepetition compensation when due on November 6, 2026. Any significant attrition would disrupt the Restaurants' operations, impair guest service, and diminish the value of the business being marketed for sale.

90. The Wages Motion does not seek authority to pay any bonus, retention, incentive, or severance obligation to any insider. For completeness, I note that, before the Petition Date, in July 2026, OWRG entered into retention letter agreements with certain of the Debtors' officers and made retention payments to those officers under those agreements. In addition, under my

employment agreement, dated as of June 18, 2024, I am eligible for a bonus upon a change in control of the Company, including a sale of substantially all of its assets. Under a separate letter agreement of the same date, the Prepetition Agent and the Prepetition Lenders agreed to fund or pay amounts owing in respect of that bonus, including if my employment agreement is not assumed in a chapter 11 case. Any request to pay any of these obligations from the Debtors' estates would be made by separate motion.

**C. Tax Motion**

91. Pursuant to the Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees, (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing, and (III) Scheduling a Final Hearing* (the "**Tax Motion**"), the Debtors request authority to pay certain prepetition taxes and fees in the ordinary course of business, subject to the caps set forth in the Tax Motion.

92. In the ordinary course of business, the Debtors collect, withhold, or incur sales and use taxes, property taxes, franchise taxes, liquor license, business license, and permit fees, and other similar taxes and fees (collectively, the "**Taxes and Fees**"), which they remit to various federal, state, and local taxing, licensing, and regulatory authorities (collectively, the "**Taxing Authorities**"). As of the Petition Date, I estimate that the Debtors owe approximately $3.7 million of prepetition Taxes and Fees, consisting principally of approximately five (5) weeks of sales and use taxes (approximately $2.7 million) and approximately $0.9 million of property taxes. Of that total, approximately $2.0 million will become due before the final hearing on the Tax Motion.

93. *Sales and Use Taxes.* The Debtors collect sales taxes from guests on food and beverage sales at the Restaurants and remit them to Taxing Authorities in California, Arizona,

Colorado, Nevada, and New Mexico, including certain municipalities that administer their own sales taxes, and incur use taxes on certain purchases. The Debtors remit these taxes monthly or quarterly, depending on the jurisdiction.

94. *Property Taxes.* Taxing Authorities levy taxes on real property and on the business personal property at the Restaurants. The Debtors do not own any real property, other than improvements at certain Restaurants located on leased land. Many of the Debtors' leases are "triple net" leases under which the Debtors pay the real property taxes on the leased premises directly to the applicable Taxing Authorities, and the Debtors also pay taxes on the furniture, fixtures, and equipment at the Restaurants. Nonpayment of those taxes would result in penalties and would constitute a default under the applicable leases, which the Debtors expect to assume and assign in connection with the sale. The Debtors therefore seek authority to pay property taxes, including prepetition property taxes, as they come due, subject to the caps set forth in the Tax Motion, other than prepetition property taxes on the premises of the Closed Restaurants. Real property taxes that a lease requires the Debtors to reimburse to the landlord as additional rent are not addressed in the Tax Motion.

95. *Franchise Taxes.* The Debtors are subject to state franchise and similar taxes, and to annual report and similar fees, in the jurisdictions in which they are organized or qualified to do business. Non-Debtor CT RG is the common parent of the Company's consolidated federal income tax group. The Tax Motion does not seek authority to pay any Taxes and Fees owed by CT RG or any other non-Debtor affiliate, except to the extent a Debtor is liable for those Taxes and Fees, including as a member of a consolidated, combined, or unitary group.

96. *Licenses and Fees.* The Debtors must hold, and pay fees to maintain, liquor licenses, business licenses, health permits, and similar licenses and permits to operate the

Restaurants. The Debtors hold a liquor license for each Restaurant, and a lapse in any liquor license would impair both the operations and the going-concern value of the affected Restaurant.

97. *Audits.* Certain of the Debtors' Taxes and Fees are or recently have been subject to audit, including sales and use tax audits by the California Department of Tax and Fee Administration and the Cities of Thornton and Louisville, Colorado, and property tax audits by the County of Orange, California. The Debtors seek authority to pay any resulting assessments for prepetition periods only on a final basis and after notice to the parties identified in the Tax Motion.

98. Failure to pay the Taxes and Fees could cause Taxing Authorities to audit the Debtors, impose penalties and interest, suspend licenses, or take other action that would distract management and disrupt operations at a critical time. On an interim basis, the Debtors seek authority to pay Taxes and Fees, including any past-due amounts, up to the interim cap set forth in the Tax Motion, and seek authority to pay any assessments resulting from audits only on a final basis.

