**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>CERCA TROVA RESTAURANT GROUP HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11749<br><br>(Joint Administration Requested) |

**MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING FROM OUTBACK STEAKHOUSE OF FLORIDA, LLC, (B) USE CASH COLLATERAL, (C) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS; AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), by and through their proposed undersigned counsel, file this motion (the "**Motion**") pursuant to sections 105, 361, 362, 363, 364, 503, 506(c), 507, and 552 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure (the "**Local Rules**") of the United States Bankruptcy Court for the District of Delaware (the "**Court**"), for entry of an interim order (the "**Interim Order**"), substantially in the form attached hereto as Exhibit A, and a final order (the "**Final Order**" and together with the Interim Order, the "**Proposed Orders**"), granting the following relief:

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Cerca Trova Restaurant Group Holdings, Inc. (5725); Out West Restaurant Group, Inc. (0849); Cerca Trova Steakhouse, Inc. (8902); Cerca Trova Steakhouse, L.P. (2006); and Cerca Trova Southwest Restaurant Group, LLC (8835). The Debtors' mailing address is 8885 Rio San Diego Drive, Suite 360, San Diego, California 92108.

i. authorizing the Debtors to enter into a revolving credit facility (the "**DIP Facility**") and obtain advances thereunder (the "**DIP Advances**") for up to $5,500,000 on a final basis (collectively, the "**DIP Obligations**"), including up to $2,500,000 that may be drawn by the Debtors after entry of the Interim Order (the "**Interim DIP Advances**"), to be provided by Outback Steakhouse of Florida, LLC (in its capacity as post-petition lender, the "**DIP Lender**") pursuant to the Proposed Orders which shall be the sole loan documents governing the DIP Facility (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and the terms of the Proposed Orders collectively, the "**DIP Facility Loan Documents**");

ii. granting to the DIP Lender automatically perfected superpriority DIP Liens (as defined in the Interim Order) upon all of the DIP Collateral (as defined in the Interim Order), which DIP Liens shall be on the terms and subject to the relative priorities set forth in the Proposed Orders, subject to the Carve-Out (as defined in the Interim Order);

iii. authorizing the Debtors to use Cash Collateral (as defined herein) which is subject to a prepetition lien and security interest in favor of Goldman Sachs Specialty Lending Group, L.P., in its capacity as Prepetition Agent (as defined below) under the Prepetition Credit Agreement, and the lenders party thereto from time to time ("**Lenders**" and, together with Prepetition Agent, individually and collectively, the "**Prepetition Secured Creditors**");

iv. granting adequate protection to the Prepetition Secured Creditors with respect to the Debtors' use of the Cash Collateral;

v. modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the DIP Lender, and/or the Prepetition Secured Creditors to implement and effectuate the terms and provisions of the DIP Facility Loan Documents and the Proposed Orders;

vi. subject to entry of the Final Order, waiving (x) the Debtors' ability to surcharge against the Prepetition Collateral (as defined below), the DIP Collateral, and/or the Adequate Protection Collateral (as defined in the Interim Order) pursuant to section 506(c) of the Bankruptcy Code or any other applicable principle of equity or law, (y) the applicability of the "equities of the case" exception under section 552(b) of the Bankruptcy Code and (z) the application of the equitable doctrine of "marshalling" or any other similar doctrine;

vii. scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order within twenty-one (21) days of the Petition Date;

viii. waiving any applicable stay with respect to the effectiveness and enforceability of the Interim Order and, as later applicable, the Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h)); and

ix. granting related relief.

In support of this Motion, the Debtors rely on and incorporate by reference the *Declaration of Anish Gandhi in Support of the Debtors' DIP Financing and Cash Collateral Motion* (the "**Gandhi Declaration**"), the *Declaration of Douglas J. Brickley in Support of the Debtors' DIP Financing and Cash Collateral Motion* (the "**Brickley Declaration**"), and the *Declaration of David Goronkin, Chief Executive Officer of Cerca Trova Restaurant Group Holdings, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "**Goronkin Declaration**"

and, together with the Gandhi Declaration and the Brickley Declaration, the "**First Day Declarations**"), and respectfully represent as follows:

## I. BANKRUPTCY RULE 4001 CONCISE STATEMENT[2]

1. Pursuant to Bankruptcy Rule 4001(b)(1), the Debtors submit the following concise statement of the material terms of the Interim Order:

| Summary of Material Terms | | Location |
|---|---|---|
| **Parties**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Borrowers: the Debtors.<br><br>DIP Lender: Outback Steakhouse of Florida, LLC<br><br>Prepetition Secured Creditors: Goldman Sachs Specialty Lending Group, L.P., as administrative agent and collateral agent under the Prepetition Credit Agreement, and the lenders party thereto from time to time. | Interim Order at Preamble, ¶ C(1)(a) |
| **DIP Loan and Borrowing Limits**<br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(A)* | Revolving debtor-in-possession facility in an aggregate principal amount not to exceed $5,500,000, including up to $2,500,000 that may be drawn by the Debtors after entry of the Interim Order. The DIP Facility is intended to serve as a contingent liquidity backstop during the Debtors' chapter 11 sale process. The Debtors expect ordinary course operations and authorized use of Cash Collateral to fund the majority of case expenditures, and DIP Advances may be drawn solely to the extent of a Liquidity Shortfall (i.e., to the extent the Debtors' projected cash on hand would otherwise fall below a Minimum Liquidity Amount of $2,000,000). The Interim DIP Advances are available upon entry of the Interim Order. DIP Advances in excess of the Interim DIP Advances are available upon entry of the | Interim Order at Preamble, ¶¶ 3, 11 |

