**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>CERCA TROVA RESTAURANT GROUP HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11749<br><br>(Joint Administration Requested) |

**DECLARATION OF DOUGLAS J. BRICKLEY IN SUPPORT OF THE DEBTORS' DIP FINANCING AND CASH COLLATERAL MOTION**

I, Douglas J. Brickley, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a Managing Director of Stout Risius Ross, LLC ("**Stout**"), with offices at 1000 Main Street, Suite 3200, Houston, Texas 77002. Stout is the proposed financial advisor to the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in these chapter 11 cases. I am authorized to submit this declaration (this "**Declaration**") on behalf of Stout.

2. I submit this Declaration in support of the *Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing from Outback Steakhouse of Florida, LLC, (B) Use Cash Collateral, (C) Provide Adequate Protection to Prepetition Secured Creditors; and (II) Granting Related Relief* (the "**DIP Motion**"), filed contemporaneously herewith.[2]

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cerca Trova Restaurant Group Holdings, Inc. (5725); Out West Restaurant Group, Inc. (0849); Cerca Trova Steakhouse, Inc. (8902); Cerca Trova Steakhouse, L.P. (2006); and Cerca Trova Southwest Restaurant Group, LLC (8835). The Debtors' mailing address is 8885 Rio San Diego Drive, Suite 360, San Diego, California 92108.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the DIP Motion or the proposed Interim Order, as applicable.

3. Except as otherwise indicated, the statements in this Declaration are based on (a) my personal knowledge, (b) my discussions with the Debtors' management, other members of the Stout team working under my supervision, and the Debtors' other advisors, (c) my review of relevant documents, including the Debtors' books and records, or (d) my opinion based on my experience and my knowledge of the Debtors' business and financial condition. I am over the age of eighteen. I am not being compensated for this testimony other than through the compensation Stout will receive as a professional retained by the Debtors, none of which is payable on account of this testimony. If called upon to testify, I could and would testify competently to the facts set forth herein.

## I. BACKGROUND AND QUALIFICATIONS

4. Stout is an independent global advisory firm offering financial advisory services, transaction advisory, and investment banking for privately held businesses, portfolio companies of private equity firms, and divisions of large corporations. Stout's Corporate Recovery Services group specializes in advising debtors, lenders, and other creditors of middle-market companies navigating varying levels of financial distress, and has extensive experience with transactions both out of court and in chapter 11.

5. I am a Managing Director in Stout's Corporate Recovery Services practice in Houston. I have more than thirty years of experience in financial advisory and investment banking services, including financial and operational restructurings, valuations, solvency analyses, investment banking and corporate finance transactions, asset divestitures, and troubled-company due diligence for clients in numerous industries. Before joining Stout, I was a Managing Director at The Claro Group, LLC, where I led the Corporate Finance and Restructuring Services practice. Before that, I was an investment banker in the restructuring and recapitalization investment banking practice of a global investment banking firm, and I worked

in the restructuring practices of consulting firms, middle-market investment banks, and international public accounting firms. I hold a Bachelor of Science in Political Science from Texas A&M University and a Master of Business Administration, with a concentration in finance, from the Hankamer School of Business at Baylor University. I am a Certified Turnaround Professional and a Certified Insolvency and Restructuring Advisor. My representative chapter 11 engagements include, among others: (a) *In re And Go Concepts*, *LLC*, *et al.*, Case No. 26-90753 (Bankr. S.D. Tex.), in which I serve as Chief Restructuring Officer and Stout serves as financial advisor to the debtors; (b) *In re TAWR Property Owner, Ltd.*, *et al.*, Case No. 26-90162 (Bankr. N.D. Tex.), in which I serve as Chief Restructuring Officer and Stout serves as financial advisor to the debtors; (c) *In re Razzoo's, Inc.*, *et al.*, Case No. 25-90522 (Bankr. S.D. Tex.), in which Stout served as financial advisor to the debtors and as sell-side advisor on the sale of the debtors' assets under section 363 of the Bankruptcy Code; and (d) *In re Dynacq Healthcare, Inc.*, *et al.*, Case No. 25-90798 (Bankr. S.D. Tex.), in which Stout served as financial advisor to the debtors.

## II. STOUT'S RETENTION

6. The Debtors engaged Stout under an engagement agreement dated October 2, 2026.[3] Since then, Stout has, among other things, worked with the Debtors' management to (a) prepare and update the Debtors' cash flow forecasts; (b) analyze the Debtors' liquidity and the financing needed to operate through a sale of their business; (c) prepare the Budget (as defined below) and a related sources and uses analysis; (d) assist in preparing the Debtors' first day motions; and (e) respond to information requests from the Prepetition Secured Creditors and the

[3] The terms of Stout's engagement, including its compensation, will be described in the Debtors' application to retain Stout.

DIP Lender. Through this work, I and the other members of the Stout team have become familiar with the Debtors' business, operations, and financial condition.

