**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>CERCA TROVA RESTAURANT GROUP HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11749<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF: (A) AN ORDER (I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN ASSUMED LIABILITIES AND PERMITTED ENCUMBRANCES AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BIDDING PROCEDURES AND ASSUMPTION AND ASSIGNMENT PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (III) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE AGREEMENT AND APPROVING THE BREAK-UP FEE AND (IV) GRANTING RELATED RELIEF; AND (B) AN ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN ASSUMED LIABILITIES AND PERMITTED ENCUMBRANCES, (II) APPROVING THE STALKING HORSE AGREEMENT, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

Cerca Trova Restaurant Group Holdings, Inc. and its affiliated debtors and debtors in possession (the "**Debtors**") in the above-captioned chapter 11 cases (the "**Cases**") hereby move (the "**Motion**") the United States Bankruptcy Court for the District of Delaware (the "**Court**"), pursuant to sections 105, 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cerca Trova Restaurant Group Holdings, Inc. (5725); Out West Restaurant Group, Inc. (0849); Cerca Trova Steakhouse, Inc. (8902); Cerca Trova Steakhouse, L.P. (2006); and Cerca Trova Southwest Restaurant Group, LLC (8835). The Debtors' mailing address is 8885 Rio San Diego Drive, Suite 360, San Diego, California 92108.

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for the entry of: (a) an order, substantially in the form attached hereto as Exhibit A (the "**Bidding Procedures Order**"), (i) scheduling a hearing (the "**Sale Hearing**") on approval of the proposed sale (the "**Sale**" or the "**Sale Transaction**") of substantially all of the Debtors' assets relating to their Outback Steakhouse® restaurants, other than the Excluded Assets (the "**Assets**"), free and clear of all encumbrances other than the Assumed Liabilities and the Permitted Encumbrances, to Outback Steakhouse of Florida, LLC (together with any permitted assignee under section 12.4 of the Stalking Horse Agreement, the "**Stalking Horse Bidder**" and, in its capacity as franchisor, the "**Franchisor**") or, in the event the Stalking Horse Bidder is not the Successful Bidder (as defined herein), to the Successful Bidder, and the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; (ii) authorizing and approving certain bidding procedures for the Sale (collectively, the "**Bidding Procedures**," a copy of which is attached as Exhibit 1 to the Bidding Procedures Order) and certain procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, and as more specifically set forth in the Bidding Procedures Order, the "**Assumption Procedures**") and the form and manner of notice thereof; (iii) authorizing and approving the Debtors' entry into the Asset Purchase Agreement, dated as of November 1, 2026 (together with all exhibits and schedules thereto, the "**Stalking Horse Agreement**"), with the Stalking Horse Bidder, a copy of which is attached hereto as Exhibit B, and approving the Break-Up Fee (as defined herein); and (iv) granting related relief; and (b) an order (the **"Sale Order"**), a proposed form of which the Debtors will file no later than seven (7) days before the Sale Objection Deadline, (i) authorizing and approving the Sale on the terms contemplated in the Stalking Horse Agreement or, in the event the Stalking Horse Bidder is not

the Successful Bidder, an alternative asset purchase agreement with the Successful Bidder (an "**Alternative APA**"); (ii) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases in connection therewith (the "**Assigned Contracts**"); and (iii) granting related relief.[2] In support of the Motion, the Debtors rely on the *Declaration of David Goronkin in Support of Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**") and the *Declaration of Anish Gandhi in Support of the Debtors' Bidding Procedures and Sale Motion* (the **"Brookwood Declaration"**), filed substantially concurrently herewith. In further support of the Motion, the Debtors respectfully represent as follows:

## I. PRELIMINARY STATEMENT

1. The Debtors operate sixty-one (61) Outback Steakhouse® restaurants in Arizona, California, Colorado, Nevada, and New Mexico (the "**Restaurants**") as franchisees of the Franchisor, an affiliate of Bloomin' Brands, Inc. ("**Bloomin'**"). Facing severe liquidity constraints, declining guest traffic, rising labor and occupancy costs, and secured debt obligations the business can no longer support, the Debtors commenced these Cases to complete a value-maximizing sale of the Restaurants as going concerns through a Court-supervised process.

2. The Debtors come to this Court with a fully negotiated stalking horse bid in hand. Before the Petition Date (as defined below), the Debtors' investment banker, Brookwood Associates, L.L.C. ("**Brookwood**"), conducted a marketing process for the Restaurants that culminated in the Stalking Horse Agreement. Under the Stalking Horse Agreement, the Stalking Horse Bidder will acquire the Acquired Assets for (a) cash in the amount of $26,300,000, plus the amount, if any, by which $6,100,000 exceeds the Specified Liabilities assumed at closing, (b)

---

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the First Day Declaration, Stalking Horse Agreement or the Bidding Procedures, as applicable.

the assumption of the Assumed Liabilities, and (c) the payment of Cure Costs (subject to certain limitations) (collectively, the "**Stalking Horse Bid**"). The Stalking Horse Bid is not subject to any financing or diligence contingency.

3. The Stalking Horse Bid would preserve the Restaurants as going concerns, provide employment opportunities for substantially all of the Debtors' restaurant-level employees and ensure that the Debtors' customers can continue to redeem their gift cards and loyalty rewards. It also establishes a floor for the Debtors' continued marketing efforts. Brookwood will continue to market the Assets, and the Debtors seek the relief requested in this Motion to ensure that a timely and thorough sale process is implemented and that alternative purchasers understand the metrics and terms of the stalking horse arrangement when framing competing offers. The only bid protection the Stalking Horse Bidder will receive is a break-up fee of $790,000, payable solely from the cash proceeds of an Alternative Transaction. There is no expense reimbursement. The Debtors believe that the proposed procedures outlined herein are reasonable, value-maximizing and in the best interests of their estates and all interested parties.

## II. JURISDICTION

4. The Court has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

5. Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the Court's entry of a final judgment or order with respect to the Motion if it is determined that the Court,

absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6. The statutory and legal predicates for the relief requested herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rules 2002-1 and 6004-1.

## III. BACKGROUND

7. On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") in these Cases. Concurrently herewith, the Debtors filed a motion seeking joint administration of the Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

8. The Debtors operate sixty-one (61) Outback Steakhouse® restaurants in California, Arizona, Colorado, Nevada, and New Mexico as franchisees of the Franchisor pursuant to that certain Amended and Restated Outback Steakhouse® Restaurant Territorial Master Franchise Agreement, dated as of April 25, 2017, among the Franchisor, non-Debtor Cerca Trova Restaurant Group, Inc., and the Debtors party thereto (as amended, restated, supplemented, or otherwise modified from time to time, the **"Master Franchise Agreement"**). Goldman Sachs Specialty Lending Group, L.P. is the administrative and collateral agent (the "**Prepetition Agent**") under the Debtors' prepetition secured credit facility. The Debtors commenced these Cases to pursue a sale of substantially all of their assets under section 363 of the Bankruptcy Code.

9. Additional information about the Debtors' business, capital structure, and the circumstances leading to these Cases is set forth in the First Day Declaration.

## IV. THE SALE PROCESS

10. The Debtors hereby seek authority to implement certain procedures and, ultimately, consummate a sale of the Assets that will maximize recoveries for the Debtors' estates, preserve the Restaurants as going concerns, and ensure the continued employment of the Debtors' employees.

### A. Prepetition Marketing Efforts

11. The Debtors have sought a sale of their business repeatedly over the past eight years. In 2018, the Debtors conducted a sale process with the assistance of North Point Advisors, and in 2022, the Debtors conducted a further sale process with the assistance of Piper Sandler & Co. Neither process resulted in a transaction. In 2025, the Debtors engaged in extended negotiations with a prospective purchaser regarding an out-of-court sale of substantially all of their assets, but no definitive agreement was reached as the Debtors' financial performance continued to decline.

12. On June 29, 2026, the Debtors engaged Brookwood to conduct a marketing process for the sale of the business. Beginning in the week of August 17, 2026, Brookwood contacted 177 potential strategic and financial buyers, twenty (20) of which executed confidentiality agreements and received a confidential information memorandum and access to a virtual data room. The Debtors received three letters of intent, one of which was submitted by Bloomin'. In the judgment of the Debtors and Brookwood, each of the two third-party letters of intent was inferior to Bloomin's, including because each offered less cash, provided for the assumption of fewer cure costs or other liabilities and therefore would have burdened the

Debtors' estates with a greater amount of liabilities, offered less certainty of closing because it was subject to diligence, financing, or other contingencies, and required substantially greater bid protections. Parties that declined to proceed cited, among other things, broader casual dining trends, the concentration of the Restaurants in California, soft unit economic trends, deferred maintenance capital expenditures required to upkeep the Restaurants, underperforming locations, and limited ability to scale within the Outback Steakhouse system. *See* Brookwood Declaration ¶¶ 8–15. Following arm's-length negotiations, the Debtors determined, in the exercise of their business judgment and in consultation with their advisors, that the proposal submitted by the Stalking Horse Bidder represented the highest or otherwise best offer for the Assets, and on October 2, 2026, after negotiations that improved the terms of Bloomin's initial proposal, Seller Parent and Bloomin' executed a letter of intent. On November 1, 2026, the Debtors and the Stalking Horse Bidder executed the Stalking Horse Agreement. *See id.* ¶¶ 14–16. Notwithstanding the stalking horse arrangement, Brookwood will continue to canvass the market for viable, value-maximizing proposals that will benefit all interested parties. Under the Stalking Horse Agreement, the Buyer expressly acknowledges and agrees that (i) the Debtors are permitted and required to continue to market the Assets for purposes of consummating an Alternative Transaction, (ii) the Debtors may accept, and the Court may approve, an Alternative Transaction and (iii) nothing in the Stalking Horse Agreement restricts the Debtors, their applicable governing bodies, or any of their representatives from taking or omitting to take any action that they determine is required in the exercise of their fiduciary duties or is required by the Bankruptcy Code, the Bidding Procedures Order or any other order of the Court. *See* Stalking Horse Agreement § 4.3(a).

