**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>CERCA TROVA RESTAURANT GROUP HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11749<br><br>(Joint Administration Requested) |

**DECLARATION OF ANISH GANDHI IN SUPPORT OF THE DEBTORS' BIDDING PROCEDURES AND SALE MOTION**

I, Anish Gandhi, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a Managing Director of Brookwood Associates, L.L.C. ("**Brookwood**"), an investment banking firm with offices at 3575 Piedmont Road, 15 Piedmont Center, Suite 820, Atlanta, Georgia 30305. Brookwood is the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**") in these chapter 11 cases. I am authorized to submit this declaration (this "**Declaration**") on behalf of Brookwood.

2. I submit this Declaration in support of the Debtors' *Motion for Entry of: (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Permitted Encumbrances and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cerca Trova Restaurant Group Holdings, Inc. (5725); Out West Restaurant Group, Inc. (0849); Cerca Trova Steakhouse, Inc. (8902); Cerca Trova Steakhouse, L.P. (2006); and Cerca Trova Southwest Restaurant Group, LLC (8835). The Debtors' mailing address is 8885 Rio San Diego Drive, Suite 360, San Diego, California 92108.

*Procedures and the Form and Manner of Notice Thereof, (III) Authorizing the Debtors to Enter into the Stalking Horse Agreement and Approving the Break-Up Fee and (IV) Granting Related Relief; and (B) an Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Permitted Encumbrances, (II) Approving the Stalking Horse Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "**Bidding Procedures and Sale Motion**"), filed contemporaneously herewith.[2]

3. Except as otherwise indicated, the statements in this Declaration are based on (a) my personal knowledge, (b) my discussions with the Debtors' management, other members of the Brookwood team, and the Debtors' other advisors, (c) my review of relevant documents, or (d) my opinion based on my experience and my knowledge of the Debtors' business, the restaurant industry, and the marketing process described below. I am over the age of eighteen. I am not being compensated for this testimony other than through the compensation Brookwood will receive as a professional retained by the Debtors, none of which is payable on account of this testimony. If called upon to testify, I could and would testify competently to the facts set forth herein.

## I. BACKGROUND AND QUALIFICATIONS

4. Brookwood is an Atlanta-based investment banking firm that provides mergers and acquisitions, financing, strategic advisory, and restructuring services to middle-market companies. Brookwood is a registered broker-dealer and a member of FINRA and SIPC.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Bidding Procedures and Sale Motion, the Bidding Procedures, or the Stalking Horse Agreement, as applicable.

Brookwood's professionals have particular experience in multi-unit, consumer-facing businesses, including restaurant concepts, franchisors, and multi-unit franchisees.

5. I joined Brookwood in 2011. I have approximately twenty years of experience providing financial and strategic advisory services to senior management teams, boards of directors, and shareholders of public and private companies, including exclusive sale assignments, acquisitions, divestitures, public debt and equity offerings, and private debt and equity placements. At Brookwood, I focus on middle-market companies in the consumer and retail sector, including the restaurant industry, and I have advised both franchisors and multi-unit franchisees. From 2006 to 2011, before joining Brookwood, I worked in investment banking at Bank of America Merrill Lynch in New York, most recently as a Vice President, focusing on mergers and acquisitions and capital raising for large-capitalization public companies. I hold a Bachelor of Business Administration from Emory University. I am registered with FINRA through Brookwood as a General Securities Representative and an Investment Banking Representative, and I have passed the Series 7, Series 63, and Series 79 examinations and the Securities Industry Essentials examination.

## BROOKWOOD'S RETENTION

6. The Company engaged Brookwood under an engagement letter dated June 29, 2026, which became effective upon its execution on June 30, 2026.[3] Since then, Brookwood has, among other things, (a) prepared a financial model and marketing materials, including a confidential information memorandum (the "**CIM**"); (b) worked with the Company to organize a virtual data room; (c) identified and contacted potential strategic and financial buyers; (d)

---

[3] The terms of Brookwood's engagement, including its compensation, will be described in the Debtors' application to retain Brookwood.

responded to diligence requests and coordinated buyers' access to management; (e) evaluated the letters of intent received; (f) assisted the Debtors in negotiating the Stalking Horse Agreement and developing the Bidding Procedures; and (g) prepared regular reports on the marketing process for the Company's management and its prepetition lenders. Through this work, I and the other members of the Brookwood team have become familiar with the Debtors' business, operations, and financial condition.