**D. Section 156(c) Application**

99. Pursuant to the Debtors' *Application for Entry of an Order Appointing Stretto, Inc. as Claims and Noticing Agent* (the "**Section 156(c) Application**"), the Debtors request authority to appoint Stretto, Inc. ("**Stretto**") as claims and noticing agent in these chapter 11 cases, effective as of the Petition Date.

100. The Debtors anticipate that there will be more than 14,000 entities to be noticed in these chapter 11 cases, including current and former Employees, landlords, vendors, and customers. Before selecting Stretto, the Debtors obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through

a competitive process. Based on those proposals, I believe that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.

**E. Creditor Matrix and Noticing Motion**

101. Pursuant to the Debtors' *Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and a Consolidated List of the Thirty Largest Unsecured Creditors, (II) Authorizing the Debtors to Serve Certain Parties in Interest by E-mail, (III) Authorizing Redaction of Certain Personally Identifiable Information, and (IV) Granting Related Relief* (the "**Creditor Matrix and Noticing Motion**"), the Debtors request authority to file a consolidated creditor matrix and a consolidated list of their thirty (30) largest unsecured creditors, to serve parties in interest by e-mail in accordance with the procedures set forth in the Creditor Matrix and Noticing Motion (the "**E-mail Service Procedures**"), and to redact the home addresses and e-mail addresses of individuals from their filings in these chapter 11 cases. The Debtors do not seek to redact the names of any individuals.

102. The Debtors share most of their creditors, and preparing separate creditor lists for each of the five (5) Debtors would be costly and largely duplicative. Restaurant employment is, by its nature, transient. Most of the Debtors' current and former Employees are part-time, hourly workers, many of whom move frequently and often do not update the home addresses on file with the Debtors after they relocate or leave the Debtors' employ. Approximately 14,100 individuals have been employed by the Debtors at some time during the four (4) years before the Petition Date, including approximately 3,700 current Employees and approximately 10,400 individuals who are no longer employed by the Debtors (the "**Former Employees**"). In my experience, and based on information provided to me by the Debtors' human resources personnel, the home addresses in the Debtors' records for many Former Employees are likely to be out of date. By contrast, an Employee's e-mail address generally follows the Employee from

one residence to the next, and the Debtors use it as the primary means of communicating with Employees regarding pay, scheduling, benefits, and other employment matters. The Debtors' records include e-mail addresses for approximately 99% of the Former Employees, and I understand that serving each notice in these chapter 11 cases on the Former Employees by first-class mail would cost approximately $16,300, compared with approximately $4,700 by e-mail. E-mail service will reduce that recurring cost and is more likely to reach a transient workforce. The Debtors will, however, serve the notices that most directly affect the rights of their other creditors, including the notice of commencement of these chapter 11 cases, any notice of a deadline to file proofs of claim, and notice of the sale hearing, by first-class mail on each party in interest, other than current and former Employees, for which the Debtors' books and records reflect a mailing address. The Debtors are concerned that publishing the home addresses and e-mail addresses of the Debtors' current and former Employees and other individual creditors would expose them to an undue risk of identity theft and could allow survivors of domestic violence, harassment, or stalking to be located.

**F. Cash Management Motion**

103. Pursuant to the Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms, (C) Continue Intercompany Transactions, and (D) Continue the Corporate Card Program, (II) Granting Administrative Expense Status to Postpetition Intercompany Claims, (III) Extending the Time to Comply with Section 345(b) of the Bankruptcy Code, and (IV) Granting Related Relief* (the "**Cash Management Motion**"), the Debtors request authority to continue to operate their cash management system, maintain their existing bank accounts and business forms, and continue their intercompany transactions and corporate card program, together with related relief.

104. *The Cash Management System.* The Debtors use a centralized cash management system to collect, concentrate, and disburse the cash generated by the Restaurants (the "**Cash Management System**"). The Cash Management System consists of eleven (11) bank accounts at Wells Fargo Bank, N.A. ("**Wells Fargo**") and one (1) account at JPMorgan Chase Bank, N.A. ("**JPMorgan**") (collectively, the "**Bank Accounts**"), four (4) of which are dormant. As of October 30, 2026, the aggregate balance of the Debtors' Bank Accounts at Wells Fargo was approximately $3.6 million, held principally in the Operating Account (as defined below). The Cash Management System is organized around a single operating account at Wells Fargo held by OWRG (the "**Operating Account**"). Cash receipts at the Restaurants are deposited through smart safes and armored-carrier services provided by several vendors into Wells Fargo depository accounts held by OWRG and CT Southwest; the Restaurants do not maintain separate bank accounts. Paymentech, LLC, for itself and on behalf of JPMorgan, processes the Debtors' Visa, Mastercard, and Discover transactions and settles those card sales to the JPMorgan account (debiting its fees from that account monthly in arrears), from which the Debtors transfer settled funds by wire to the Operating Account each business day, so that the JPMorgan account generally does not maintain a significant balance; American Express (net of its discount and fees) and the Debtors' third-party delivery services remit to Wells Fargo depository accounts. Each business day, Wells Fargo sweeps the depository accounts into the Operating Account and funds the Debtors' accounts payable account and three (3) payroll accounts (one for each of OWRG, CTS LP, and CT Southwest) from the Operating Account on a zero-balance basis.