[2] Any summary of the terms of the Interim Order contained in this Motion is qualified in its entirety by reference to the provisions of the Interim Order. To the extent there is a conflict between the Motion and the Interim Order, the Interim Order shall control. The Debtors reserve the right to supplement the statements made herein. Capitalized terms used but not otherwise defined in this Motion have the meanings given to them in the Interim Order.

| | | |
|---|---|---|
| | Final Order and the Bidding Procedures Order. | |
| **Interest Rate**<br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(B)* | 0% | Interim Order at ¶ 5 |
| **Term**<br>*Bankruptcy Rule 4001(c)(1)(B)* | From entry of the Interim Order until the earliest of repayment in full, consummation of a sale transaction with the DIP Lender, occurrence of a Termination Event, or such other termination date specified in the Proposed Orders and DIP Facility Loan Documents. | Interim Order at ¶¶ 5, 6, 23 |
| **DIP Loan Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(M)* | Customary events of default, including breach of the Proposed Orders, failure to satisfy case Milestones, dismissal, conversion, appointment of a trustee or examiner with expanded powers, unauthorized lien priming, prohibited variances, and other events specified in the Proposed Orders. | Interim Order at ¶¶ 23, 24 |
| **Liens and Priority Granted for New Credit**<br>*Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(i)(G), and Local Rule 4001-2(a)(i)(P)* | The DIP Liens are granted under sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on all DIP Collateral (excluding, pending entry of the Final Order, Avoidance Actions and the proceeds thereof), and are subject only to the Carve-Out and the Permitted Prior Liens. The DIP Liens prime the Prepetition Liens to the extent set forth herein, as consented to by the Prepetition Secured Creditors. At the closing of any sale, the DIP Obligations are satisfied first from the proceeds of the Debtors' unencumbered assets, if any, as of the Petition Date that are included in the sale and then from the proceeds of the DIP Collateral. Nothing in the Proposed Orders requires or effects any allocation of sale proceeds among assets. | Interim Order at ¶¶ 6–8, Ex. 3 |
| **Superpriority Expense Claims for New Credit**<br>*Bankruptcy Rule 4001(c)(1)(B)(i)* | All DIP Obligations shall constitute allowed superpriority administrative expense claims under section 364(c)(1), subject only to the Carve-Out and the Break-Up Fee (solely to the extent payable under the Stalking Horse Agreement and approved in the Bidding | Interim Order at ¶¶ 9, 10 |

| | | |
|---|---|---|
| | Procedures Order), with priority over all other administrative expense claims. Pending entry of the Final Order, the DIP Superpriority Claims are not payable from Avoidance Actions or the proceeds thereof. | |
| **Carve-Out**<br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(F)* | (a) Statutory fees payable to the U.S. Trustee and up to $25,000 of fees and expenses of a chapter 7 trustee; (b) allowed fees and costs of the Debtors' claims and noticing agent; (c) Allowed Professional Fees incurred before delivery of a Carve-Out Trigger Notice, up to the lesser of the budgeted and actual amounts, plus any transaction or success fee payable to Brookwood Associates, L.L.C. under its engagement letter as approved by the Court; and (d) Allowed Professional Fees of up to $200,000 incurred after delivery of a Carve-Out Trigger Notice. No more than $50,000 of Cash Collateral, DIP Collateral, Adequate Protection Collateral, or proceeds of the DIP Facility may be used by any Committee's professionals to investigate a potential Challenge. | Interim Order at ¶¶ 19–21 |
| **Parties with an Interest in Cash Collateral**<br>*Bankruptcy Rule 4001(c)(1)(B)(i)* | Goldman Sachs Specialty Lending Group, L.P., as administrative agent and collateral agent, and the lenders party to the Prepetition Credit Agreement. | Interim Order at Preamble, ¶ C(1)(a) |
| **Duration/Use of Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* | Cash Collateral may be used in accordance with the Budget from entry of the Interim Order until the earlier of January 4, 2027 (unless otherwise agreed in writing by Prepetition Agent) and the Termination Date, and thereafter solely as provided in the Proposed Orders. | Interim Order at ¶¶ 13, 26 |
| **Liens, Cash Payments, or Adequate Protection Provided for Use of Cash Collateral**<br>*Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii), Local Rule 4001-2(a)(i)(G), and Local Rule 4001-2(a)(i)(N)* | Solely to the extent of any diminution in the value of their interests in the Prepetition Collateral from and after the Petition Date, the Prepetition Secured Creditors receive: (a) Adequate Protection Liens, consisting of (i) Replacement Liens on post-petition property of the same priority as the Prepetition Liens, junior to the Carve-Out, the Permitted Prior Liens, the Break-Up Fee, and the DIP Liens, and (ii) Subordinated Adequate Protection Liens on the DIP Collateral, subject only to the Carve-Out and junior only to the DIP | Interim Order at ¶ 15(a)–(e) |