## III. THE BUDGET

7. Under my supervision, Stout worked with the Debtors' management to prepare a nine-week cash flow forecast, a copy of which is attached as Exhibit 1 to the proposed Interim Order (the "**Budget**"). The Budget projects the Debtors' cash receipts and disbursements on a weekly basis from the week of the Petition Date through the week ending January 1, 2027.

8. The Budget is based on the Debtors' historical results and on assumptions developed with management, including assumptions about restaurant sales, the effect of the chapter 11 filing on sales and on vendor terms, payroll, rent, taxes, franchise fees, and other operating costs. It also includes the costs of these chapter 11 cases, including payments to critical vendors and PACA and PASA claimants, adequate assurance deposits for utility providers, weekly funding of the Carve-Out Reserve Account for professional fees, fees payable to the U.S. Trustee, and the fees and expenses of the DIP Lender and the Prepetition Secured Creditors payable under the Proposed Orders, in each case subject to Court approval.

9. Based on my experience and my work with the Debtors, I believe that the Budget is a reasonable, good-faith estimate of the Debtors' cash receipts and disbursements during the period it covers. I also believe that the Budget is adequate, taking into account all projected cash flows, including the DIP Facility, and the use of Cash Collateral, to pay administrative expenses as they come due during that period.

## IV. THE DEBTORS' NEED FOR THE DIP FACILITY AND USE OF CASH COLLATERAL

10. Substantially all of the Debtors' cash is subject to the liens of the Prepetition Secured Creditors and is Cash Collateral. The Budget projects that the Debtors will have

approximately $3.4 million of cash on the Petition Date. The Debtors operate sixty-one restaurants. Their payroll and benefits average approximately $2.5 million per week, and their food and liquor purchases approximately $1.5 million per week. Without the use of Cash Collateral, the Debtors could not pay employees or vendors, and their restaurants would close.

11. Cash Collateral alone, however, is not sufficient. Disbursements are heavily concentrated in the first weeks of these cases, when the Debtors expect to pay, subject to Court approval, approximately $5.2 million to critical vendors and approximately $0.55 million to PACA and PASA claimants, together with insurance premiums of approximately $1.7 million, a utility deposit of approximately $0.4 million, and weekly funding of the Carve-Out Reserve Account. The Budget projects that, without the DIP Facility, the Debtors' cash would be negative by approximately $0.8 million by the week ending November 27, 2026. The Budget also provides for the payment of approximately $1.4 million of Franchise Fees in the week of November 16, 2026, before the Final Hearing, which relate to the period before the Petition Date and are within the cap on prepetition Franchise Fees pending the Final Hearing under the proposed Interim Order.

12. Because the Budget projects that, absent DIP Advances, the Debtors' cash would fall below the Minimum Liquidity Amount of $2,000,000 in the week ending November 20, 2026, before the Final Hearing, the Budget contemplates Interim DIP Advances of $2,500,000 in the first week of these cases, which is the amount needed to avoid immediate and irreparable harm to the Debtors' estates pending the Final Hearing, and a further DIP Advance of approximately $2,000,000 in the week of November 23, 2026, after entry of the Final Order and the Bidding Procedures Order. In total, the Budget projects that the Debtors will draw approximately $4.5 million of the $5,500,000 DIP Facility. Under the proposed Interim Order,

DIP Advances are available only to the extent that the Debtors' projected cash on hand would otherwise fall below the Minimum Liquidity Amount. In my view, the remaining availability of approximately $1.0 million under the DIP Facility provides an appropriate cushion against variances in a restaurant business whose weekly receipts fluctuate with seasonality, weather, and the effects of the chapter 11 filing.

13. The DIP Facility will also signal to the Debtors' employees, vendors, landlords, and guests that the Debtors have the liquidity to continue operating in the ordinary course while they complete the sale process. Without it, I believe that the Debtors would face a real risk of being unable to operate their restaurants through the closing of the sale, to the detriment of all stakeholders.

## V. THE BUDGET COVENANTS ARE WORKABLE

14. I understand that the proposed Interim Order requires the Debtors to deliver weekly variance reports and to remain within the Budget, subject to a variance test under which the Debtors' Net Cash Flow from Operations, measured cumulatively from the Petition Date and tested every two weeks, may not be less than eighty-five percent (85%) of the amount forecast in the Budget. Based on my experience and the Debtors' historical variability in weekly receipts and disbursements, I believe that the Debtors can comply with these reporting and variance requirements.

15. The Budget also provides for weekly funding of the Carve-Out Reserve Account in an aggregate amount of approximately $2.4 million through the anticipated closing of the sale, and for payment of the Prepetition Secured Creditors' professional fees and expenses as Adequate Protection Payments to the extent set forth in the Budget.

## VI. CONCLUSION

16. For these reasons, I believe that the Budget is reasonable, that the Debtors require immediate access to the DIP Facility and the use of Cash Collateral to avoid immediate and irreparable harm to their estates, and that the interim relief requested in the DIP Motion is limited to the amount necessary for the Debtors to operate until the Final Hearing.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 2, 2026
Houston, Texas

*/s/ Douglas J. Brickley*
Douglas J. Brickley
Managing Director
Stout Risius Ross, LLC