13. The Stalking Horse Bidder is the Debtors' franchisor, and the Debtors have a long-standing and multifaceted relationship with the Franchisor and Bloomin'. The Franchisor is a significant creditor of the Debtors, including under the Amended and Restated Deferred Payment Agreement, and affiliates of the Franchisor are landlords or sublandlords of certain of the Restaurants. The Stalking Horse Bidder is also the Debtors' proposed postpetition lender (in such capacity, the **"DIP Lender"**) under a debtor-in-possession financing facility (the **"DIP Facility"**) for which the Debtors are seeking approval by a motion filed concurrently herewith (any order approving the DIP Facility and use of cash collateral, the **"DIP Order"**). The Debtors disclose these relationships so that parties in interest may evaluate the Stalking Horse Bid and the Bidding Procedures with full information. The Debtors do not believe that the Stalking Horse Bidder is an "insider" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code. The Stalking Horse Bidder holds no equity interest in the Debtors and has no representative on the Debtors' board of directors; there is no common identity of directors, officers, or controlling equity holders between the Stalking Horse Bidder and the Debtors; the Debtors' board of directors oversaw the negotiation of the Stalking Horse Agreement; and the Stalking Horse Agreement was negotiated extensively at arm's-length, with each party represented by separate counsel. Although the Franchise Agreements give the Franchisor approval and other rights customary in a franchise system, those contractual rights do not give the Franchisor control over the Debtors' management or their decisions in these Cases, including the conduct of the sale process. *See* Brookwood Declaration ¶¶ 17–18.

**B. Liquidity and Sale Timeline**

14. The Debtors' liquidity is limited, and their revolving credit facility is fully drawn. In addition, the operation of a restaurant business in chapter 11 places strains on relationships with employees, vendors, and landlords that will, if prolonged, erode the value of the

Restaurants. The Debtors, in consultation with their advisors, have concluded that a prompt sale of the Restaurants as going concerns, subject to a market test under the Bidding Procedures, is the best means of maximizing value for their estates. Many of the parties most likely to bid are restaurant operators and investors who already know the Outback system, and many have already received the CIM and conducted diligence. The proposed schedule falls within the milestones in the Stalking Horse Agreement and the DIP Order (the **"Transaction Milestones"**), which require, among other things, a bid deadline no later than December 8, 2026 and closing by January 4, 2027. In light of the Debtors' limited liquidity, the costs of operating the Restaurants in chapter 11, and the extensive prepetition marketing process, the Debtors believe that the proposed schedule is reasonable under the circumstances and that a prolonged sale timeline would be value-destructive and potentially cause irreparable harm to the Debtors' estates. *See* Brookwood Declaration ¶ 26.

**C. Proposed Sale Process**

15. The sale process will provide a transparent and comprehensive avenue through which the Debtors will seek bids for the Assets. The Stalking Horse Agreement will serve as the baseline for all prospective bidders to negotiate from and will be subject to higher or otherwise better bids for the Assets pursuant to the Bidding Procedures. Thus, upon completion of the sale process, the Debtors will have fully market tested the value of their Assets.

16. In furtherance of Brookwood's ongoing efforts to market the Assets, and consistent with the Transaction Milestones and the Stalking Horse Agreement, the Debtors have filed this Motion seeking authority to proceed with a bidding and auction process to consummate a sale that the Debtors expect will generate maximum value for the Assets. To facilitate the Sale, the Debtors, in consultation with Brookwood and their other professional advisors, have developed customary Bidding Procedures to preserve flexibility in the sale process, generate the

greatest level of interest in the Assets and result in the highest or otherwise best value for the Assets. Among other things, the Bidding Procedures, in the Debtors' business judgment, create an appropriate timeline for the sale process, consistent with the Transaction Milestones and the Stalking Horse Agreement.

## V. THE STALKING HORSE AGREEMENT

17. The Debtors negotiated the Stalking Horse Agreement with the Stalking Horse Bidder in good faith and at arm's-length. The Debtors believe that consummation of the Stalking Horse Agreement, subject to higher or otherwise better offers, will maximize value for the Debtors' estates, provide for the continuation of the jobs of substantially all of the Debtors' restaurant-level employees and afford the Debtors the best possible opportunity to ensure that their customers, landlords, and vendors continue to be served.

18. As discussed throughout this Motion, the Bidding Procedures have been designed with the objective of generating the greatest level of interest in and best value for the Assets, while allowing the Debtors to close the Sale in a timely and efficient manner. The robust auction and sale process contemplated by the Bidding Procedures will also serve as a market test to ensure that the Stalking Horse Agreement is a value-maximizing transaction.

19. The Stalking Horse Bidder will be deemed to be a Qualified Bidder and the Stalking Horse Bid will be deemed to be a Qualified Bid. The following chart summarizes the material terms of the Stalking Horse Agreement:

| **Provision** | **Summary** |
|---|---|
| Parties | Sellers: Cerca Trova Restaurant Group Holdings, Inc. ("**Seller Parent**") and its affiliated Debtors listed on Schedule A to the Stalking Horse Agreement (together, the "**Sellers**").<br>Buyer: Outback Steakhouse of Florida, LLC (or a permitted assignee under § 12.4, with the Buyer remaining liable). |

| | |
|---|---|
| | *Preamble* |
| Acquired Assets | Substantially all of the assets used in the operation of the Restaurants listed on Schedule B to the Stalking Horse Agreement (the "**Stores**"), including Inventory, FF&E, the Assigned Contracts, petty cash in Stores and Store registers, intellectual property, Books and Records relating exclusively to the Acquired Assets or the Business, back-office and front-of-house technology, Permits (including, to the extent transferable, the Liquor Licenses), deposits (including Security Deposits, but excluding adequate assurance utility deposits), bonds (to the extent transferable), prepayments and vendor rebates, and all other tangible and intangible assets, rights and claims of seller (including goodwill and business information) (collectively, the "**Acquired Assets**"). The Acquired Assets also include the Acquired Avoidance Actions (see below).<br>*§§ 1.1, 2.1* |
| Excluded Assets | Include all cash (other than petty cash in Stores and Store registers), accounts receivable and other rights to payment arising on or prior to closing, bank accounts, the Deposit, all Avoidance Actions and other estate causes of action (other than the Acquired Avoidance Actions), including claims against current or former directors, officers, and insiders, all D&O and other insurance policies, Tax refunds and attributes, Contracts that are not Assigned Contracts, equity interests in Sellers and their Affiliates, employee benefit plans, the assets of the Debtors' corporate headquarters, and the Suspended Stores.<br>*§§ 1.1, 2.2, 8.15* |
| Purchase Price | (a) Cash of $26,300,000, plus the amount, if any, by which $6,100,000 exceeds the aggregate Specified Liabilities assumed by Buyer at Closing (the "**Cash Purchase Price**"); (b) the assumption of the Assumed Liabilities; and (c) the payment of Cure Costs (subject to § 2.3(a), under which the Buyer does not assume (i) Cure Costs on account of Specified Liabilities in excess of their caps, (ii) for Store leases, Cure Costs other than Unpaid Property Tax and Percentage Rent within their caps, or (iii) Cure Costs associated with a Suspended Store). At Closing, all obligations outstanding under any Buyer DIP Loan are credited against the Cash Purchase Price (§ 3.11). No adjustment, holdback, escrow or offset except as expressly provided.<br>*§ 3.1* |
| Assumed Liabilities | Include all Cure Costs (other than (i) Cure Costs on account of Specified Liabilities in excess of their respective caps, (ii) for Store leases, Cure Costs other than Unpaid Property Tax and Percentage Rent within their caps, and (iii) Cure Costs associated with a Suspended Store, as to which the Buyer will cooperate with the Sellers in any negotiations); post-Closing obligations under the Assigned Contracts; fifty percent (50%) of Transfer Taxes (§ 3.7); all post-Closing obligations arising out of or related to ownership, possession, or operation of the Acquired Assets; Unpaid Property Tax up to $1,000,000; Percentage Rent up to $600,000; |