## II. THE PREPETITION MARKETING PROCESS

7. As described in the *Declaration of David Goronkin in Support of Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"), the Debtors operate sixty-one (61) Outback Steakhouse restaurants (the "**Restaurants**") as franchisees of Outback Steakhouse of Florida, LLC (the "**Franchisor**"). I understand that the Company pursued a sale on several occasions before Brookwood's engagement, including through processes run by other investment banks in 2018 and 2022 and in negotiations with a prospective purchaser during 2025, none of which resulted in a transaction. I also understand that, on May 22, 2026, before Brookwood was engaged, an affiliate of the Franchisor delivered a letter of interest to the Company.

8. Following its engagement, Brookwood worked with the Company's management to prepare the CIM, a financial model, and the data room. Brookwood began contacting potential buyers in the week of August 17, 2026 (the "**Marketing Process**"). Brookwood's outreach was intended to reach every party it believed reasonably likely to have an interest in, and the ability to complete, an acquisition of the Restaurants. The outreach targeted three groups: (a) restaurant operators, including multi-unit franchisees of other casual-dining and quick-service brands; (b) other strategic acquirers in the restaurant industry; and (c) private equity funds, family offices, and other financial and distressed investors with experience in restaurants or franchised businesses.

9. In total, Brookwood contacted 177 potential buyers, consisting of 115 strategic parties and 62 financial parties. Twenty parties executed non-disclosure agreements and received the CIM and access to the data room. Brookwood and management responded to diligence requests from the parties under non-disclosure agreements, including a comprehensive diligence request from the Franchisor's parent, Bloomin' Brands, Inc. Brookwood's weekly reports on the status of its outreach were provided to the Company's prepetition lenders.

10. Brookwood invited the parties that had executed non-disclosure agreements to submit letters of intent by September 17, 2026. The Debtors received three letters of intent: two from third parties and one from Bloomin' Brands, Inc., the Franchisor's parent (the "**Franchisor LOI**").

11. In evaluating the letters of intent, the Debtors and Brookwood considered, among other things, (a) the amount and form of the consideration offered, including the liabilities to be assumed and the cure costs the Debtors would bear; (b) the number of Restaurants to be acquired, and the cost to the estates of closing any Restaurants not acquired; (c) the bidder's ability to obtain the Franchisor's approval as a franchisee; (d) the bidder's financial ability to close and any financing or diligence contingencies; (e) the bid protections requested; (f) the treatment of the Debtors' employees, landlords, and customers; and (g) the conditions to closing and the time required to close.

12. In the judgment of the Debtors and Brookwood, each of the two third-party letters of intent was inferior to the Franchisor LOI. Each offered less cash than the Franchisor LOI. Each would have left cure costs or other liabilities with the Debtors' estates or deducted them from the purchase price. Each was subject to diligence, financing, or other contingencies,

including the Franchisor's approval of the bidder as a franchisee. And each required bid protections substantially greater than those in the Stalking Horse Agreement.

13. Feedback from the potential buyers that declined to sign a non-disclosure agreement and proceed in the process or declined to submit a letter of intent after reviewing the information and data room included concerns around broader casual dining trends, concentration of restaurants in California, soft unit economic trends including negative same store sales and low profit margins, deferred maintenance capital expenditures required to upkeep the existing restaurants, a significant number of underperforming locations and limited ability to scale within the Outback system.

14. After evaluating the letters of intent with Brookwood and their other advisors, the Debtors concluded that the Franchisor LOI offered the highest or otherwise best value available and the greatest certainty of closing. Compared with the two third-party proposals, the Franchisor's proposal offered more cash for all sixty-one Restaurants, the payment of cure costs by the purchaser (subject to certain caps), and the assumption of the Debtors' gift card and other customer program obligations, without any financing or diligence contingency and without the risk that the Franchisor would decline to approve the purchaser as a franchisee. It also required substantially smaller bid protections.

15. Bloomin' Brands, Inc. submitted a revised Franchisor LOI on September 25, 2026. As revised, it proposed a cash purchase price of $25.0 million, plus the assumption of certain liabilities, including the Debtors' gift card obligations and up to $4.5 million of obligations to certain vendors, and a break-up fee of $750,000 with super-priority under section 364(d) of the Bankruptcy Code. Over the following week, the Debtors, with the assistance of Brookwood and their other advisors, negotiated improvements to those terms. As a result,

among other things, (a) the cash purchase price increased to $26.3 million; (b) the additional cash payable if certain assumed liabilities fall below an agreed amount was expanded to cover up to $6.1 million of specified liabilities, including unpaid property taxes and percentage rent; (c) the purchaser agreed to pay cure costs for the contracts and leases it assumes, subject to certain limitations, including caps on the components payable for restaurant leases; (d) the deposit increased from $2.5 million to $2.63 million; and (e) the break-up fee became a $790,000 administrative expense claim that is payable only from the cash proceeds of an alternative transaction and is not secured by any lien on the Debtors' assets, rather than a claim entitled to super-priority under section 364(d) of the Bankruptcy Code. Following negotiations, Bloomin' Brands, Inc. also agreed to remove the requirement that it obtain new or transferred liquor licenses as a condition to closing, which substantially decreased the expected timeline to closing and increased the likelihood of closing. The Company and Bloomin' Brands, Inc. executed the revised Franchisor LOI on October 2, 2026, and the Debtors then negotiated the definitive terms of the Stalking Horse Agreement with the Franchisor.