105. *Bank Fees and Corporate Card Program.* The Debtors incurred bank fees of approximately $174,000 during the first eight (8) fiscal periods of 2026, or approximately $22,000 per month. The Debtors also maintain a commercial card program with Wells Fargo, under which corporate cards are issued to certain Employees for travel, restaurant supplies,

repairs, and other business expenses (the "**Corporate Card Program**"), with a credit limit of $50,000 and average monthly spending of approximately $81,000, which the Debtors pay down several times each month. If the Corporate Card Program were terminated, the Debtors' managers would lose a principal means of purchasing the goods and services needed to keep the Restaurants running.

106. *Intercompany Transactions.* Because the Operating Account and the accounts payable account are held by OWRG and the Debtors' receipts are concentrated in the Operating Account, the Debtors engage in transactions with one another in the ordinary course of business, including the deposit of receipts of CTS LP and CT Southwest into Bank Accounts held by OWRG and of American Express receipts of all of the Restaurants into a Bank Account held by CT Southwest, the daily sweep of those receipts into the Operating Account, and the funding of each Debtor's payroll, rent, vendor, tax, and other obligations from the Operating Account (the "**Intercompany Transactions**"). The Debtors have not historically recorded the Intercompany Transactions on an entity-by-entity basis. Beginning as of the Petition Date, the Debtors, with the assistance of their financial advisor, will account for postpetition Intercompany Transactions among the Debtors on a monthly basis using a reasonable allocation methodology, so that the Intercompany Transactions can be traced and prepetition and postpetition intercompany claims can be distinguished. The Debtors do not seek authority to make any payment to, or on behalf of, any non-Debtor affiliate or insider, including CT RG and H.I.G., on account of any prepetition or postpetition obligation, including management fees.

107. The Cash Management System is integrated with the Debtors' armored-carrier, card-processing, delivery, payroll, and vendor-payment arrangements. Requiring the Debtors to close the Bank Accounts and open new accounts at the outset of these chapter 11 cases would

disrupt the collection of restaurant receipts and the payment of Employees and vendors, to the detriment of the Debtors' operations and the sale process.

**G. Utilities Motion**

108. Pursuant to the Debtors' *Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, (IV) Authorizing the Debtors to Continue Paying the Utility Consolidator, (V) Authorizing Banks to Honor and Process Related Checks and Transfers, and (VI) Granting Related Relief* (the "**Utilities Motion**"), the Debtors request approval of their proposed adequate assurance of payment for future utility services and related procedures, and authority to continue paying their utility consolidator in the ordinary course.

109. The Debtors obtain electricity, natural gas, water, sewer, waste disposal and recycling, telecommunications, internet, and similar services (collectively, the "**Utility Services**") for the Restaurants and their corporate office from a number of utility companies. The Restaurants require electricity and gas for cooking, refrigeration, lighting, heating, and air conditioning; water and sewer service to prepare food, wash dishes, and satisfy health codes; and telecommunications and internet service to process card payments and run their point-of-sale systems. A Restaurant cannot remain open without these services, and perishable inventory would spoil within hours of an interruption. In addition, Budderfly, Inc. ("**Budderfly**") installs and operates energy-efficiency equipment at fifty-four (54) of the Restaurants and six (6) of the Closed Restaurants, holds the utility accounts at those locations in its own name, and bills the Debtors, through ENGIE (as defined below), for energy there under an Energy Management Outsourcing Contract, dated as of March 18, 2022.