| | | |
|---|---|---|
| | Liens; (b) Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy Code, subject to the Carve-Out and the Break-Up Fee and junior only to the DIP Superpriority Claims; (c) Adequate Protection Payments of the reasonable and documented pre- and post-petition fees and expenses of Goldberg Kohn Ltd. and Richards, Layton & Finger, P.A., solely to the extent set forth in the Budget, subject to the right of the Debtors, the U.S. Trustee, and any Committee to object to the reasonableness of such fees and expenses within ten (10) days after receipt of summary invoices, and subject to recharacterization as payments of principal if the Prepetition Secured Creditors are determined to be undersecured; and (d) reporting and access rights. Pending entry of the Final Order, the Adequate Protection Liens and Adequate Protection Superpriority Claims do not extend to Avoidance Actions or the proceeds thereof. | |
| **DIP Budget**<br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(E)* | Nine (9)-week budget attached as Exhibit 1 to the Interim Order, as may be amended in accordance with the Proposed Orders. | Interim Order at ¶ 18(a), Ex. 1 |
| **Conditions to Borrowing**<br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(E)* | <u>Interim DIP Advances</u>: Entry of the Interim Order; execution of the Stalking Horse Agreement designating the DIP Lender or its affiliate as stalking horse bidder; and satisfaction of all conditions contained in the Interim Order.<br><br><u>DIP Advances in excess of the Interim DIP Advances</u>: In addition, entry of the Final Order and the Bidding Procedures Order. | Interim Order at ¶¶ 3, 11 |
| **Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Budget compliance, reporting obligations, sale Milestones, and other customary DIP and cash collateral covenants. | Interim Order at ¶¶ 4, 15(d), 18, Ex. 2 |
| **Fees, Expenses, and Additional Payments**<br>*Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(i)(B), and Local Rule 4001-2(a)(i)(K)* | The Debtors shall reimburse the DIP Lender's reasonable and documented out-of-pocket expenses and pay a DIP Commitment Fee of $50,000. No other origination fee, exit fee, unused line fee, or similar financing fee is contemplated. | Interim Order at ¶ 5 |

| | | |
|---|---|---|
| **Prepayments**<br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(I)* | Outstanding DIP Obligations shall be repaid in accordance with the DIP Facility Loan Documents and Proposed Orders, including any repayment through consummation of the contemplated sale transaction. | Interim Order at ¶ 6 |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral**<br>*Bankruptcy Rules 4001(c)(1)(B) and 4001(b)(1)(B)(ii)* | Working capital, payroll, vendor obligations, chapter 11 administrative expenses, and other expenditures authorized by the Budget, DIP Facility Loan Documents, and Proposed Orders. DIP Advances are intended to be used only to the extent Cash Collateral and operating receipts are insufficient to fund approved budgeted expenditures while maintaining the Minimum Liquidity Amount. Authorized uses include payment of Franchise Fees owed to the DIP Lender, as franchisor, whether attributable to the period before or after the Petition Date, solely to the extent set forth in the Budget (with prepetition Franchise Fees capped at $1.5 million pending entry of the Final Order). | Interim Order at ¶¶ 3, 12–14 |
| **Waiver or Modification of the Automatic Stay**<br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(S)* | Limited modification of the automatic stay to permit implementation of the DIP Facility, adequate protection package, and exercise of remedies following a Termination Event. | Interim Order at ¶¶ 22, 25, 29 |
| **Stipulations of the Debtors**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii), Local Rule 4001-2(a)(i)(C), Local Rule 4001-2(a)(i)(L), and Local Rule 4001-2(a)(i)(Q)* | Debtors stipulate to the validity, amount, enforceability, and priority of the Prepetition Obligations and Prepetition Liens, subject to the challenge rights described in the Proposed Orders. | Interim Order at ¶ C |
| **Releases, Waivers, or Limitation on any Claim or Cause of Action**<br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | Debtor releases in favor of the DIP Lender and Prepetition Secured Creditors, subject to challenge rights and limitations set forth in the Proposed Orders. | Interim Order at ¶¶ C(4), 17(b)–(c) |
| **Effect of Stipulations and Releases; Challenge Period**<br>*Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B)(iii), and 4001(c)(1)(B)(viii)* | Debtor releases, challenge rights for parties in interest, and challenge period provisions as set forth in the Proposed Orders. | Interim Order at ¶¶ 16, 17(b)–(c), 20 |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating** | Automatic perfection provisions and related protections contained in the Proposed Orders. | Interim Order at ¶ 22 |

| | | |
|---|---|---|
| **to the Perfection or Enforcement of a Lien**<br>*Bankruptcy Rule 4001(c)(1)(B)(vii)* | | |
| **Reporting Information**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Beginning November 6, 2026, weekly nine (9)-week Cash Flow Forecasts, Variance Reports, and budget compliance certificates; a Prohibited Variance occurs if the Debtors' cumulative Net Cash Flow from Operations is less than eighty-five percent (85%) of the budgeted amount, tested every two (2) weeks beginning with the Variance Report delivered November 20, 2026; monthly and quarterly financial statements and certain notices under the Prepetition Credit Agreement through the closing of the sale, and DIP Lender and Prepetition Secured Creditor access rights as set forth in the Proposed Orders. | Interim Order at ¶¶ 15(d)–(e), 18(b) |
| **Indemnification**<br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | Debtors shall indemnify the DIP Lender and related parties as provided in the DIP Facility Loan Documents. | Interim Order at ¶ 34 |
| **Section 506(c) and 552(b) Waivers; Marshalling**<br>*Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(i)(C)* | Waiver sought upon entry of the Final Order. | Interim Order at ¶¶ 17(a), 27 |
| **Milestones**<br>*Bankruptcy Rule 4001(c)(1)(B)(vi) and Local Rule 4001-2(a)(i)(H)* | 1. Sale Motion (including the request for entry of the Bidding Procedures Order) must be filed within two (2) days of the Petition Date.<br>2. Bidding Procedures Order must be entered within fourteen (14) days after the Petition Date (unless otherwise agreed in writing by Prepetition Agent).<br>3. The Final Order must be entered within twenty-one (21) days after the Petition Date.<br>4. Bid deadline must be no later than December 8, 2026 (unless otherwise agreed in writing by Prepetition Agent).<br>5. The auction (if necessary) must be held on or before December 11, 2026 (unless otherwise agreed in writing by Prepetition Agent). | Interim Order at ¶ 4, Ex. 2 |

| | | |
|---|---|---|
| | 6. The hearing to consider entry of a Sale Order must be held on or before December 15, 2026.<br>7. A Sale Order must be entered on or before December 17, 2026, reasonably acceptable to Prepetition Agent and the DIP Lender.<br>8. Sale must close no later than January 4, 2027 (unless otherwise agreed in writing by Prepetition Agent). | |

## II. JURISDICTION

2. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of these Chapter 11 Cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506(c), 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1.