| | |
|---|---|
| | Named Vendor Liabilities up to $4,500,000; and all Liabilities in respect of the Customer Programs, including gift cards and loyalty balances. The Named Vendor Liabilities, Unpaid Property Tax, and Percentage Rent are the "**Specified Liabilities**." Although the MP Buyout Obligations are not Assumed Liabilities, the Buyer will pay the obligations owed under certain promissory notes to the Transferred Employee managing partners and area operations directors listed on Schedule 8.16, when due or as otherwise agreed with each of them, and no MP Buyout Obligation will be payable by the Sellers or their estates (§ 8.16).<br>*§§ 2.3, 8.16* |
| Earmarked Employee Amounts | $1,300,000 of the Cash Purchase Price is allocated to the Sellers' payment of accrued but unpaid employee severance, bonuses, paid time off, and other accrued compensation relating to periods through Closing. The Sellers must reserve that amount in a segregated account and use it solely for those obligations, which may include up to $100,000 of severance for the employees listed on Schedule 3.10 who are not hired by the Buyer. Any unused portion is returned to the Buyer within ninety (90) days after Closing, and neither the Sellers' estates nor the Existing Lenders have any right to it (and the Prepetition Agent has so consented).<br>*§ 3.10* |
| Deposit | $2,630,000, due within two (2) Business Days after the later of entry of the Bidding Procedures Order and the Agreement Date, held in a segregated account and applied to the Cash Purchase Price at Closing. Retained by the Sellers upon a termination for the Buyer's material breach, Buyer's failure to consummate, Franchisor Party's act under § 10.2(h), or Buyer's failure to make DIP Advances, in which case the Sellers may also recover damages, including benefit-of-the-bargain damages, that are not capped at the amount of the Deposit; otherwise returned to the Buyer.<br>*§§ 3.2, 10.4* |
| Bid Protections | Break-Up Fee of $790,000 (approximately 3% of the base Cash Purchase Price), payable only upon consummation of an Alternative Transaction with the Successful Bidder or a back-up bidder selected at the Auction or within one (1) year after a termination under § 10.2(c) or (d), solely from the cash proceeds thereof and concurrently with its closing, as an allowed administrative expense under sections 503(b) and 507(a)(2) of the Bankruptcy Code with priority over other administrative expenses, subject only to the DIP Order (including any carve-out for professional fees therein), and not secured by any lien; the DIP Order must permit payment of the Break-Up Fee from the cash proceeds of an Alternative Transaction. Not payable if the Stalking Horse Agreement is terminated by Seller Parent under § 10.2(a), (b), (h) or (i), if the Buyer is the Successful Bidder, or if the Buyer fails to participate in the Auction, withdraws or reduces its bid, or fails to comply with the Bidding Procedures. Upon payment, the Buyer waives all other claims against the Sellers in connection with the Alternative Transaction, except that, if the |

| | |
|---|---|
| | Alternative Transaction is with a purchaser that will not operate the Restaurants as Outback Steakhouse restaurants, the Buyer reserves its claims under the Franchise Agreements. No expense reimbursement.<br>*§ 4.5* |
| Back-Up Bid | If not the Successful Bidder, but the next highest or otherwise best bid, the Buyer's bid remains open as the Back-Up Bid until the earlier of consummation of the Alternative Transaction and thirty (30) days after entry of the order approving it (plus five (5) days). If the Sellers deliver a Back-Up Closing Notice, the Buyer must close within twenty (20) Business Days.<br>*§ 4.3(c)* |
| Conditions to Closing | Buyer's conditions include entry of the Bidding Procedures Order and the Sale Order (not stayed and in form and substance satisfactory to the Buyer in its reasonable discretion), accuracy of representations (subject to the materiality standards in § 9.2(a)), performance of covenants, and the agreement of the Prepetition Agent, on behalf of the Existing Lenders, to (i) consent to the Sale Transaction and release all liens on the Acquired Assets (but not the proceeds), subject to the Existing Lenders' receipt of net cash proceeds at Closing of not less than $15,000,000 (after funding of a wind-down reserve), and (ii) not credit bid at the Auction except to assign a credit bid to the Buyer (so long as the Buyer is not in breach of, and has not adversely amended, the Stalking Horse Agreement), and the Existing Lenders' execution of a mutual release agreement with the Buyer (the "Mutual Release Agreement"), and agreement among the Sellers, the Buyer, and the Prepetition Agent on a wind-down budget for the Sellers in form and substance acceptable to the Buyer (§ 9.2(d), (f)). Sellers' conditions include the Buyer's execution of the Mutual Release Agreement and agreement among the Sellers, the Buyer, and the Prepetition Agent on a wind-down budget for the Sellers, including the funding of a wind-down reserve. Receipt of Liquor License Approvals is not a condition to Closing.<br>*Art. 9; § 8.12(b)* |
| Outside Date; Termination | January 31, 2027, subject to automatic extension of up to ninety (90) days in certain circumstances, but in no event beyond five (5) Business Days before the expiration of the Debtors' deadline under section 365(d)(4). Any longer extension requires the consent of the Parties and the Prepetition Agent. Customary termination rights, including the Sellers' right to terminate in the exercise of their fiduciary duties and if the Buyer fails to make any advance required under the DIP Order (§ 10.2(i)).<br>*§§ 1.1, 10.1–10.5* |
| Assigned Contracts | The Buyer will designate the Assigned Contracts no later than three (3) Business Days before Closing and may remove any Contract (including a Store lease) or other Acquired Asset before Closing, without reduction of the Cash Purchase Price. The Buyer pays Cure Costs, subject to § 2.3(a), under which the Buyer pays only the Unpaid Property Tax and |

| | |
|---|---|
| | Percentage Rent components of Cure Costs for Store leases, within their caps, and no Cure Costs associated with a Suspended Store; if the Sellers will not pay the balance of the Cure Costs for a Store lease, they may close the Store under § 2.5(d) (§ 2.5(c)), and is solely responsible for demonstrating adequate assurance of future performance. The Buyer may designate additional Contracts for up to sixty (60) days after Closing, reimbursing the Sellers' costs under those Contracts. If a Cure Cost is disputed at Closing, the Buyer must pay all post-Closing amounts under the contract and fund a reserve for the asserted Cure Cost, and may decline to take the contract (including a Store lease) only if the Cure Cost as finally determined exceeds the Sellers' estimate by more than ten percent (10%) (§ 2.5(e)). The Sellers may close Stores before Closing on notice to the Buyer, in which case the Cash Purchase Price will be reduced in an amount agreed by the Sellers and the Buyer, and the Buyer and the Franchisor reserve their rights with respect to any such closure, other than the closure of the Suspended Stores listed on Schedule 8.15 (§§ 2.5(d), 8.15). The Franchise Agreements are not assigned and will be terminated at Closing.<br>*§§ 2.5, 2.8, 8.13* |
| Franchise Agreements | The Buyer and each other Franchisor Party (each of which signs the Stalking Horse Agreement for this purpose) (i) consent to the Sale Transaction and to any Alternative Transaction with a bidder approved as a franchisee, (ii) waive any right of first refusal or similar right that would otherwise apply to the Sale Transaction or any Alternative Transaction, (iii) agree to forbear from exercising remedies under the Franchise Agreements pending Closing, subject to the Sellers' payment of postpetition franchise fees and the absence of any other material breach (other than on account of these Cases or the nonpayment of prepetition amounts), and (iv) effective at Closing, terminate the Franchise Agreements as to the Sellers and the Stores, waive any Cure Cost owing to them, and release the Sellers, their estates, and non-Debtor Cerca Trova Restaurant Group, Inc. from all claims, including under the Amended and Restated Holistic Resolution Agreement and the Amended and Restated Deferred Payment Agreement. The Franchisor reserves certain rights with respect to an Alternative Transaction with a purchaser that will not operate the Restaurants as Outback Steakhouse restaurants.<br>*§ 8.13(a)* |
| Employees | The Buyer will make employment offers to substantially all Store-level employees, subject to its normal hiring practices, and anticipates making offers to certain managing partners, area operations directors, and corporate employees. The Buyer is solely responsible for all liabilities arising out of its employment of any of the Sellers' employees from and after Closing, and the Sellers and the Buyer will cooperate with respect to any notices to employees. § 8.4.<br>*§ 8.4* |

| | |
|---|---|
| Customer Programs | The Buyer will honor all Customer Programs, including gift cards and loyalty balances, at each acquired Store for not less than the remaining stated term or, if none, twelve (12) months after Closing, subject to any applicable requirement of the Franchisor.<br>*§ 8.14* |
| Liquor Licenses; Interim Management | The Buyer will seek Liquor License Approvals at its sole cost, with the Sellers' cooperation. Pending approval, the Sellers will, to the extent permitted by law, enter into Interim Management Agreements, at the Buyer's sole cost and with indemnification and insurance for the Sellers, for up to one hundred twenty (120) days after Closing.<br>*§§ 5.2(d), 8.12* |
| Transition Services | At the Buyer's request, the parties will enter into a Transition Services Agreement under which certain members of the Sellers' management will provide transition services to the Buyer on a consulting basis, at the Buyer's sole cost. The terms of the Transition Services Agreement, including payments by the Buyer that will fund a portion of the Sellers' wind-down budget, remain under negotiation.<br>*§§ 5.2(e), 8.16* |
| Release | Effective at Closing, (a) the Buyer and its Affiliates release the Sellers, their estates, their Affiliates, and their current and former directors, officers, employees, and representatives from all claims relating to the Acquired Assets, the Assumed Liabilities, the Business, the Stalking Horse Agreement, the Sale Transaction, or the Franchise Agreements, and (b) each Seller, on behalf of itself and its estate, releases the Buyer, its Affiliates, and their respective representatives from all claims relating to the same matters, in each case other than claims arising under the express post-Closing covenants of the other party in the Stalking Horse Agreement, the Sale Order, any Interim Management Agreement or the Transition Services Agreement. Each party waives California Civil Code section 1542.<br>*§ 11.3* |