## III. THE STALKING HORSE AGREEMENT

16. The Debtors have entered into an asset purchase agreement, dated as of November 1, 2026 (the "**Stalking Horse Agreement**"), with the Franchisor (in its capacity as purchaser, the "**Stalking Horse Bidder**"), subject to higher or otherwise better offers. Under the Stalking Horse Agreement, the Stalking Horse Bidder will acquire substantially all of the Debtors' assets relating to the Restaurants in exchange for: (a) a cash purchase price of $26,300,000, plus an additional cash amount of up to $6,100,000 to the extent that certain specified liabilities assumed by the Stalking Horse Bidder at closing are less than $6,100,000 (together, the "**Cash Purchase Price**"); (b) the payment of cure costs for the executory contracts and unexpired leases assumed and assigned to the Stalking Horse Bidder, subject to certain

limitations; and (c) the assumption of certain other liabilities, including the Debtors' obligations under their gift card and other customer programs. $1,300,000 of the Cash Purchase Price is earmarked for the payment of certain employee-related obligations. The Stalking Horse Bidder has agreed, subject to its normal hiring practices, to offer employment to substantially all of the Debtors' Restaurant-level employees. The Stalking Horse Bidder will deliver a cash deposit of $2,630,000, equal to ten percent of the base cash purchase price. The Stalking Horse Agreement is not subject to a financing contingency.

17. The Franchisor has several relationships with the Debtors, each of which is described in the First Day Declaration and in the Stalking Horse Agreement. The Franchisor is the Debtors' franchisor and a significant creditor. Affiliates of the Franchisor are landlords or sublandlords of certain of the Restaurants, and its parent, Bloomin' Brands, Inc., is a co-defendant with the Debtors in certain litigation. The Franchisor is also providing the Debtors' postpetition financing of up to $5.5 million (the "**DIP Facility**"), and the Stalking Horse Agreement permits the Stalking Horse Bidder to credit the amounts it advances under the DIP Facility against the Cash Purchase Price and to credit bid such amounts at the Auction. The Franchisor does not hold any equity interest in the Debtors and has no representative on the Debtors' board of directors.

18. The Debtors, with the assistance of Brookwood and their other advisors, negotiated the Stalking Horse Agreement with the Franchisor and its counsel at arm's length and in good faith. The negotiations were overseen by the Debtors' board of directors. The negotiations were extensive and resulted in a number of changes to the Stalking Horse Bidder's initial proposal that benefit the Debtors' estates. I am not aware of any agreement or understanding between the Debtors and the Stalking Horse Bidder relating to the sale of the

Debtors' assets other than as set forth in the Stalking Horse Agreement and the documents related to it, or of any fact suggesting that the Stalking Horse Agreement was entered into to hinder, delay, or defraud creditors.

19. Because the Franchisor is also the stalking horse, the Debtors negotiated provisions designed to ensure that its other roles do not chill competing bids. Among other things, (a) the Franchisor's approval of a competing bidder that proposes to operate the Restaurants as Outback Steakhouse restaurants may not be unreasonably withheld, conditioned, or delayed, will be determined under the standards the Franchisor applies generally in approving new franchisees, which the Franchisor will provide within fourteen (14) days after the date of the Stalking Horse Agreement and which will be made available to potential bidders in the Debtors' data room, and must be communicated within five business days after the Franchisor receives a request and in any event before the Bid Deadline; (b) the Franchisor and its affiliates have waived any right of first refusal, right of first offer, or similar right that would otherwise apply to the sale or any alternative transaction; and (c) the Stalking Horse Bidder, including in its capacity as lender under the DIP Facility, is not a Consultation Party. In my opinion, these provisions are important to a fair and competitive process.

20. In my opinion, the Stalking Horse Agreement benefits the Debtors' estates. It establishes a floor for the value of the Restaurants, provides for their continued operation as going concerns, and preserves jobs, the Debtors' customer programs, and the Debtors' relationships with their landlords and vendors, while leaving the Debtors free to pursue higher or otherwise better offers through the Auction.