110. The Debtors pay most of their electricity, natural gas, water, and sewer providers through ENGIE Insight Services Inc. ("**ENGIE**"), which receives, audits, and pays invoices on the Debtors' behalf from funds the Debtors must provide within one (1) business day after ENGIE presents each consolidated bill, for a fee of $4.35 per account per month (subject to a $1,000 monthly minimum) that has averaged approximately $1,200 per month. SLM Waste & Recycling Services, Inc. ("**SLM**"), which the Debtors pay directly, arranges and bills for waste removal, recycling, grease trap, and related facility services at most of the Restaurants and pays the underlying haulers. During the twelve (12) months ended August 23, 2026, the Debtors paid approximately $9.3 million to ENGIE and approximately $1.25 million to SLM, and paid approximately $11.6 million in the aggregate, or an average of approximately $963,000 per month, for Utility Services, of which approximately $9.7 million, or approximately $808,000 per month, related to the Restaurants and the corporate office. If ENGIE stops processing payments, the underlying utility companies will not be paid and could discontinue service. As of October 30, 2026, approximately $400,000 was outstanding for prepetition Utility Services, approximately $311,000 of which was billed by Budderfly, and the Debtors do not seek authority to pay those amounts, other than ENGIE's prepetition fees, which I estimate at approximately $2,500 and which the Debtors request authority to pay in an amount not to exceed $5,000.

111. As adequate assurance of payment, the Debtors propose to deposit $372,900, approximately two (2) weeks of the Debtors' average cost of Utility Services excluding the Closed Restaurants, into a segregated, interest-bearing account within twenty (20) days after entry of an interim order. The Debtors intend to pay all postpetition obligations for Utility Services in a timely manner from cash on hand, cash generated by operations, the use of cash collateral, and, to the extent necessary, advances under the DIP Facility. Because Budderfly holds the utility accounts at fifty-four (54) of the Restaurants in its own name, the Debtors also

request that Budderfly be prohibited from discontinuing, or causing any underlying provider to discontinue, Utility Services to the Restaurants on account of unpaid prepetition charges. Uninterrupted Utility Services are essential to the Debtors' operations and the sale process.

### H. Insurance Motion

112. Pursuant to the Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Their Insurance Policies and Pay Related Prepetition Obligations and (B) Renew, Supplement, Extend, or Purchase Insurance Coverage, and* Finance Related Premiums and *(II) Granting Related Relief* (the "**Insurance Motion**"), the Debtors request authority to maintain their insurance program, pay related prepetition obligations, renew, supplement, extend, or purchase insurance coverage in the ordinary course of business, and finance related premiums.

113. The Debtors maintain approximately fifteen (15) insurance policies (collectively, the "**Insurance Policies**") that provide coverage for, among other things, general and liquor liability; umbrella and excess liability; property and earthquake; workers' compensation and employers' liability; directors' and officers', employment practices, and fiduciary liability; crime; cyber; and food-borne illness. The aggregate annual premium for the 2025–2026 policy year was approximately $6.2 million (net of broker commissions). The Debtors obtain the Insurance Policies through Marsh & McLennan Agency, LLC (the "**Broker**"), to which they pay an annual service fee of approximately $450,000, and they pay third-party claims administration fees under certain of the Insurance Policies. The Debtors have paid the Broker's fee and the claims administration fees through the end of November 2026.

114. The Debtors financed the premiums for certain of the Insurance Policies for the 2025–2026 policy year under a premium finance agreement with FIRST Insurance Funding, which was payable in nine (9) monthly installments from January through September 2026. The

Debtors paid the final installment under that agreement in September 2026, and no amount remains outstanding. The Debtors pay the premium for their workers' compensation policy directly to the carrier, through a deposit and ten (10) monthly installments collected by ACH debit, based on estimated payroll and subject to audit after the end of the policy period, and paid the premium for their property policy in full. Certain of the Insurance Policies also require the Debtors to pay deductibles or self-insured retentions. No surety bonds or letters of credit support the Debtors' insurance program.

115. Other than the directors' and officers' liability, employment practices liability, fiduciary liability, and crime policies, which were extended before the Petition Date as described below, the Insurance Policies expire on December 1, 2026. Before the Petition Date, the Debtors, with the assistance of the Broker, extended their directors' and officers' liability, employment practices liability, fiduciary liability, and crime policies for ninety (90) days and purchased a six-year extended reporting period under those policies (other than the crime policy). The Debtors, with the assistance of the Broker, intend to extend the remaining Insurance Policies after the Petition Date and before they expire, and to pay the related premiums, currently estimated at approximately $1.7 million, during these chapter 11 cases in the ordinary course of business and, if necessary, to finance them. Premium financiers customarily require a first-priority security interest in the unearned premiums under the financed policies, and I do not believe that premium financing would be available on any other basis. Because the Debtors intend to sell substantially all of their assets during these chapter 11 cases, they may also need to modify, extend, or replace coverage during these cases, including in connection with the closing of the sale. I estimate that approximately $250,000 of prepetition obligations under the Insurance Policies will be outstanding as of the Petition Date, consisting principally of a potential audit adjustment under the workers' compensation policy that the carrier will not

determine until after the current policy period ends. I do not expect any material prepetition obligations under the Insurance Policies to come due during the first twenty-one (21) days of these chapter 11 cases, other than deductibles in respect of covered claims, and the Debtors request authority to pay prepetition obligations under the Insurance Policies of up to $50,000 pending a final hearing and up to $300,000 in the aggregate upon entry of a final order.