## III. BACKGROUND

4. On the date hereof (the "**Petition Date**"), the Debtors commenced the Chapter 11 Cases. The Debtors are continuing to operate their businesses as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committee has been appointed or designated.

5. A description of the Debtors' operations, the reasons for commencing these Chapter 11 Cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the First Day Declarations filed contemporaneously herewith and incorporated herein.

**A. The Debtors' Prepetition Secured Indebtedness**

6. The Debtors' prepetition secured indebtedness arises under that certain Credit and Guaranty Agreement, dated April 25, 2017 (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "**Prepetition Credit Agreement**"), by and among Cerca Trova Restaurant Group Holdings, Inc. (*f/k/a T-Bird Restaurant Group Holdings, Inc.*), Out West Restaurant Group, Inc. (*f/k/a T-Bird Restaurant Group, Inc.*), Cerca Trova Southwest Restaurant Group, LLC (*f/k/a T-Bird Southwest Restaurant Group, LLC*), the other parties signatory thereto as "Borrower", Cerca Trova Restaurant Group, Inc. (*f/k/a T-Bird Restaurant Group, Inc.*), as "Guarantor", the other parties signatory thereto from time to time as "Credit Parties", Goldman Sachs Specialty Lending Group, L.P., as administrative agent, collateral agent, lead arranger, and syndication agent (in such capacities, together with any successors or assigns, "**Prepetition Agent**") and the Lenders party thereto from time to time. The Prepetition Credit Agreement was most recently amended pursuant to that certain Forbearance Agreement and Fourth Amendment to Credit and Guaranty Agreement, effective as of December 31, 2023.

7. The "Obligations" (as defined in the Prepetition Credit Agreement) arising under the Prepetition Credit Agreement and the other documents executed in connection therewith, including, without limitation, the "Collateral Documents" (as defined in the Prepetition Credit Agreement) (collectively, the "**Prepetition Loan Documents**"), are referred to herein as the "**Prepetition Obligations**." The liens and security interests granted by the Debtors in favor of the Prepetition Secured Creditors under the Prepetition Loan Documents securing such obligations are referred to herein as the "**Prepetition Liens**", and all of the "Collateral" (as defined in the Prepetition Credit Agreement) existing as of the Petition Date, including, for the avoidance of doubt, all proceeds, products, accessions, rents, and profits thereof, is referred to herein as the

"**Prepetition Collateral**." "**Cash Collateral**" means all cash and cash equivalents constituting cash collateral within the meaning of section 363(a) of the Bankruptcy Code in which the Prepetition Secured Creditors hold valid and perfected security interests.

8. As of the Petition Date, the aggregate outstanding Prepetition Obligations under the Prepetition Credit Agreement totaled not less than $319,897,490.05, consisting of approximately $122,500,000 of term loan obligations, $6,500,000 of revolving loan obligations, and approximately $190,897,490.05 of accrued amounts capitalized pursuant to the Prepetition Loan Documents, plus all other Prepetition Obligations, including, without limitation, all accrued, accruing, and unpaid interest (including default rate interest), fees, costs, expenses, and disbursements (including, without limitation, all attorneys' fees, accountants' fees, auditor fees, appraisers' fees, financial advisors' fees, and related fees, costs, expenses, and disbursements), in each case payable pursuant to the Prepetition Loan Documents and to the extent allowable under sections 502 and 506(b) of the Bankruptcy Code.

**B. The Debtors' Proposed Sale Process**

9. Prior to the Petition Date, the Debtors retained an investment banker and conducted a fulsome marketing process for the sale of substantially all of the Debtors' business assets. In connection with that marketing process, the Debtors engaged in extensive discussions with the DIP Lender concerning a potential acquisition of substantially all operating assets of the Debtors. Those discussions culminated in a stalking horse proposal pursuant to which the DIP Lender expressed its willingness to acquire substantially all operating assets through a chapter 11 sale process, which has been documented in that certain Asset Purchase Agreement, dated as of November 1, 2026, by and between the Debtors, as sellers, and the DIP Lender, as buyer (as the

same may be amended, supplemented, or otherwise modified from time to time, the "**Stalking Horse Agreement**").

10. The Debtors intend to seek approval of bidding procedures and conduct a value-maximizing sale process under section 363 of the Bankruptcy Code pursuant to a motion to be filed (the "**Sale Motion**") seeking entry of (a) an order approving bidding procedures and the Debtors' entry into the Stalking Horse Agreement (the "**Bidding Procedures Order**") and (b) an order approving the sale (the "**Sale Order**"). The Debtors believe the proposed stalking horse transaction provides the best available path to preserve going concern value, maximize recoveries for stakeholders, and maintain operational continuity during these Chapter 11 Cases.

11. The stalking horse proposal contemplates customary bidding procedures and bid protections designed to facilitate a competitive section 363 sale process. The Debtors anticipate seeking approval of such procedures through separate pleadings. The Stalking Horse Agreement provides for a cash purchase price of $26,300,000, plus the amount, if any, by which $6,100,000 exceeds the Specified Liabilities assumed by the DIP Lender at closing, together with the assumption of the Assumed Liabilities and the payment of all Cure Costs, subject to the limitations set forth in the Stalking Horse Agreement (each as defined in the Stalking Horse Agreement). The Debtors believe the stalking horse proposal establishes a baseline transaction that will promote value maximization and encourage participation by competing bidders, while preserving the estates' ability to pursue any higher or otherwise better offers.