20. Local Rule 6004-1(b)(iv) requires a sale motion to highlight certain provisions of the proposed sale agreement and sale order. The Debtors identify the following:

| **Provision** | **Description and Location** |
|---|---|
| Sale to Insider | The Debtors do not believe that the Stalking Horse Bidder is an "insider" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code. The Stalking Horse Bidder holds no equity interest in the Debtors and has no representative on the Debtors' board of directors; there is no common identity of directors, officers, |

| | |
|---|---|
| | or controlling equity holders between the Stalking Horse Bidder and the Debtors; the Debtors' board of directors oversaw the negotiation of the Stalking Horse Agreement; and the Stalking Horse Agreement was negotiated at arm's-length, with each party represented by separate counsel. Although the Franchise Agreements give the Franchisor approval and other rights customary in a franchise system, those contractual rights do not give the Franchisor control over the Debtors' management or their decisions in these Cases, including the conduct of the sale process. As described above, the Stalking Horse Bidder is the Franchisor, a significant creditor of the Debtors, through affiliates a landlord or sublandlord of certain Restaurants, and the DIP Lender. Stalking Horse Agreement § 7.7 |
| Agreements with Management | The Stalking Horse Bidder anticipates offering employment to managing partners, area operations directors, and certain corporate employees, and may enter into a Transition Services Agreement under which certain members of management will provide consulting services. No agreements with management or key employees have been finalized as of the date hereof. The Stalking Horse Bidder will also pay the MP Buyout Obligations owed to the Transferred Employees listed on Schedule 8.16, when due or as otherwise agreed with each of them. §§ 8.4, 8.16. |
| Releases | Mutual release, effective at Closing, between the Sellers and their estates, on the one hand, and the Buyer and its Affiliates, on the other (§ 11.3). The Debtors highlight that the Debtors' estates release the Buyer and its Affiliates from claims relating to the Acquired Assets, the Assumed Liabilities, the Business, the Stalking Horse Agreement, the Sale Transaction, and the Franchise Agreements. The Franchisor Parties also release the Sellers, their estates, and non-Debtor Cerca Trova Restaurant Group, Inc. (§ 8.13(a)). As a condition to the Buyer's obligation to close, the Existing Lenders and the Buyer must enter into a mutual release agreement (§ 9.2(d)). |
| Private Sale / No Competitive Bidding | Not applicable. The Stalking Horse Bid is subject to higher or otherwise better offers under the Bidding Procedures. |
| Closing and Other Deadlines | Bid Deadline no later than 45 days after the Petition Date; Auction no later than 3 days after the Bid Deadline; Sale Hearing no later than 3 business days after the Auction (or 4 business days after the Bid Deadline if no Auction); Closing 2 Business Days after satisfaction of conditions; Outside Date of January 31, 2027. *§§ 1.1, 4.2, 4.6, 5.1.* |
| Good Faith Deposit | $2,630,000. *§§ 3.2, 10.4.* |
| Interim Arrangements with Proposed Buyer | Interim Management Agreements for the operation of Stores pending Liquor License Approvals, at the Buyer's sole cost. *§ 8.12(a).* The Stalking Horse Bidder is also the DIP Lender; all obligations under |

| | |
|---|---|
| | the DIP Facility outstanding at Closing will be credited against the Cash Purchase Price. § 3.11. |
| Use of Proceeds | $1,300,000 of the Cash Purchase Price must be reserved and used solely for the Earmarked Employee Amounts, with any unused portion returned to the Buyer (*§ 3.10*). The balance of the net cash proceeds will be distributed in accordance with the DIP Order and the Sale Order. The Sellers' obligation to close is conditioned on agreement on a wind-down budget, including the funding of a wind-down reserve from the Sale proceeds (§ 9.3(f)). The Existing Lenders' consent is subject to their receipt of net cash proceeds of not less than $15,000,000 at Closing, after funding of a wind-down reserve (§ 9.2(d)). |
| Tax Exemption | None requested. The Buyer and the Sellers each bear fifty percent (50%) of Transfer Taxes, and the parties will cooperate to minimize Transfer Taxes and obtain all available exemptions. *§ 3.7.* |
| Record Retention | The Buyer must preserve the Books and Records for three (3) years after Closing and provide the Debtors and their successors reasonable access. The Debtors may retain copies. *§ 8.7* |
| Sale of Avoidance Actions | The Acquired Assets include Avoidance Actions against (i) the Buyer and (ii) the parties listed on Schedule 2.1(e), which the Debtors expect to include the landlords of the Stores and certain key vendors. The Buyer may not pursue the Acquired Avoidance Actions except as necessary to enforce its rights in the Acquired Assets. All other Avoidance Actions are Excluded Assets. *§§ 2.1(e), 2.2(b).* |
| Requested Findings as to Successor Liability | The proposed Sale Order will provide that the Buyer is not a successor to the Debtors and has no successor, transferee, de facto merger or similar liability. *§ 4.4(e)* |
| Sale Free and Clear of Unexpired Leases | Not applicable. |
| Credit Bid | The Prepetition Agent has agreed not to credit bid at the Auction, except to assign a credit bid to the Buyer, so long as the Buyer is not in breach of the Stalking Horse Agreement, the Stalking Horse Agreement is still in full force and effect, and neither the Stalking Horse Agreement nor any other agreement contemplated thereby has been amended or otherwise modified in a manner that reduces the cash purchase price or is otherwise adverse to the Debtors, Prepetition Agent or Existing Lenders in any material respect. The Stalking Horse Bidder, as DIP Lender, may credit bid the DIP Obligations. *§§ 3.11, 9.2(d).* |
| Relief from Bankruptcy Rule 6004(h) | Requested. *§ 4.4(g)* |

## VI. BIDDING PROCEDURES[3]

21. The Debtors are soliciting bids for all of the Assets, or any Restaurant or combination of Restaurants, in accordance with the Bidding Procedures. The Bidding Procedures describe, among other things, (i) the Assets available for sale, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and the Debtors, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction, and (vi) the selection and approval of the Successful Bidder and the Back-Up Bidder. The Bidding Procedures reflect the Debtors' objective of conducting the sale process in an orderly, fair, and open manner, while ensuring that the highest or otherwise best bid is generated for the Assets.

22. Certain of the key terms of the Bidding Procedures, which shall apply to Potential Bidders, Qualified Bidders, the submission, receipt, and analysis of all bids relating to the Sale and the conduct of the Sale and the Auction, are included below, including those required to be highlighted by Local Rule 6004-1(c):

(a) Participation Requirements. To receive due diligence information, including access to the Debtors' electronic data room and to additional non-public information regarding the Debtors, a potential bidder (each, an "**Interested Party**") must deliver to counsel to the Debtors and to Brookwood the following documents (the "**Preliminary Bid Documents**"): (i) an executed confidentiality agreement on terms reasonably acceptable to the Debtors; (ii) a statement and other factual support demonstrating to the Debtors' satisfaction, in consultation with the Consultation Parties, that the Interested Party has a bona fide interest in purchasing some or all of the Assets; (iii) preliminary proof of the Interested Party's financial capacity to close its proposed Sale Transaction; and (iv) a statement of whether the Interested Party is working with any other party in connection with a joint Bid. Only those Interested Parties who have submitted acceptable Preliminary Bid Documents (each, a "**Potential Bidder**") may submit

[3] Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order. To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control.

Bids. The Stalking Horse Bidder is deemed to be a Qualified Bidder and is not required to provide any of the Preliminary Bid Documents.

(b) Due Diligence. The Debtors will provide each Potential Bidder with due diligence commensurate with that given to the Stalking Horse Bidder; *provided* that the Debtors may, after consultation with the Consultation Parties, withhold or delay business-sensitive information from any Potential Bidder that is (or is affiliated with) a competitor. The due diligence period will end on the Bid Deadline.

(c) Bid Deadline. A Potential Bidder that desires to make an offer for the Assets (each, a "**Bid**") must transmit its Bid so as to be actually received on or before December 8, 2026 at 5:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**") by (i) the Debtors, (ii) counsel to the Debtors, (iii) Brookwood, (iv) counsel to the Prepetition Agent, and (v) counsel to any official committee of unsecured creditors appointed in these Cases (the "**Committee**").

(d) Bid Requirements. Each Bid must be submitted in writing and satisfy the following requirements (collectively, the "**Bid Requirements**"), among others:

(i) Purpose. The Bid must identify (A) the Assets to be acquired, including each Restaurant by store number and location, (B) each executory contract and unexpired lease to be assumed and assigned (the "**Designated Contracts**") and (C) the liabilities to be assumed, including Cure Costs, obligations in respect of the Customer Programs, Unpaid Property Tax, Percentage Rent, Named Vendor Liabilities, and employee-related obligations.