## IV. THE BID PROTECTIONS

21. As an inducement to enter into the Stalking Horse Agreement, the Debtors agreed, subject to the Court's approval, to pay the Stalking Horse Bidder a break-up fee of $790,000 (the

"**Break-Up Fee**") if the Debtors consummate an alternative transaction with the successful bidder or a back-up bidder selected at the Auction, or consummate an alternative transaction within one year after the Stalking Horse Agreement is terminated under certain of its provisions, including by the Debtors in the exercise of their fiduciary duties. The Break-Up Fee is approximately three percent of the $26,300,000 base cash purchase price,[4] and a smaller percentage of the total consideration offered by the Stalking Horse Bidder once the additional cash amount, cure costs, and assumed liabilities are taken into account. The Stalking Horse Agreement does not provide for an expense reimbursement. I understand that the Break-Up Fee is payable only from the cash proceeds of an alternative transaction, at the closing of that transaction, and is not payable if, among other things, the Stalking Horse Agreement is terminated as a result of the Stalking Horse Bidder's breach or its failure to fund the DIP Facility, the Stalking Horse Bidder is the successful bidder, or the Stalking Horse Bidder fails to participate in the Auction or withdraws or reduces its bid.

22. The Break-Up Fee was negotiated at arm's length and in good faith. Based on my involvement in the negotiations, I believe that the Stalking Horse Bidder would not have agreed to serve as the stalking horse, and to commit to the terms of the Stalking Horse Agreement, without the Break-Up Fee.

23. Based on my experience, I believe that the Break-Up Fee is reasonable and consistent with the bid protections customarily provided to stalking horse bidders in sale processes of this size and type, both in and out of chapter 11. The Break-Up Fee compensates the Stalking Horse Bidder for the time and expense of its diligence and negotiations and for the risk that its bid will be used to attract a higher one. The Bidding Procedures require that any

[4] Three percent of the $26,300,000 base Cash Purchase Price is $789,000.

competing bid exceed the Stalking Horse Bid by at least the amount of the Break-Up Fee plus $250,000, and include cash exceeding the estimated cash purchase price under the Stalking Horse Agreement by at least the same amount, so the Debtors' estates will receive a net benefit from any competing bid that is accepted. In my opinion, the Break-Up Fee will encourage, rather than chill, competitive bidding by establishing a baseline that other bidders can evaluate and improve upon.

## V. THE BIDDING PROCEDURES AND SALE TIMELINE

24. The Debtors, in consultation with Brookwood and their other advisors, developed the Bidding Procedures to promote a competitive process that will produce the highest or otherwise best offer for the Debtors' assets within the time available. The Bidding Procedures permit bids for all of the Restaurants or for individual Restaurants or groups of Restaurants, and give the Debtors the flexibility to solicit and evaluate bids, negotiate with bidders, hold an auction if they receive more than one qualified bid, and close a sale with the successful bidder, while providing a clear and uniform process for all bidders.

25. The Bidding Procedures propose a bid deadline of December 8, 2026 (the "**Bid Deadline**"), an auction, if necessary, on December 11, 2026 (the "**Auction**"), and a hearing to approve the sale on December 15, 2026. By the Bid Deadline, the Debtors' business will have been marketed for approximately sixteen weeks. Brookwood intends to provide the Stalking Horse Agreement and the Bidding Procedures to each party that received the CIM, to contact again each party that Brookwood contacted during the Marketing Process, and to contact any additional party that Brookwood or the Debtors identify. Any party that executes a non-disclosure agreement will receive immediate access to the data room, which already contains substantial diligence information.

26. I believe that the proposed timeline gives potential bidders sufficient time to complete their diligence and submit bids. Many of the parties most likely to bid are restaurant operators and investors who already know the Outback system, and many have already received the CIM and conducted diligence. At the same time, I believe that a longer process would put value at risk. As described in the First Day Declaration, the Debtors have limited liquidity, and the timeline is consistent with the milestones under the DIP Facility, which require, among other things, a bid deadline no later than December 8, 2026 and a closing no later than January 4, 2027. A prolonged chapter 11 case would also increase the risk of losing employees, guests, and vendor support, and the resulting erosion of value would harm all stakeholders.

## VI. CONCLUSION

27. For these reasons, I believe that the Bidding Procedures, the Debtors' entry into the Stalking Horse Agreement, and the Break-Up Fee are reasonable and appropriate, and that they are designed to produce the highest or otherwise best value for the Debtors' assets for the benefit of the Debtors' estates and their stakeholders.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 2, 2026
Atlanta, Georgia

*/s/ Anish Gandhi*
Anish Gandhi
Managing Director
Brookwood Associates, L.L.C.