116. The Debtors' leases, the Master Franchise Agreement, and the Prepetition Credit Agreement require the Debtors to maintain insurance coverage, as do the Debtors' liquor licenses in certain jurisdictions. A lapse in coverage would force the Debtors to close the Restaurants.

**I. Customer Programs Motion**

117. Pursuant to the Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance, Administration, and Continuation of Certain Customer Programs, (II) Approving Procedures for Notice to Customer Program Participants, and (III) Granting Related Relief* (the "**Customer Programs Motion**"), the Debtors request authority to maintain and honor their customer programs in the ordinary course of business, to pay related prepetition obligations in cash subject to a cap of $50,000 pending a final hearing and $100,000 in the aggregate, and to modify or discontinue those programs upon fourteen (14) days' notice to the U.S. Trustee and any statutory committee, together with approval of procedures for notice to customer program participants.

118. *Gift Cards.* The Master Franchise Agreement requires the Debtors to participate in the Outback Steakhouse system-wide gift card program and to honor Outback Steakhouse gift cards, stored value cards, and similar instruments (collectively, the "**Gift Cards**") at face value, including Gift Cards sold by the Franchisor or by third parties, and to accept as full reimbursement for Gift Cards sold by third parties their face amount, less the fee or discount given to the third-party distributor. Bloomin' Brands Gift Card Services, LLC tracks and

processes the Gift Cards, and settles Gift Card sales and redemptions with the Debtors monthly, around the twentieth day of the following month, net of third-party gift card fees and distributor discounts and certain other charges billed by the Franchisor and its affiliates. As of October 2026, there was approximately $7.6 million in face value of outstanding Gift Cards sold by the Debtors and not yet redeemed, of which approximately $1.2 million was recorded as an accrued liability on the Debtors' books. As of the Petition Date, I estimate that approximately $1.1 million will be owed to the Debtors on account of prepetition Gift Card settlements. Under the Stalking Horse APA, the Stalking Horse Bidder will assume the Debtors' liabilities in respect of unredeemed Gift Cards, loyalty program rewards, and promotions.

119. *Other Programs.* The Debtors also offer promotions and participate in the Franchisor's national and regional promotions and Dine Rewards loyalty program, as the Master Franchise Agreement requires; provide refunds and guest-recovery accommodations; participate in community fundraising events, including through the "Outback Giveback" program; and accept credit and debit cards, mobile payments, and online and third-party delivery orders. Approximately 235,000 of the Debtors' guests participate in the Dine Rewards loyalty program. The vast majority of the Debtors' sales are made with non-cash payment methods, and card processing fees and delivery commissions are deducted from the amounts remitted to the Debtors or debited from the Debtors' accounts. The Debtors' credit card processing costs have averaged approximately 1.9% of total sales for the seven (7) fiscal periods ended July 26, 2026, and the delivery services charge commissions of approximately 10% to 25%.

120. Guests expect Gift Cards, promotions, and loyalty rewards to be honored, and any disruption would damage the goodwill and going-concern value of the Restaurants at the outset of the sale process. Honoring Gift Cards, promotions, and loyalty rewards generally involves providing food and beverages rather than making cash payments.

**J. Critical Vendor Motion**

121. Pursuant to the Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Shippers, Maintenance Providers, 503(b)(9) Claimants, and PACA/PASA Claimants; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief* (the "**Critical Vendor Motion**"), the Debtors request authority to pay certain prepetition claims of critical vendors, shippers, and maintenance providers, claims entitled to priority under section 503(b)(9) of the Bankruptcy Code, and claims under the Perishable Agricultural Commodities Act of 1930 ("**PACA**") and the Packers and Stockyards Act of 1921 ("**PASA**") (collectively, the "**Trade Claims**"), subject to the caps set forth in the Critical Vendor Motion.