12. The stalking horse proposal further contemplates an earnest money deposit of $2,630,000 (the "**Deposit**"), payable within two (2) business days after the later of entry of the Bidding Procedures Order and execution of the Stalking Horse Agreement, which deposit will be credited against the purchase price if the transaction closes.

13. The stalking horse proposal also contemplates other customary bid protections, including a proposed break-up fee of $790,000 (approximately three percent (3%) of the cash purchase price) (the "**Break-Up Fee**") payable solely from the cash proceeds of an Alternative Transaction (as defined in the Stalking Horse Agreement) and customary overbid protections.

**C. The Debtors' Need for Post-Petition Financing and Access to Cash Collateral**

14. The Debtors have a pressing need for the continued use of Cash Collateral to continue operating as a going concern (including funding their day-to-day operations which include payroll, vendors, and the costs of these Chapter 11 Cases), minimize disruption, and to ensure stable business operations in response to these Chapter 11 Cases. In the absence of the continued use of Cash Collateral, serious and irreparable harm to the Debtors and their estates will occur and impair, if not wholly undermine, the Debtors' goals in these Chapter 11 Cases.

15. The Debtors anticipate funding ordinary course operations primarily through the consensual use of Cash Collateral. The proposed DIP Facility is intended to operate as a contingent liquidity backstop and will only be drawn to the extent operating cash receipts and approved Cash Collateral are insufficient to satisfy budgeted expenditures while maintaining a minimum cash balance of $2,000,000. Accordingly, the DIP Facility provides critical liquidity protection while minimizing borrowing during the pendency of these Chapter 11 Cases.

**D. The Debtors' DIP Financing / Cash Collateral Negotiations**

16. Prior to the Petition Date, the Debtors and their advisors explored available financing alternatives. The Prepetition Secured Creditors, which assert liens on substantially all of the Debtors' assets, including their cash, declined to provide postpetition financing, and they consent to being primed only by the DIP Facility, on the terms and to the extent set forth in the Proposed Orders. The Prepetition Obligations of approximately $319.9 million far exceed the

$26.3 million cash purchase price under the Stalking Horse Agreement, and the Debtors have no material unencumbered assets. As a result, there is no equity cushion or unencumbered value to support unsecured or junior-lien financing, and a third-party lender requiring a senior lien would have to prime the Prepetition Secured Creditors without their consent. In light of these facts and the small, contingent nature of the facility, the Debtors' investment banker, Brookwood Associates, L.L.C., concluded that a separate solicitation of debtor-in-possession financing would have been futile. See Gandhi Declaration paragraphs 9-14. In connection with the DIP Lender's stalking horse proposal and proposed acquisition transaction, the DIP Lender agreed to provide a post-petition debtor-in-possession financing facility of up to $5.5 million to serve as a liquidity backstop during the chapter 11 sale process. The DIP Facility bears no interest, consistent with the stalking horse proposal submitted by the DIP Lender. Moreover, the DIP Facility contains no fees, other than the $50,000 DIP Commitment Fee and the Debtors' obligation to reimburse the DIP Lender for its reasonable and documented out-of-pocket fees and expenses associated with the DIP Facility.

17. The Debtors, the DIP Lender, and the Prepetition Secured Creditors engaged in extensive arm's-length negotiations concerning the use of Cash Collateral, the terms of post-petition financing, the proposed adequate protection package, and the structure of the contemplated chapter 11 sale process. Following those negotiations, the Debtors concluded that the DIP Facility and consensual Cash Collateral arrangement represent the best financing alternative available under the circumstances.

18. The parties further agreed that any obligations outstanding under the DIP Facility at the closing of the contemplated sale transaction will be satisfied through a dollar-for-dollar reduction of the cash purchase price otherwise payable by the DIP Lender or its affiliate purchaser.

As a result, the DIP Facility functions as a contingent liquidity backstop during these Chapter 11 Cases while simultaneously providing a built-in repayment mechanism upon consummation of the proposed sale.

19. The financing is intended solely to provide the limited liquidity necessary to preserve operations and bridge the Debtors to the consummation of a near-term sale transaction that is supported by the Prepetition Secured Creditors and expected to maximize value for the estates. Because the DIP Facility functions as a transaction-specific bridge to the closing of the proposed sale, rather than a traditional chapter 11 financing intended to fund an extended reorganization process, the universe of potential alternative lenders is particularly limited. In light of the Debtors' chapter 11 status, the short-term nature of the financing need, and the pending sale process, the Debtors have not identified and do not believe any third-party lender would have both the incentive and ability to provide financing on terms comparable to those offered by the DIP Lender. The DIP Facility bears no interest, requires only minimal fees, and is tailored to fund operations through closing of the contemplated sale, making it economically superior to any realistically available alternative. Moreover, further efforts to solicit competing financing proposals would likely increase costs, delay the sale process, and diminish estate value without a reasonable prospect of obtaining financing on better terms. Accordingly, the proposed DIP Facility represents the best financing available under the circumstances and is in the best interests of the estates and all stakeholders.

**E. The DIP Facility and Use of Cash Collateral Are in the Best Interests of the Estates**

20. Without the entry of the Proposed Orders, and the immediate entry of the Interim Order, and the resulting access to cash and financing, the Debtors and their bankruptcy estates will

be immediately and irreparably harmed. The continued viability of the Debtors and their business operations will be severely jeopardized.