(ii) Deposit. Each Bid must be accompanied by a cash deposit equal to ten percent (10%) of the cash portion of the purchase price (the "**Deposit**"); *provided* that the deposit of the Stalking Horse Bidder is governed by the Stalking Horse Agreement.

(iii) Total Consideration. Each Bid must identify the form and amount of the total consideration, including cash and non-cash components and all liabilities to be assumed (the "**Bid Value**"), and must state the extent to which the Bidder will pay or assume the Specified Liabilities, Customer Program obligations, and Cure Costs, whether it earmarks an amount comparable to the Earmarked Employee Amounts, and its proposed treatment of the Acquired Avoidance Actions. Unless the Prepetition Agent consents, any non-cash consideration may consist only of freely tradeable public securities.

(iv) Minimum Bid. The Bid Value must exceed the Purchase Price under the Stalking Horse Agreement by not less than the sum of (A) the Break-Up Fee plus (B) $250,000 (the "**Minimum Bid Requirement**"). For this purpose, the Purchase Price is deemed to be no less than $26,300,000 plus

the Debtors' good faith estimate of the amount payable under section 3.1(a)(ii) of the Stalking Horse Agreement, which the Debtors will provide in writing to Potential Bidders and the Consultation Parties before the Bid Deadline (the "Estimated Cash Purchase Price"). Each Bid must also include a cash component that exceeds the Estimated Cash Purchase Price by not less than the sum of the Break-Up Fee plus $250,000.

(v) Marked Agreement. Each Bid must include an executed asset purchase agreement, together with a redline marked against the Stalking Horse Agreement and a redline of the proposed sale order marked against the proposed form of Sale Order filed by the Debtors.

(vi) Contingencies; Franchisor Approval. A Bid may not be conditioned on financing, internal approval or the outcome of due diligence. To the extent a Bid contemplates the operation of any Restaurant as an Outback Steakhouse restaurant following the closing, the Bid must include evidence that the Franchisor has approved the Bidder as a franchisee.

(vii) Timeline to Close; Irrevocability. Each Bid must include a commitment to close within fifteen (15) days after entry of the order approving the Sale Transaction, and in any event by January 4, 2027 (or such later date as the Prepetition Agent may agree to in writing) and the Outside Date, and must remain irrevocable until two (2) business days after entry of the Sale Order (or, if selected as the Successful Bid or the Back-Up Bid, until the earlier of the closing and the Outside Date).

(viii) Back-Up Bidder Commitment. Each Bid (other than the Stalking Horse Bid) must include a written commitment by the Bidder to serve as the Back-Up Bidder if its Bid is selected as the next highest or otherwise best Bid after the Successful Bid.

(ix) Sources of Financing; Adequate Assurance. Each Bid must include evidence of the Bidder's ability to consummate the Sale Transaction and sufficient information to establish adequate assurance of future performance under sections 365(f)(2)(B) and, as applicable, 365(b)(3) of the Bankruptcy Code with respect to each Designated Contract (the "**Adequate Assurance Information**").

(x) Employees; Liquor Licenses; Transition Services. Each Bid must describe the Bidder's proposed treatment of the Debtors' employees, its plan for obtaining liquor licenses and other permits, and any transition services it would require.

(xi) Disclaimer of Fees; Identity; No Collusion. Each Bid (other than the Stalking Horse Bid) must disclaim any right to a break-up fee, expense reimbursement, or similar payment, fully disclose the identity of each entity participating in the Bid and any connection with the Debtors, any

insider of the Debtors, the Franchisor, the Stalking Horse Bidder, the Prepetition Agent, or any prepetition lender, and include the Bidder's acknowledgment that it has not engaged in any collusion.

(e) Designation of Qualified Bidders. A "**Qualified Bidder**" is a Bidder that, in the Debtors' reasonable determination after consultation with the Consultation Parties, has timely submitted a Bid that satisfies each of the Bid Requirements and is able to consummate the proposed transaction within the required timeframe (such Bid, a "**Qualified Bid**"). The Debtors will make that determination by December 9, 2026. If no Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Stalking Horse Bidder will be the Successful Bidder, no Auction will be held and the Debtors will seek approval of the Sale to the Stalking Horse Bidder at the Sale Hearing.

(f) Auction. If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Bid, the Debtors will conduct an auction (the "**Auction**") on December 11, 2026 at 10:00 a.m. (prevailing Pacific Time) at the offices of KTBS Law LLP or virtually. Before the Auction, the Debtors will notify all Qualified Bidders, the Consultation Parties, and the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") of the highest or otherwise best Qualified Bid (the "**Baseline Bid**"). Bidding will begin with the Baseline Bid and continue in minimum increments of at least $250,000 in cash value (each, an "**Overbid**"). All Bids will be made on an open basis, the Auction will be transcribed or recorded, and each participating Qualified Bidder must confirm on the record that it has not engaged in any collusion.

(g) Selection of Successful Bid. The Auction will continue until the Debtors determine, in the exercise of their reasonable business judgment after consultation with the Consultation Parties, the highest or otherwise best bid (the "Successful Bid" and the bidder, the "**Successful Bidder**") and the next highest or otherwise best bid (the "**Back-Up Bid**" and the bidder, the "**Back-Up Bidder**"). Within one (1) business day after the conclusion of the Auction, the Debtors will file and serve a notice identifying the Successful Bidder and the Back-Up Bidder, if any. The Back-Up Bid will remain open and irrevocable until the earlier of the closing with the Successful Bidder and the Outside Date (or, if the Stalking Horse Bidder is the Back-Up Bidder, for the period set forth in the Stalking Horse Agreement). If the Successful Bidder fails to close, the Debtors may, after consultation with the Consultation Parties, close with the Back-Up Bidder without further order of the Court.

(h) Sale Hearing. The Sale Hearing will be held on December 15, 2026, subject to the Court's availability. Any party that fails to timely file and serve an objection to the Sale will be deemed to consent to the Sale for purposes of section 363(f) of the Bankruptcy Code. The Sale Hearing may be adjourned by the Debtors after consultation with the Consultation Parties.

(i) Bid Protections. The Stalking Horse Bidder is entitled to a break-up fee of $790,000 (the "**Break-Up Fee**"), payable only upon the consummation of an Alternative Transaction with the Successful Bidder or a back-up bidder selected at the Auction, or consummated within one (1) year after termination of the Stalking Horse Agreement under section 10.2(c) or (d) thereof, solely from the cash proceeds thereof and concurrently with its closing, as an allowed administrative expense subject only to the DIP Order. No other Qualified Bidder is entitled to any expense reimbursement or similar payment.

(j) Return of Deposit. The Deposit of the Successful Bidder will be applied to the purchase price at closing. Deposits of Qualified Bidders (other than the Successful Bidder and the Back-Up Bidder) will be returned five (5) business days after the Auction, or as soon as reasonably practicable thereafter. If a Successful Bidder (other than the Stalking Horse Bidder) fails to consummate the Sale Transaction because of its breach, the Debtors may retain its Deposit as damages.

(k) Consultation Parties. The "**Consultation Parties**" are (i) the Prepetition Agent, (ii) the DIP Lender (other than any DIP Lender affiliated with the Stalking Horse Bidder), and (iii) the Committee, if any; provided that neither the Stalking Horse Bidder nor any of its affiliates (including in its capacity as Franchisor or DIP Lender) is a Consultation Party; and provided further that any Consultation Party that submits a Bid or otherwise participates as a bidder will not be a Consultation Party with respect to the evaluation of its own or any competing Bid for so long as it remains a bidder. Consultation rights do not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

(l) Reservation of Rights; Fiduciary Out. The Debtors reserve the right, in the exercise of their fiduciary obligations and after consultation with the Consultation Parties, to reject any Bid, waive terms and conditions, extend deadlines, adjourn or cancel the Auction or the Sale Hearing and otherwise modify the Bidding Procedures, but may not, without the Stalking Horse Bidder's consent, modify them in any manner inconsistent with the Stalking Horse Agreement or adverse to the Stalking Horse Bidder (it being understood that the extension of any deadline, or the adjournment of the Auction or the Sale Hearing, does not require the Stalking Horse Bidder's consent). Nothing in the Bidding Procedures limits, modifies, or otherwise affects any consent or approval right of any party under the DIP Order.

23. The following is a summary of the key dates established by the Bidding Procedures and the Assumption Procedures:

| Event | Date |
|---|---|
| Service of Sale Notice | Within two (2) business days after entry of the Bidding Procedures Order |
| Service of Cure Notice | Within five (5) business days after entry of the Bidding Procedures Order |
| Cure Objection Deadline | December 7, 2026 at 4:00 p.m. (ET) |
| Bid Deadline | December 8, 2026 at 5:00 p.m. (ET) |
| Deadline for Debtors to Designate Qualified Bids | December 9, 2026 |
| Auction (if necessary) | December 11, 2026 at 10:00 a.m. (PT) |
| Notice of Successful Bidder | Within one (1) business day after the conclusion of the Auction |
| Sale Objection Deadline | December 1, 2026 at 4:00 p.m. (ET) |
| Supplemental Objection Deadline (conduct of the Auction, identity of the Successful Bidder and its adequate assurance) | At the Sale Hearing |
| Sale Hearing | December 15, 2026 at [__]:[__] [a/p].m. (ET) |

24. The Debtors respectfully submit that the timeline set forth in the Bidding Procedures is reasonable and necessary under the circumstances of these Cases. Such timeline provides an approximately five (5)-week period between the filing of this Motion and the Bid Deadline, which will allow parties in interest sufficient time to formulate bids for the Assets. Moreover, Brookwood was engaged in June 2026 and began contacting potential buyers in August 2026, and relevant information regarding the Debtors' business has been made available in the data room and potential bidders that execute a confidentiality agreement and otherwise satisfy the participation requirements of the Bidding Procedures will promptly receive access to diligence.