122. The Restaurants depend on a network of vendors that supply proteins, produce, dairy, beverages, paper goods, cleaning supplies, and other goods, most of which must meet the Franchisor's specifications, and the Restaurants require frequent deliveries and quick turnover of perishable goods. As described above, PFG is the Debtors' sole broadline food and supply distributor, and C.H. Robinson procures the Debtors' fresh produce. The Debtors purchase beer, wine, and spirits from approximately forty-two (42) distributors on approximately thirty (30)-day terms, consistent with federal and state restrictions on the extension of credit by alcoholic beverage suppliers, and rent the linens, towels, and uniforms used every day at the Restaurants from Mission Linen Supply, which launders and delivers them on a recurring basis. Based on their accounts payable as of October 29, 2026, and estimated deliveries through the Petition Date, the Debtors estimate that approximately $5.72 million of Trade Claims will be outstanding as of the Petition Date, of which approximately $4.03 million is owed to PFG, approximately

$550,000 relates to produce purchased through C.H. Robinson, and approximately $279,000 is owed to beer, wine, and spirits distributors.

123. The Debtors reviewed their accounts payable and vendor lists to identify the vendors most essential to their operations, considering, among other things, whether a vendor provides unique goods or services or goods that the Debtors must purchase from Franchisor-approved suppliers, whether timely alternatives are available, and whether the vendor is likely to refuse to do business with the Debtors postpetition if its prepetition claim is not paid, and designated approximately sixty-six (66) vendors as critical vendors, to which the Debtors estimate they will owe approximately $4.75 million as of the Petition Date, including approximately $4.03 million owed to PFG. In addition, shippers and maintenance providers may assert possessory or mechanics' liens on the Debtors' goods and property, and the Debtors estimate that approximately $19,000 of the Trade Claims are owed to shippers and approximately $365,000 to maintenance providers, most of whom the Debtors dispatch through a third-party facilities management platform. The Debtors generally pay PFG approximately seventeen (17) days after invoice and pay C.H. Robinson and their beer, wine, and spirits vendors approximately thirty (30) days after invoice, so most goods received in the twenty (20) days before the Petition Date will remain unpaid as of the Petition Date. The Debtors estimate that approximately $4.76 million of the Trade Claims are entitled to priority under section 503(b)(9) of the Bankruptcy Code and that approximately $550,000 of the Trade Claims are owed to sellers of produce that supply the Debtors through C.H. Robinson and may assert claims under PACA. PFG may also assert PACA claims on account of produce included in its deliveries, and any such claims are included in the amount estimated to be owed to PFG.

124. The Debtors will condition payment of Trade Claims on the claimant's agreement to continue supplying goods or services on customary trade terms, and may also require a

claimant to release any of the Debtors' goods in its possession and any lien or trust interest on account of the paid claim. A disruption in the supply of food and beverages, even briefly, would force the Debtors to close Restaurants, cause guest attrition that would be difficult to reverse, and impair the value of the Restaurants being sold.

**K. Lease Rejection Motion**

125. Pursuant to the Debtors' *First Omnibus Motion for Entry of an Order (I) Authorizing the Rejection of Certain Unexpired Leases of Nonresidential Real Property Effective as of the Petition Date, (II) Authorizing the Abandonment of Any Remaining Personal Property Located at the Closed Restaurants, and (III) Granting Related Relief* (the "**Lease Rejection Motion**"), the Debtors request authority to reject the leases for the Closed Restaurants (the "**Rejected Leases**"), effective as of the Petition Date (or, if later, the date on which the applicable premises were surrendered to the landlord), and to abandon any personal property remaining at those premises.

126. The Closed Restaurants, which are located in Arizona, California, Colorado, and Nevada, operated at a loss or at margins that did not justify their occupancy costs, and they are not among the restaurants to be acquired under the Stalking Horse APA. After consultation with their advisors, the Debtors ceased operations at the Closed Restaurants between October 11 and October 25, 2026, transferred usable inventory and certain equipment to other Restaurants, and removed books, records, and devices containing customer or employee information. On October 29, 2026, the Debtors sent each landlord, by overnight courier with a copy by e-mail, a letter unequivocally surrendering possession of the premises effective as of October 30, 2026, together with the keys and alarm codes for the premises. The Debtors will serve the Lease Rejection Motion on each landlord on the Petition Date as notice of their intent to reject the applicable lease effective as of the Petition Date. Before the Petition Date, the Debtors and the Franchisor

terminated the restaurant addenda to the Master Franchise Agreement for the Closed Restaurants, and the Franchisor consented to the surrender of the premises and the rejection of the Rejected Leases. The Rejected Leases for the Closed Restaurants in Tucson and Mesa, Arizona; Colorado Springs and Highlands Ranch, Colorado; and Reno, Nevada, are guaranteed by Holdings, and the lease for the Closed Restaurant in Aurora, Colorado, under which an affiliate of Bloomin' is the landlord, is guaranteed by Bloomin'.