## IV. RELIEF REQUESTED

21. The Debtors respectfully request entry of the Proposed Orders: (i) authorizing the Debtors to obtain the DIP Facility; (ii) authorizing the Debtors to incur and perform the DIP Obligations in accordance with the DIP Facility Loan Documents; (iii) authorizing the Debtors to continue to use Cash Collateral in which the Prepetition Secured Creditors have an interest in accordance with the terms and conditions of the Proposed Orders (including to pay Franchise Fees (as defined below), including Franchise Fees attributable to the period prior to the Petition Date, solely to the extent set forth in the Budget), and granting adequate protection to the Prepetition Secured Creditors for any diminution in value of their interests in the Prepetition Collateral resulting from, inter alia, the priming of the Prepetition Liens by the DIP Liens and the Debtors' use of the Cash Collateral; (iv) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the DIP Lender, and the Prepetition Secured Creditors to implement and effectuate the terms and provisions of the Proposed Orders and DIP Facility Loan Documents, subject to notice and a hearing as provided herein; and (v) granting related relief.

## V. BASIS FOR RELIEF

### A. The DIP Facility Represents a Sound Exercise of the Debtors' Business Judgment and Satisfies Section 364 of the Bankruptcy Code.

#### i. The DIP Facility Represents a Sound Exercise of the Debtors' Business Judgment.

22. Courts view a debtor's proposed DIP loan under the business judgment rule. *See In re All Land Investments, LLC*, No. 09-13790, 2009 WL 7226974 at *3 (Bankr. D. Del. Dec. 2,

2009) ("The terms of the proposed financing appear fair and reasonable, reflect the Debtor's exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration."); *In re QHB Holdings LLC*, No. 09-14312, 2009 WL 7226979 at *7 (Bankr. D. Del. Dec. 22, 2009). Under the applicable business judgment rule, courts defer to a debtor's decision to borrow money unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994).

23. Courts grant a debtor in possession considerable deference in its exercise of business judgment when securing post-petition financing. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."). When determining whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

24. Under the circumstances, the Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment. The DIP Facility is currently the only available and viable source of contingent backstop liquidity to support the Debtors' proposed chapter 11 sale process and ongoing operations. In addition, the Debtors negotiated the terms of the DIP Facility with the DIP Lender in good faith, at arms' length, and with the assistance of the Debtors' advisors. Based on such negotiations, the Debtors believe the terms of the DIP Facility, as set forth in the DIP Facility Loan Documents and Proposed Orders, are fair, reasonable, and reflective of the market for financings of this type, offer a significant benefit to the Debtors' estates, and constitute the best financing available under the circumstances. The Debtors further believe the repayment structure of the DIP Facility provides a substantial benefit to the estates because

any obligations outstanding under the DIP Facility at the closing of the contemplated sale transaction will be credited on a dollar-for-dollar basis against the cash purchase price otherwise payable by the DIP Lender or its affiliate purchaser. Accordingly, the Court should authorize the Debtors' entry into the DIP Facility as a reasonable exercise of the Debtors' business judgment.

25. The DIP Facility was negotiated in connection with the Debtors' broader chapter 11 sale strategy and the stalking horse transaction proposed by the DIP Lender. The Debtors believe the DIP Facility materially enhances the prospects for a successful sale transaction, preserves going concern value, and maximizes recoveries for stakeholders. The Debtors further believe that the combination of the DIP Facility, consensual use of Cash Collateral, and proposed sale process provides the most favorable available alternative under the circumstances.

**ii. The Debtors Should be Authorized to Grant the DIP Liens As Well As the DIP Superpriority Claims.**

26. Section 364(c) of the Bankruptcy Code provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – [¶] (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [¶] (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or [¶] (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c). In evaluating whether a debtor has satisfied the requirements of section 364(c) of the Bankruptcy Code, courts consider (a) whether the debtor made reasonable efforts to obtain unsecured credit under Section 364(a) and 364(b) of the Bankruptcy Code, (b) whether the credit transaction benefits the debtor or is necessary to preserve estate assets, and (c) whether the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and the proposed lender. *See In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990).

27. Section 364 of the Bankruptcy Code "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). A debtor need only demonstrate "by good faith effort that credit was not available without" the protections afforded to potential lenders by Section 364(c) of the Bankruptcy Code. *Id.*; *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show only that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

28. In this case, the Debtors satisfy the requirements of section 364(c) because credit is not otherwise available on an unsecured basis. The Debtors are in chapter 11, their assets are substantially encumbered by the liens of the Prepetition Secured Creditors (who approve the superpriority administrative expense status being requested in the Motion), and the proposed financing is intended only to fund operations during the brief period necessary to complete the contemplated sale transaction. Under these circumstances, a third-party lender would have little incentive to extend unsecured credit, particularly where repayment depends upon the successful closing of a bankruptcy sale and the lender would obtain no meaningful collateral support or economic upside to offset that risk. By contrast, the proposed DIP Facility is being provided by the stalking horse bidder, whose interest in preserving the value of the business and facilitating a timely closing uniquely aligns with the Debtors' financing needs. As a result, the Debtors believe that further efforts to obtain unsecured financing would be futile and would not produce a proposal on terms equal or superior to those available under the proposed DIP Facility.

29. Based on the foregoing, the Debtors submit that the requirements of section 364(c) of the Bankruptcy Code have been satisfied and, as such, the Court should authorize the Debtors

to grant the DIP Lender superpriority administrative expense status for the obligations under the DIP Facility as provided for in section 364(c)(1) of the Bankruptcy Code and the Proposed Orders.

**iii. Authorizing the Debtors to Grant Priming Liens on Encumbered Assets is Appropriate.**

30. The Debtors must have access to backstop post-petition financing to maximize the value of their estates. Section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

31. What constitutes adequate protection is decided on a case-by-case basis. *See In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 Bankr. LEXIS 5812, at *17 (Bankr. D. Del. Dec. 7, 2012) (citing cases). The focus of this requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy."). This standard applies equally with respect to a proposed "priming" financing under section 364(d) of the Bankruptcy Code. *See Satcon Tech.*, at *17 (citing cases).