## VII. NOTICE PROCEDURES FOR THE SALE, BIDDING PROCEDURES, AUCTION AND SALE HEARING

25. The Debtors also request approval of the sale notice (the "**Sale Notice**"), substantially in the form attached to the proposed Bidding Procedures Order as Exhibit 2.

26. Within two (2) business days after entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice on: (a) the U.S. Trustee; (b) counsel to the Committee, if any, or, if no Committee has been appointed, the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (c) counsel to the Prepetition Agent; (d) counsel to the DIP Lender; (e) counsel to the Stalking Horse Bidder; (f) the United States Attorney's Office for the District of Delaware; (g) the state attorneys general and alcoholic beverage control authorities for all states in which the Debtors conduct business; (h) all counterparties to the Potential Assigned Contracts (as defined below) known as of the date hereof; (i) all parties who have expressed to the Debtors or their professionals in writing an interest in acquiring some or all of the Assets; (j) all known holders of liens, encumbrances, and other claims secured by any of the Assets; (k) the Internal Revenue Service; (l) all applicable state and local taxing authorities; (m) the Federal Trade Commission; (n) all applicable state alcoholic beverage authorities; (o) each governmental agency that is an interested party with respect to the Sale; (p) all of the Debtors' other known creditors and equity security holders; and (q) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

27. The Debtors will also cause the Sale Notice to be published once in *The Wall Street Journal*, with any modifications necessary for ease of publication, and post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent, Stretto, Inc.

## VIII. ASSUMPTION PROCEDURES[4]

28. To facilitate the Sale, the Debtors seek authority to assume and assign to the Stalking Horse Bidder or, in the event the Stalking Horse Bidder is not the Successful Bidder, to the Successful Bidder, certain executory contracts and unexpired leases in accordance with the Assumption Procedures.

29. The Assumption Procedures are as follows:

(a) Cure Notice. Within five (5) business days after entry of the Bidding Procedures Order, the Debtors shall file on the docket and serve a notice of assumption and assignment, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "**Cure Notice**"), by first-class mail (and by email where available) on all counterparties to all executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (collectively, the "**Potential Assigned Contracts**") and provide a copy of the same to the Stalking Horse Bidder. The Cure Notice shall inform each recipient of (i) the timing and procedures relating to such assumption and assignment, (ii) the title of the Potential Assigned Contract, (iii) the name of the counterparty to the Potential Assigned Contract, (iv) the Debtors' good faith estimate of the amount required to cure all monetary defaults thereunder pursuant to section 365(b) of the Bankruptcy Code (the "**Cure Costs**"), (v) the identity of the Stalking Horse Bidder, and (vi) the Cure Objection Deadline (as defined below); *provided*, however, that service of a Cure Notice does not constitute an admission that such Potential Assigned Contract is an executory contract or unexpired lease or that such stated Cure Cost constitutes a claim against the Debtors or a right against the Stalking Horse Bidder (or other Successful Bidder), and all rights with respect thereto shall be expressly reserved. Further, the inclusion of a Potential Assigned Contract on the Cure Notice is not a guarantee that such Potential Assigned Contract will ultimately be assumed and assigned.

(b) Objections. Any counterparty to a Potential Assigned Contract shall file and serve any objection to (i) the proposed assumption and assignment of its Potential Assigned Contract (stating, with specificity, the legal and factual basis of its objection), (ii) the proposed Cure Cost for its Potential Assigned Contract (stating, with specificity, the Cure Cost asserted, with appropriate documentation in support thereof), or (iii) the adequate assurance of future performance by the Stalking Horse Bidder, no later than December 7, 2026 at 4:00 p.m. (prevailing Eastern Time) (the "**Cure Objection Deadline**"). If no objection is timely filed

[4] Any summary of the Assumption Procedures contained herein is qualified in its entirety by the actual terms of the Bidding Procedures Order. To the extent that there is any conflict between any summary contained herein and the actual terms of the Bidding Procedures Order, the actual terms of the Bidding Procedures Order shall control.

and served, (x) the counterparty shall be deemed to have consented to the assumption and assignment of its Potential Assigned Contract to the Successful Bidder if such Potential Assigned Contract is designated as an Assigned Contract, and shall be forever barred from asserting any objection with regard to such assumption and assignment, except with respect to the adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder, and (y) the Cure Cost set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Potential Assigned Contract or any other document, and the counterparty shall be forever barred from asserting any other claims related to such Potential Assigned Contract against the Debtors or the Successful Bidder, or the property of either of them.

(c) Supplemental Cure Notice. To the extent the Debtors, at any time after service of the Cure Notice, (i) identify additional Potential Assigned Contracts, (ii) remove Potential Assigned Contracts, or (iii) modify the previously stated Cure Cost for any Potential Assigned Contract, the Debtors will promptly file and serve a supplemental Cure Notice on each affected counterparty and its counsel of record, if any. Each supplemental Cure Notice that identifies a Potential Assigned Contract not previously listed, or that reduces the Debtors' calculation of the Cure Cost, shall provide a deadline of not less than seven (7) days after service by which the counterparty may object solely to (i) its listing as a Potential Assigned Contract or (ii) the Debtors' calculation of the Cure Cost.

(d) Successful Bidder Other Than the Stalking Horse Bidder. If the Debtors receive one or more Qualified Bids other than the Stalking Horse Bid, the Debtors will provide the Adequate Assurance Information of each Qualified Bidder that included a counterparty's Potential Assigned Contract in its Bid to such counterparty, on a confidential basis, within one (1) business day after receipt, and will serve the notice of Successful Bidder on all counterparties to the Designated Contracts of the Successful Bidder and the Back-Up Bidder. Any objection to the adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder must be filed and served by the Supplemental Objection Deadline.

(e) Dispute Resolution. If the Debtors and a counterparty cannot consensually resolve a timely objection to a Cure Cost, the objection will be heard at the Sale Hearing or adjourned to a later date. Pending resolution, the Potential Assigned Contract may be assumed and assigned at Closing as a Disputed Amount Contract, in which case the Successful Bidder shall pay all amounts arising under such contract from and after the Closing and deposit the Cure Cost asserted by the counterparty into a segregated account pending determination of the Cure Cost.

(f) Contract Assumption. No Potential Assigned Contract shall be deemed assumed and assigned until the later of (i) the date the Court has entered an order authorizing such assumption and assignment and (ii) the Closing.

(g) Designation Notice. No later than three (3) business days before the closing of the Sale, the Debtors will file and serve on each counterparty to a Potential Assigned Contract a notice identifying the Potential Assigned Contracts designated as Assigned Contracts by the Successful Bidder and the identity of the assignee of each. If the Successful Bidder intends to designate an assignee other than itself, it must identify the assignee and provide its Adequate Assurance Information by the date set forth in the Bidding Procedures Order, and the applicable counterparty may object solely as to the adequate assurance of future performance by that assignee.

30. The inclusion of a Potential Assigned Contract on the Cure Notice or any supplemental Cure Notice shall not (a) obligate the Debtors to assume or assign any executory contract or unexpired lease listed thereon, (b) obligate any Qualified Bidder or the Successful Bidder to designate such Potential Assigned Contract as an Assigned Contract, or (c) constitute an admission or agreement of the Debtors that such Potential Assigned Contract is an executory contract or that such lease is unexpired. Only those Potential Assigned Contracts that are designated as Assigned Contracts under a final asset purchase agreement approved by the Court will be assumed and assigned. Under the Stalking Horse Agreement, the Stalking Horse Bidder will designate the Assigned Contracts no later than three (3) Business Days before the Closing and may remove any Contract before the Closing.

## IX. RELIEF REQUESTED

31. By this Motion, the Debtors seek entry of: (a) the Bidding Procedures Order, (i) scheduling a date for the Sale Hearing, (ii) authorizing and approving the Bidding Procedures and the Assumption Procedures and the form and manner of notice thereof, (iii) authorizing and approving the Debtors' entry into the Stalking Horse Agreement and approving the Break-Up Fee, and (iv) granting related relief; and (b) the Sale Order, (i) authorizing and approving the Sale, free and clear of all encumbrances other than the Assumed Liabilities and the Permitted Encumbrances, on the terms contemplated in the Stalking Horse Agreement or, in the event the

Stalking Horse Bidder is not the Successful Bidder, an Alternative APA, (ii) authorizing and approving the assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder or, in the event the Stalking Horse Bidder is not the Successful Bidder, to the Successful Bidder, and (iii) granting related relief. The Debtors request that the Court schedule the Sale Hearing on December 15, 2026, or as soon thereafter as the Court's calendar permits. The Debtors will file the proposed Sale Order no later than November 24, 2026, seven (7) days before the Sale Objection Deadline, and will serve it on the parties that received the Sale Notice and on each Potential Bidder.