127. The aggregate base rent under the Rejected Leases is approximately $164,000 per month, or approximately $2.0 million per year, plus common area maintenance charges, real property taxes, insurance, and other charges. The Debtors no longer use the premises, and the Rejected Leases have no marketable value that would justify the cost of continuing to perform under them. The personal property remaining at the premises consists principally of kitchen equipment, furniture, and fixtures that are costly to remove and store and of little resale value. I believe that rejecting the Rejected Leases effective as of the Petition Date and abandoning the remaining property are a sound exercise of the Debtors' business judgment.

**L. DIP Motion**

128. Pursuant to the Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing from Outback Steakhouse of Florida, LLC, (B) Use Cash Collateral, (C) Provide Adequate Protection to Prepetition Secured Creditors; and (II) Granting Related Relief (the "**DIP Motion**"), the Debtors request entry of interim and final orders (the "**DIP Orders**") authorizing them to obtain postpetition financing from the Franchisor (in such capacity, the "**DIP Lender**") under a revolving credit facility of up to $5.5 million (the "**DIP Facility**"), to use the cash collateral of the Prepetition Agent and the Prepetition Lenders (the "**Cash Collateral**"), and to provide adequate protection to the Prepetition Agent and the Prepetition Lenders. The facts supporting the DIP Motion are set forth more fully in the

declaration of Douglas J. Brickley of Stout Risius Ross, LLC, the Debtors' proposed financial advisor (the "**Brickley Declaration**"), and the declaration of Anish Gandhi of Brookwood (the "**Gandhi DIP Declaration**"), each filed concurrently herewith, and I summarize them below.

129. *Need for Cash Collateral.* Substantially all of the Debtors' cash is subject to the liens of the Prepetition Agent and constitutes Cash Collateral. As described in Part III.D above, the Debtors' liquidity is nearly exhausted, and the Debtors' nine (9)-week cash flow budget (the "**Budget**") projects that they will have approximately $3.4 million of cash on the Petition Date. The Restaurants' payroll and benefits average approximately $2.5 million per week, and their food and liquor purchases average approximately $1.5 million per week. Without the immediate use of Cash Collateral, the Debtors could not pay their Employees or vendors, and the Restaurants would close, destroying the going-concern value that the sale process is designed to preserve.

130. *Need for the DIP Facility.* Cash Collateral alone is not sufficient. The Debtors' disbursements will be concentrated in the first weeks of these chapter 11 cases, when the Debtors expect to pay, subject to the Court's approval, approximately $5.2 million to critical vendors, shippers, maintenance providers, and section 503(b)(9) claimants and approximately $550,000 to PACA claimants, together with insurance premiums of approximately $1.7 million, the adequate assurance deposit for utility providers, and weekly funding of a reserve for professional fees. The Budget projects that, without the DIP Facility, the Debtors' cash would be negative by approximately $0.8 million by the week ending November 27, 2026. Because the Budget projects that, absent advances under the DIP Facility, the Debtors' cash would fall below the $2.0 million minimum liquidity amount in the week ending November 20, 2026, before the final hearing on the DIP Motion, the Budget contemplates an interim advance of $2.5 million in the first week of these cases and, after entry of the final DIP Order and an order approving the

bidding procedures, a further advance of approximately $2.0 million in the week of November 23, 2026, and projects that the Debtors will use approximately $4.5 million of the $5.5 million DIP Facility. The remaining availability provides a cushion against variances in a business whose weekly receipts fluctuate with seasonality, weather, and the effects of the chapter 11 filing.

131. *Alternative Financing.* The Debtors, with Brookwood, concluded that a separate solicitation of postpetition financing would not be productive. The Prepetition Secured Obligations of approximately $319.9 million far exceed the $26.3 million cash purchase price under the Stalking Horse APA, and the Debtors have no material unencumbered assets. As a result, there is no equity cushion or unencumbered value to support unsecured or junior-lien financing, and any third-party lender requiring a senior lien would have to prime the Prepetition Lenders without their consent. The Prepetition Lenders declined to provide postpetition financing and have consented to being primed only by the DIP Facility.