32. As described above, the Debtors were unable to obtain post-petition financing on more advantageous terms than the DIP Facility. The DIP Facility contemplates the grant of priming liens pursuant to section 364(c) and 364(d) of the Bankruptcy Code. The Prepetition

Secured Creditors have consented to the use of Cash Collateral and the proposed DIP Facility, including superpriority priming liens in favor of DIP Lender, to the extent set forth herein, in exchange for the adequate protection package described in the Proposed Orders, including Adequate Protection Liens, Adequate Protection Superpriority Claims, Adequate Protection Payments, and other protections. Accordingly, the Debtors submit that the requirements of section 364(d)(1)(B) of the Bankruptcy Code are satisfied.

33. For the avoidance of doubt, nothing in the Proposed Orders is intended to determine the ultimate disposition, ownership, transferability, treatment, or release of any cause of action arising under chapter 5 of the Bankruptcy Code ("**Avoidance Action**") in connection with any future sale transaction and, pending entry of the Final Order, neither the DIP Collateral nor the Adequate Protection Collateral includes Avoidance Actions or the proceeds thereof. Any transfer, assignment, release, or other disposition of any such Avoidance Actions shall be subject to entry of the Final Order and any subsequently approved sale transaction.

34. Based on the foregoing, including the consent of the Prepetition Secured Creditors, the Debtors submit that the requirements for granting priming liens, to the extent set forth in the Proposed Orders, for the benefit of the DIP Lender pursuant to section 364(d)(1) of the Bankruptcy Code are satisfied and, therefore, respectfully request that the Court authorize the Debtors to grant such liens in accordance with the terms of the DIP Facility and the Proposed Orders.

**iv. Authorization to Pay Fees Under the DIP Documents is Appropriate and Necessary.**

35. Finally, the Debtors have agreed, subject to Court approval, to pay a $50,000 DIP Commitment Fee and certain expenses of the DIP Lender, as provided for in the Proposed Orders. The provisions regarding the payment of such fees and expenses were negotiated at arms'-length through the parties' respective counsel and are integral conditions to the bargain struck between

the Debtors and the DIP Lender. Aside from payment of the DIP Commitment Fee and the DIP Lender's out-of-pocket expenses, the DIP Facility does not require the Debtors to pay any other origination fees, DIP lending fees, exit fees, unused line fees, or other fees typical in DIP lending agreements. No financing, let alone with terms similar to those in the DIP Facility, is available to the Debtors with lower fees or better terms overall. Accordingly, the Debtors respectfully submit that the Court should authorize the Debtors to pay the DIP Commitment Fee and the DIP Lender's reasonable and documented out-of-pocket fees and expenses as provided for under the Proposed Orders.

## B. The DIP Lender Constitutes a Good-Faith Lender Under Section 364(e) of the Bankruptcy Code.

36. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. 11 U.S.C. § 364(e). Here, the terms of the DIP Facility are the result of the Debtors' reasonable and informed determination that the DIP Lender has offered the most favorable terms under the circumstances. All negotiations of the DIP Facility were conducted in good faith and at arms'-length through the parties' respective counsel and the terms of the DIP Facility have been vetted by the Debtors' board of directors. The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, the Proposed Orders, and the Budget, as amended or modified consistent with the foregoing. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code.

**C. The Debtors Should be Authorized to Use the Cash Collateral.**

37. The Debtors should be permitted to use Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code, which provides, in relevant part, that a debtor "may not use, sell, or lease cash collateral . . . unless: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

38. The Bankruptcy Code does not expressly define "adequate protection." Section 361 of the Bankruptcy Code, however, provides a non-exhaustive list of examples of adequate protection, specifically including replacement liens. *See* 11 U.S.C. § 361. Section 361(3) of the Bankruptcy Code goes on to provide the flexible concept that adequate protection may also take other forms, so long as the relief "will result in the realization by [creditor] of the indubitable equivalent of such [creditor's] interest in [cash collateral]." 11 U.S.C. § 361.

39. Generally, courts decide what constitutes adequate protection on a case-by-case basis. *See, e.g., Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.),* 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp,* No. 05-60442, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Columbia Gas Sys., Inc.,* Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what

constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.,* 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding") (internal citation omitted).

40. In *Swedeland,* the Third Circuit pointedly noted that the purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy." *In re Swedeland Dev. Grp., Inc.,* 16 F.3d at 564 (quoting *In re O'Connor,* 808 F.2d 1393, 1396 (10th Cir. 1987)); *see also Shaw Indus., Inc. v. First Nat'l Bank of Pa. (In re Shaw Indus., Inc.)*, 300 B.R. 861 (Bankr. W.D. Pa. 2003).

41. The Debtors propose to provide a variety of adequate protection—including the Adequate Protection Liens, Adequate Protection Superpriority Claims, and Adequate Protection Payments—to protect the interests of the Prepetition Secured Creditors in the Debtors' property from any diminution in value of the Prepetition Collateral resulting from the use of the Cash Collateral and the imposition of automatic stay (the "**Adequate Protection**"), and the Prepetition Secured Creditors consent to the use of Cash Collateral subject to receiving the Adequate Protection and the terms of the Proposed Orders.