## X. BASIS FOR RELIEF

### A. Sufficient Business Justification Exists for Consummation of the Sale Under Sections 105(a) and 363(b) of the Bankruptcy Code

32. Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. *See, e.g.*, *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (requiring a sound business purpose for a pre-confirmation sale of assets and identifying the factors a court must consider); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999) (requiring the debtor

to show that a sound business purpose justifies the use, sale, or lease of estate property). In applying that test, courts in this District first consider whether a sound business purpose justifies the sale, then determine whether (a) adequate and reasonable notice of the sale has been provided to interested parties, (b) the sale price is fair and reasonable and (c) the purchaser is proceeding in good faith. *See Del. & Hudson*, 124 B.R. at 176.

33. The business judgment rule is a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

34. The Debtors submit that their decision to pursue and, ultimately, consummate the Sale represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtors lack the liquidity to continue operating the Restaurants for an extended period, have no source of financing for a standalone reorganization and have repeatedly tried, without success, to sell the business outside of bankruptcy. A prompt sale of the Restaurants as going concerns will preserve jobs, avoid the loss of value associated with a liquidation, and ensure that gift cards and other customer obligations are honored. The Debtors will continue to conduct an extensive and fulsome process to market the Assets. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or otherwise best value available for the Assets by allowing the market to dictate the value of the Assets. Furthermore, compliance with the Bidding Procedures will establish that the Debtors and the Successful Bidder have proceeded in good faith and will ensure the fairness and reasonableness

of the consideration to be paid by the Stalking Horse Bidder or, in the event the Stalking Horse Bidder is not the Successful Bidder, the Successful Bidder.

35. Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances. Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction and the deadline for filing any objections. The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Stalking Horse Agreement, the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Assets.

36. The Sale, conducted in accordance with the Bidding Procedures, will generate significant value for the Debtors' estates and represents the best path forward for maximizing recoveries in these Cases. The Debtors submit that ample business justification exists for the consummation of the Sale and therefore request that the Court approve the Sale.

**B. The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code**

37. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

38. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *See Citicorp Homeowners Servs., Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that, because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co.* (*In re Wolverine Radio Co.*), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, the Third Circuit has construed the term "interest" in section 363(f) broadly. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–90 (3d Cir. 2003).

39. The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all encumbrances other than the Assumed Liabilities and the Permitted Encumbrances (and except as otherwise expressly set forth in the Sale Order), in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to the Sale. In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Prepetition Agent, which holds liens on substantially all of the Debtors' assets on behalf of the prepetition lenders, is expected to consent to the Sale, and its consent and release of liens on the Acquired Assets is a condition to the Stalking Horse Bidder's obligation to close. *See* Stalking Horse Agreement § 9.2(d).

40. Moreover, with respect to any other party asserting a lien, claim, encumbrance or the like against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code. In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested. Such lienholders that do not object to the Sale should be deemed to have consented. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted);*Hargrave v. Twp. of Pemberton* (*In re Tabone, Inc.*), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of all liens was deemed acceptance that satisfied section 363(f)(2)); *Elliot*, 94 B.R. at 345–46 (holding creditor's failure to timely object after receiving notice was consent to sale). Consistent with the foregoing, the Bidding Procedures provide that the absence of a timely objection to the Sale shall be "consent" to the Sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

41. Furthermore, the Debtors propose that any encumbrances asserted against the Assets be transferred to, and attach to, the proceeds of the Sale with the same validity, extent, and priority as they had against the Assets, and that application of the proceeds generated by the Sale be subject to any applicable provisions of the DIP Order.

42. The Sale Order should also provide that the Successful Bidder is not a successor to the Debtors and is not liable for any claims against the Debtors on any theory of successor or transferee liability. The Third Circuit has held that section 363(f) permits a sale free and clear of successor liability claims that arise from a debtor's ownership and operation of the assets being

sold. *See Trans World Airlines*, 322 F.3d at 288–90. Such a finding is necessary to give the Successful Bidder the benefit of its bargain, and the Stalking Horse Agreement requires that the Sale Order so provide. *See* Stalking Horse Agreement § 4.4(e). Without the protection of a sale free and clear of all interests, the Stalking Horse Bidder would not purchase the Acquired Assets, and any other bidder would likely pay substantially less.

**C. The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

43. Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) of the Bankruptcy Code does not affect the validity of a sale to an entity that purchased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal. *See* 11 U.S.C. § 363(m). In approving the Sale, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures, including the Stalking Horse Bidder, are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to the proposed transaction. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (explaining that good faith "speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings," and that the misconduct that would destroy good-faith status "involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

44. The Stalking Horse Agreement is the product of extended, arm's-length negotiations between the Debtors and the Stalking Horse Bidder, each represented by separate counsel and advisors. As discussed above, the Debtors do not believe that the Stalking Horse Bidder is an insider of the Debtors, and the Stalking Horse Bidder has represented that it has not entered into any agreement with any other bidder to control the price or the conduct of the Auction. *See* Stalking Horse Agreement § 7.7. The Debtors have disclosed the Stalking Horse Bidder's relationships with the Debtors as franchisor, creditor, landlord, and DIP Lender, and the Stalking Horse Bid will be subject to the same market test as any other Bid. The Debtors will present evidence at the Sale Hearing supporting a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) and that the Sale is not subject to avoidance under section 363(n) of the Bankruptcy Code.

**D. The Court Should Approve the Bidding Procedures**

45. The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (en banc) (same). Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Res.*, 147 B.R. at 659 (stating that "[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets").

46. The Debtors and their professional advisors, including Brookwood, have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors. The Bidding Procedures will allow the Debtors to

conduct the Auction in an orderly, fair, and open fashion, which will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or otherwise best possible consideration for the Assets. The Bidding Procedures permit Bids for all or any portion of the Assets and require each Bidder to disclose any connection with the Debtors, their insiders, the Franchisor, the Stalking Horse Bidder, or the Prepetition Agent and lenders, which promotes transparency and guards against collusion. Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors and their professional advisors to review, analyze, and compare any Bids received to determine which Bids are in the best interests of the Debtors' estates and their creditors. Brookwood believes that the Bidding Procedures are designed to produce the highest or otherwise best value for the Assets. *See* Brookwood Declaration ¶¶ 24, 27.

47. The requirement that a Bidder that intends to operate any Restaurant as an Outback Steakhouse obtain the Franchisor's approval as a franchisee is appropriate. The Restaurants operate under the Franchisor's marks and system, and the Franchisor's consent rights arise under the Master Franchise Agreement. To prevent that requirement from chilling bidding, the Stalking Horse Agreement requires that the Franchisor's approval (a) not be unreasonably withheld, conditioned or delayed, (b) be determined under the standards the Franchisor applies generally in approving new franchisees, which the Franchisor will provide within fourteen (14) days after the Agreement Date and which will be available to potential bidders in the Debtors' data room upon execution of a confidentiality agreement, and (c) be communicated in writing within five (5) Business Days after the Franchisor receives a request, and in any event before the Bid Deadline. *See* Stalking Horse Agreement § 4.2(c)(v). In addition, the Franchisor and its affiliates waive any right of first refusal or similar right that

would otherwise apply to the Sale or any Alternative Transaction. Id. § 8.13(a). These protections ensure that competing bidders have a fair and predictable path to approval. *See* Brookwood Declaration ¶ 19.

48. The proposed timeline is also fair and reasonable. Brookwood has marketed the Assets since August 2026, and Brookwood will continue to market them through the Bid Deadline. The Debtors' liquidity, the costs of operating in chapter 11 and the Transaction Milestones make a longer process impractical. *See* Brookwood Declaration ¶¶ 25–26. The Debtors submit that the Bidding Procedures are necessary and transparent and will derive the highest or otherwise best bids for the Assets. Therefore, the Debtors request that the Court approve the Bidding Procedures.

**E. The Break-Up Fee Should Be Approved**

49. In the Third Circuit, a break-up fee is approved if it is an allowable administrative expense under section 503(b) of the Bankruptcy Code, meaning that it is actually necessary to preserve the value of the estate. *See O'Brien*, 181 F.3d at 535; *In re Reliant Energy Channelview LP*, 594 F.3d 200, 205–06 (3d Cir. 2010). A break-up fee may meet that standard where, among other things, it promotes competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited. *See O'Brien*, 181 F.3d at 537.