132. *Terms of the DIP Facility.* The DIP Facility is a liquidity backstop for the sale process. It bears no interest, and its only fee is a $50,000 commitment fee, together with reimbursement of the DIP Lender's reasonable and documented out-of-pocket expenses. Advances of up to $2.5 million will be available upon entry of the interim DIP Order, and the balance will be available upon entry of the final DIP Order and an order approving the bidding procedures. Advances are available only to the extent that the Debtors' projected cash on hand would otherwise fall below a minimum liquidity amount of $2.0 million. The DIP Lender will not be obligated to make advances if it is no longer the stalking horse bidder, the successful bidder, or the back-up bidder. The obligations under the DIP Facility will be secured by liens on substantially all of the Debtors' assets that, with the consent of the Prepetition Agent, will prime the liens securing the Prepetition Secured Obligations, subject only to a carve-out for

professional fees and certain other expenses (the "**Carve-Out**") and certain permitted prior liens, and will be entitled to superpriority administrative expense status, subject only to the Carve-Out and, to the extent payable, the Break-Up Fee. Pending entry of the final DIP Order, the liens securing the DIP Facility will not extend to avoidance actions or their proceeds. Under the Stalking Horse APA, amounts outstanding under the DIP Facility at closing will be credited dollar-for-dollar against the cash purchase price.

133. *Adequate Protection.* As adequate protection for any diminution in the value of their interests in the Debtors' property, the Prepetition Agent and the Prepetition Lenders will receive replacement liens and superpriority claims under section 507(b) of the Bankruptcy Code, each junior to the Carve-Out, the Break-Up Fee, and the liens and claims securing the DIP Facility; payment of the reasonable and documented fees and expenses of their counsel, solely to the extent set forth in the Budget and subject to recharacterization as payments of principal if they are determined to be undersecured; and financial reporting. Pending entry of the final DIP Order, the adequate protection liens and claims will not extend to avoidance actions or their proceeds.

134. *Other Terms.* The Debtors must operate within the Budget, subject to permitted variances, and deliver weekly variance reports. The Carve-Out will be funded weekly into a segregated account, in an aggregate amount of approximately $2.4 million through the anticipated closing of the sale under the Budget. The DIP Orders also contain milestones for the sale process, which require the Debtors, among other things, to file their sale motion within two (2) days after the Petition Date, to obtain entry of an order approving the bidding procedures within fourteen (14) days after the Petition Date, to set a bid deadline no later than December 8, 2026, to hold any auction on or before December 11, 2026, to hold the sale hearing on or before December 15, 2026, to obtain entry of a sale order on or before December 17, 2026, and to close

the sale on or before January 4, 2027, in certain cases subject to extension with the written consent of the Prepetition Agent. In addition, the Debtors will stipulate to the amount, validity, and priority of the Prepetition Secured Obligations and the related liens, subject to the right of parties in interest to challenge those stipulations within seventy-five (75) days after entry of the interim DIP Order (a period that the Debtors will ask the Court to shorten in the final DIP Order so that it ends at the sale hearing), will release claims against the Prepetition Agent, the Prepetition Lenders, and the DIP Lender (subject, as to the Debtors' estates, to the same challenge rights), and, subject to entry of the final DIP Order, will waive their rights under section 506(c) of the Bankruptcy Code, the "equities of the case" exception under section 552(b) of the Bankruptcy Code, and the doctrine of marshaling. The Budget also provides for the Debtors' continued payment of royalty fees, advertising and marketing fees, and other fees owed to the Franchisor or its affiliates, in their capacities as franchisor, under the franchise agreements (the "**Franchise Fees**"), including Franchise Fees attributable to the period before the Petition Date (capped at $1.5 million pending entry of the final DIP Order and excluding the Deferred Franchisor Obligations and any other amounts deferred under the Debtors' prepetition agreements with the Franchisor). The Franchisor has required, as a condition of its continued forbearance under the franchise agreements and under the Stalking Horse APA, that the Debtors remain current on all Franchise Fees through the closing of a sale. The Restaurants operate under those franchise agreements, and I believe that keeping them in good standing through the closing is necessary to preserve the going-concern value of the Restaurants, whether they are sold to the Stalking Horse Bidder or to another bidder.

135. The DIP Facility and the terms of the Debtors' use of Cash Collateral were negotiated at arm's length and in good faith among the Debtors, the DIP Lender, and the Prepetition Agent. I believe that the terms of the DIP Facility, which bears no interest and will

be drawn only as needed, are fair and reasonable, and that access to the DIP Facility and the use of Cash Collateral are necessary to avoid immediate and irreparable harm to the Debtors' estates, to maintain the Restaurants' operations, and to complete the sale process for the benefit of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 2, 2026

*/s/ David Goronkin*
David Goronkin
Chief Executive Officer