42. The Budget also provides for the Debtors' continued payment of royalty fees, advertising and marketing fees, and other fees owed to the DIP Lender or its affiliates, in their capacities as franchisor, under the Debtors' franchise agreements (the "**Franchise Fees**"), whether attributable to the period before or after the Petition Date. The franchisor has required, as a condition of its continued forbearance under the franchise agreements and under the Stalking Horse Agreement, that the Debtors remain current on all Franchise Fees through the closing of a sale. In exchange, at the closing of the sale to the DIP Lender, the franchisor will waive any cure

amounts and release the Debtors from approximately $13.9 million of deferred obligations. The Debtors' restaurants operate under those franchise agreements, and the Debtors' going-concern value, including the value to be realized through the Stalking Horse Agreement or any Alternative Transaction, depends on keeping them in good standing through the closing of a sale. Courts in this Circuit authorize the payment of prepetition claims where payment is necessary to preserve the value of the estate. *See* 11 U.S.C. §§ 105(a), 363(b)(1); *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–26 (D. Del. 1999). The Proposed Orders authorize, but do not direct, the payment of Franchise Fees solely to the extent set forth in the Budget, cap the payment of prepetition Franchise Fees pending entry of the Final Order at $1.5 million, exclude any amounts deferred, capitalized, or evidenced by a promissory note under the Debtors' prepetition agreements with the franchisor that are not due and payable, and provide that payment of Franchise Fees does not constitute an assumption of any franchise agreement or a waiver of any of the Debtors' rights, claims, or defenses, including any right of setoff or recoupment.

**D. The Scope of the Proposed Carve-Out is Reasonable and Appropriate.**

43. The DIP Facility, Adequate Protection, and Proposed Orders subject the security interests and administrative expense claims under the DIP Facility and Adequate Protection to the Carve-Out. Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted. *See, e.g., In re Ames Dep't Stores,* 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve-Out does not directly or indirectly deprive the Debtors' estates or other

parties in interest of possible rights and powers. Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for payment of the Clerk of the Court and the U.S. Trustee fees, the fees and costs of the Debtors' claims and noticing agent, and professional fees.

**E. The Automatic Stay Should be Modified on a Limited Basis.**

44. The relief requested herein contemplates a modification of the automatic stay to (a) permit the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to incur all liabilities and obligations to the DIP Lender and Prepetition Secured Creditors under the Proposed Orders; (c) subject to the Carve-Out, authorize the Debtors to pay, and the DIP Lender and Prepetition Secured Creditors to retain and apply, payments made in accordance with the terms of the Proposed Orders; and (d) authorize the DIP Lender and the Prepetition Agent, subject to certain limitations in the Proposed Orders, to exercise remedies upon the occurrence and during the continuation of a Termination Event, following the expiration of the Default Notice Period and entry of a further order of the Court on a Stay Relief Motion (each as defined in the Interim Order). Stay modifications of this kind are ordinary and standard features for debtor in possession financing arrangements, and in the Debtors' business judgment, are reasonable and fair under the circumstances.

**F. Interim Relief Should be Granted.**

45. Bankruptcy Rule 4001 provides that a final hearing on a motion for authority to use cash collateral or obtain credit may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the court is authorized to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral or obtain DIP financing to the extent necessary to avoid immediate and irreparable harm to a debtor's estate

pending a final hearing. *See* Fed. R. Bankr. P. 4001(b)(2) & 4001(c)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

46. Pending the Final Hearing, the Debtors require immediate access to Cash Collateral and immediate access to up to $2,500,000 in Interim DIP Advances to satisfy the day-to-day needs of the Debtors' business operations. Access to liquidity will help to address any concerns of employees or vendors regarding the Debtors' financial health and ability to continue operations in light of these Chapter 11 Cases. The Debtors have an immediate need for liquidity to, among other things, maintain business relationships with their vendors and suppliers, pay payroll and certain benefits, and satisfy other essential working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

47. Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b) & (c), the Debtors request an expedited hearing to consider the Motion and entry of the Interim Order.

## VI. BANKRUPTCY RULE 4001(A)(3) SHOULD BE WAIVED

48. The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides, "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 4001(a)(3). As explained above and in the First Day Declarations, access to the DIP Facility and use of Cash Collateral is essential to prevent irreparable damage to the Debtors' operations. Accordingly, ample cause exists to justify the waiver of the fourteen (14)-day stay imposed by Bankruptcy Rule 4001(a)(3) to the extent such stay applies.

## VII. THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

49. Bankruptcy Rule 6003 empowers the Court to issue an order within the first twenty-one (21) days after the Petition Date granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" if such requested relief "is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, entry of an interim order granting this Motion is integral to the Debtors' ability to successfully transition into chapter 11 and to avoid disruptions to the Debtors' operations and potential penalties, to the detriment of the Debtors' estates and creditors. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## VIII. WAIVER OF BANKRUPTCY RULE 6004(H)

50. The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief requested in this Motion is necessary for the Debtors to preserve the value of their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen (14)-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## IX. NOTICE

51. Notice of this Motion will be given to the following parties or, in lieu thereof, to their counsel: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Lender; (iv) counsel to the Prepetition Agent; and (v) any party that has requested notice pursuant

to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## X. CONCLUSION

WHEREFORE, the Debtors respectfully request the entry of the proposed Interim and Final Orders, granting the relief requested herein and such other and further relief as is just and proper.

Dated: November 2, 2026
Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Bradford J. Sandler*
Bradford J. Sandler (DE Bar No. 4142)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: bsandler@pszjlaw.com
pkeane@pszjlaw.com

-and-

KTBS LAW LLP
Michael L. Tuchin (*pro hac vice* admission pending)
Nir Maoz (*pro hac vice* admission pending)
1801 Century Park East, Twenty-Sixth Floor
Los Angeles, California 90067
Telephone: (310) 407-4000
Facsimile: (310) 407-9090
Email: mtuchin@ktbslaw.com
nmaoz@ktbslaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*