50. The Break-Up Fee satisfies that standard. *First*, the Stalking Horse Bidder required the Break-Up Fee as a condition to entering into the Stalking Horse Agreement and committing to serve as the stalking horse. *See* Brookwood Declaration ¶ 22. *Second*, the Stalking Horse Bid establishes a floor for the Auction that gives the Debtors the certainty of a fully committed, non-contingent bid and signals to the market the value of the Assets. *Third*, the Break-Up Fee is modest: $790,000 is approximately three percent (3%) of the $26.3 million base

Cash Purchase Price and a substantially smaller percentage of the total consideration, including the Assumed Liabilities and Cure Costs. There is no expense reimbursement, and Brookwood believes the Break-Up Fee is reasonable and consistent with market practice. See id. ¶¶ 21, 23. *Fourth*, the Break-Up Fee is payable only upon consummation of an Alternative Transaction, solely from the cash proceeds of that transaction, so it will be paid only if the estates receive a higher or otherwise better bid, and the Minimum Bid Requirement ensures that any Alternative Transaction will cover the Break-Up Fee and provide at least $250,000 of incremental value to the estates. *See* Stalking Horse Agreement §§ 4.2(c)(i), 4.5.

51. The Stalking Horse Agreement provides that the Break-Up Fee will constitute an allowed administrative expense with priority over all other administrative expenses, subject only to any carve-out for professional fees in the DIP Order. Because the Break-Up Fee is payable only from the cash proceeds of an Alternative Transaction, concurrently with its closing, that priority will not reduce recoveries available to other administrative creditors from any other source. The Prepetition Agent and the DIP Lender have consented to payment of the Break-Up Fee from the cash proceeds of an Alternative Transaction, subject to the DIP Order and upon the terms and conditions provided for in the Stalking Horse Agreement and Bidding Procedures. The Break-Up Fee is payable only in respect of an Alternative Transaction with the Successful Bidder or a back-up bidder selected at the Auction or one consummated within one (1) year after a termination under section 10.2(c) or (d) of the Stalking Horse Agreement. *See* Stalking Horse Agreement § 4.5(b). Like the Break-Up Fee, any such payment is limited to the circumstance in which the estates actually close an Alternative Transaction and is payable only from the cash proceeds of that transaction.

**F. The Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code**

52. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 Collier on Bankruptcy ¶ 365.01[1] (15th ed. 1993)).

53. The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard. *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice). The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See Integrated Res.*, 147 B.R. at 656 ("The business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing"); *Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Generally,

courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co.* (*In re Wheeling-Pittsburgh Steel Corp.*), 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987) ("[C]ourts accord the debtor's business judgment a great amount of deference since the decision to assume or reject an executory contract is an administrative not a judicial matter"); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182–83 (Bankr. E.D. Pa. 2010) (approving debtor's rejection of an executory contract where debtor's business judgment had been reasonably exercised).

54. Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Assigned Contracts is in the best interests of the Debtors and their estates. The Restaurants cannot be sold as going concerns without their real property leases and key contracts, and the assumption and assignment of the Assigned Contracts is necessary for the Debtors to obtain the benefits of the Stalking Horse Agreement or an Alternative APA, as applicable. In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Thus, following an assignment to the Successful Bidder of any Assigned Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

55. Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts be cured or that adequate assurance be provided that such defaults will be promptly cured. 11 U.S.C. § 365(b)(1). The Debtors propose to file with the Court, and serve on each counterparty to a Potential Assigned Contract, a Cure Notice that indicates the proposed Cure Cost for each such contract. As such, each counterparty

will have the opportunity to object to the proposed assumption and assignment and to the proposed Cure Cost. Under the Stalking Horse Agreement, the Stalking Horse Bidder will pay the Cure Costs for the Assigned Contracts, subject to section 2.3(a) of the Stalking Horse Agreement, under which the Stalking Horse Bidder pays only the Unpaid Property Tax and Percentage Rent components of the Cure Costs for Store leases, within their caps, and does not pay Cure Costs associated with a Suspended Store. *See* Stalking Horse Agreement §§ 2.3, 2.5.

56. Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (quoting Cinicola v. Scharffenberger, 248 F.3d 110, 120 n.10 (3d Cir. 2001)); *Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance "does not mean absolute insurance that the debtor will thrive and make a profit"); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"). Adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See Bygaph*, 56 B.R. at 605–06 (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding

to the business to ensure its success, and that in the leasing context, "the chief determinant of adequate assurance of future performance is whether the rent will be paid").

57. Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assigned Contract. The Stalking Horse Bidder is the Franchisor of the Outback Steakhouse® system, has extensive experience operating Outback Steakhouse restaurants, will provide evidence of its financial ability to perform, and is solely responsible for demonstrating adequate assurance of future performance. *See* Stalking Horse Agreement § 2.5(b). For its Bid to be deemed a Qualified Bid, each other Bidder will be required to provide Adequate Assurance Information, which the Debtors will provide to the applicable counterparties on a confidential basis. Furthermore, given that the Debtors will submit evidence at the Sale Hearing that all requirements for the assumption and assignment of the Assigned Contracts have been met, the Court and other interested parties will have the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance.

58. To the extent any Assigned Contract is a lease of real property in a shopping center, section 365(b)(3) of the Bankruptcy Code imposes additional requirements for adequate assurance of future performance. *See In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1086 & n.3 (3d Cir. 1990). The Debtors will demonstrate at the Sale Hearing that the Successful Bidder satisfies those requirements, including with respect to the financial condition and operating performance of the proposed assignee and the use of the premises, which will remain operating Outback Steakhouse restaurants under the Stalking Horse Bid.

59. Therefore, the Debtors respectfully request that the Court (a) approve the proposed assumption and assignment of the Assigned Contracts and (b) find that all anti-

assignment provisions of such contracts are unenforceable under section 365(f) of the Bankruptcy Code.[5]

**G. Section 363(b)(1) of the Bankruptcy Code Is Not Implicated**

60. Section 363(b)(1) of the Bankruptcy Code restricts the sale of personally identifiable information, as defined in section 101(41A) of the Bankruptcy Code, where a debtor's privacy policy in effect on the petition date prohibits its transfer to unaffiliated persons, unless the sale is consistent with the policy or the Court approves the sale after appointment of a consumer privacy ombudsman. 11 U.S.C. § 363(b)(1). The Debtors do not collect or maintain customer personally identifiable information. The Restaurants process customer purchase transactions, but payment card transactions are processed by third-party payment processors, and the Debtors do not retain full payment card numbers. The gift card, loyalty, and online ordering programs in which the Debtors participate are administered by the Franchisor and its affiliates. See Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance, Administration, and Continuation of Certain Customer Programs, (II) Approving Procedures for Notice to Customer Program Participants, and (III) Granting Related Relief*, filed concurrently herewith (the "**Customer Programs Motion**"), ¶¶ 9–10, 16, 19. In addition, under the Master Franchise Agreement, all customer data generated by or used in the operation of the Restaurants, including customer names, contact information, and related information, is the Franchisor's confidential information; the Debtors acquire no interest in that information other than a limited

[5] Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

right to use it during the term of the Master Franchise Agreement, and must deliver it to the Franchisor, as its exclusive property, on termination. See Master Franchise Agreement §§ 7.3, 15.8. Accordingly, although the Acquired Assets include customer lists, databases, and business information to the extent of the Debtors' interest (Stalking Horse Agreement § 2.1(h), (m)), the Debtors have no transferable interest in customer personally identifiable information, section 363(b)(1) of the Bankruptcy Code is not implicated by the Sale, and the appointment of a consumer privacy ombudsman is not required.

## XI. WAIVER OF STAY UNDER BANKRUPTCY RULES 6004(H) AND 6006(D)

61. Pursuant to Bankruptcy Rule 6004(h), "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). Furthermore, Bankruptcy Rule 6006(d) provides that, "[u]nless the court orders otherwise, an order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6006(d). As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale on the timeline contemplated by the Stalking Horse Agreement and the Bidding Procedures would be detrimental to the Debtors, their creditors, and their estates.

62. For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent applicable.

## XII. NOTICE

63. Notice of this Motion will be provided to: (i) the U.S. Trustee; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) the

Prepetition Agent and its counsel; (iv) the Stalking Horse Bidder, in its capacities as Franchisor and DIP Lender, and its counsel; (v) the United States Attorney's Office for the District of Delaware; (vi) the Internal Revenue Service; (vii) the state attorneys general and alcoholic beverage control authorities for all states in which the Debtors conduct business; (viii) all parties who have expressed a written interest in some or all of the Assets; (ix) all known holders of liens, encumbrances, and other claims secured by the Assets; (x) all counterparties to the Potential Assigned Contracts; (xi) all applicable state and local taxing authorities; (xii) the other Franchisor Parties; and (xiii) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## XIII. NO PRIOR REQUEST

64. No prior request for the relief sought in this Motion has been made to this or any other court.

## XIV. CONCLUSION

WHEREFORE, for the reasons set forth herein and in the First Day Declaration and the Brookwood Declaration, the Debtors respectfully request that this Court enter the Bidding Procedures Order and the Sale Order, granting the relief requested in the Motion and such other and further relief as is just and proper.

Dated: November 2, 2026
Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

/s/ *Bradford J. Sandler*

Bradford J. Sandler (DE Bar No. 4142)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: bsandler@pszjlaw.com
pkeane@pszjlaw.com

-and-

KTBS LAW LLP
Michael L. Tuchin (*pro hac vice* admission pending)
Nir Maoz (*pro hac vice* admission pending)
1801 Century Park East, Twenty-Sixth Floor
Los Angeles, California 90067
Telephone: (310) 407-4000
Facsimile: (310) 407-9090
Email: mtuchin@ktbslaw.com
nmaoz@ktbslaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*