**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CERCA TROVA RESTAURANT GROUP HOLDINGS, INC. *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11749 (CTG)<br><br>(Jointly Administered)<br><br>**Re: D.I. 14, 51, 17** |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTIONS FOR ENTRY OF ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; AND (II) ESTABLISHING BIDDING PROCEDURES**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (these "Chapter 11 Cases") of the above-captioned debtors in possession (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby files this omnibus objection (this "Objection") to the Debtors':

i. *Motion for an Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing from Outback Steakhouse of Florida, LLC, (B) Use Cash Collateral, (C) Provide Adequate Protection to Prepetition Secured Creditors; and (II) Granting Related Relief* [D.I. 14] (the "DIP Motion"); and

ii. *Motion for Entry of: (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Permitted Encumbrances and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures and the Form and Manner of Notice Thereof, (III) Authorizing the Debtors to Enter into the Stalking Horse Agreement and Approving the Break-Up Fee and (IV) Granting Related Relief; and (B) an Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Permitted*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cerca Trova Restaurant Group Holdings, Inc. (5725); Out West Restaurant Group, Inc. (0849); Cerca Trova Steakhouse, Inc. (8902); Cerca Trova Steakhouse, L.P. (2006); and Cerca Trova Southwest Restaurant Group, LLC (8835). The Debtors' mailing address is 8885 Rio San Diego Drive, Suite 360, San Diego, California 92108.

> *Encumbrances, (II) Approving the Stalking Horse Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 17] (the "Bidding Procedures Motion" and together with the DIP Motion, the "Motions").[2]

In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1. The Committee supports a value-maximizing sale of the Debtors' business, and it supports the Debtors obtaining appropriate postpetition financing to get there. With respect to the sale process, the Committee and the Debtors are aligned based on the observations in the First Day Declaration that, "[t]he proposed sale would transfer the restaurants to the operator of the Outback Steakhouse system, preserving thousands of jobs, providing continuity for the Company's guests, landlords, and vendors, and allowing the Company's many beloved Outback locations to continue to serve their communities. Meanwhile, the court-approved sale process, including the opportunity for higher or otherwise better bids, will test the market one final time to ensure that the Company's creditors receive as much value as possible."[4]

2. However, the Committee's alignment stops there. The Committee objects to the proposed DIP Facility on several grounds. Chief among them is that the DIP Facility will be repaid ***entirely*** from proceeds of unencumbered assets that should otherwise be available for distribution to unsecured creditors. Furthermore, despite unsecured creditors financing the entirety of these Chapter 11 Cases, the DIP Facility is designed to do two things: (i) deliver the Debtors' business to its own franchisor without a true competitive process, and (ii) funnel all sale proceeds to the

---

[2] Capitalized terms used but not otherwise defined in this Objection have the meanings ascribed to such terms in the Motions, as applicable.

[3] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meaning ascribed to such terms elsewhere in this Objection.

[4] *Declaration of David Goronkin in Support of Chapter 11 Petitions and First Day Relief* [D.I. 4] (the "First Day Declaration") ¶ 11.

Prepetition Lenders. Indeed, Franchisor only offered to provide the DIP Facility in conjunction with its stalking horse bid, is only required to extend financing while it remains the stalking horse, successful, or back-up bidder, and credits every dollar it advances against its own purchase price. Thus, the costs of the financing fall on the estates (and, in particular, on unsecured creditors), while the benefits flow to Franchisor, as buyer, and to the Prepetition Lenders, whose collateral is being sold in a fast-tracked sale.

3. As these Chapter 11 Cases are plainly being run to sell the Prepetition Lenders' collateral, the Prepetition Lenders should "pay the freight" and provide reasonable assurances of an administratively solvent estate. That is not the case here. Instead, unsecured creditors are funding a sale process for the benefit of the Prepetition Lenders and Franchisor. This is backwards.

4. Ordinarily, whoever benefits from a sale bears its cost. That is the logic underlying section 506(c) of the Bankruptcy Code, and it is why professional fee carve-outs are funded from a secured lender's collateral. The proposed Final DIP Order does the opposite: it waives the Debtors' rights under section 506(c), and it requires the Carve-Out—including the success fee of the investment banker selling the lenders' collateral—to be funded first from unencumbered assets. The result is that unsecured creditors pay the professionals, while additional waivers of the estates' rights under section 552(b) and of marshaling foreclose any later correction.

5. Accordingly, the DIP Facility is priming in name only. If a third party prevails at auction, which could be the most value-maximizing result for the estates, the DIP Facility is repaid first from unencumbered assets, and the facility's liens prime the Prepetition Collateral only to the extent not satisfied from unencumbered assets. The Prepetition Lenders claim they agreed to be "primed," but in reality, they never are. Yet they would receive adequate protection liens, payment of professional fees (despite being significantly undersecured), and superpriority claims on

property that was never their collateral, in exchange for no new money and on a record that shows no diminution in value.

6. Nor is the DIP Facility "free." While the facility bears no interest, the Budget directs approximately $2.67 million to Franchisor in the form of Franchise Fees over nine weeks, including approximately $1.44 million on account of ***prepetition fees***—roughly one-third of what the Debtors project to draw on the DIP Facility. Franchisor's prepetition claims are paid in cash while the vendors, landlords, and utility providers that supported the Outback Steakhouse system for years are provided nothing. And, because the DIP Facility is repaid first from unencumbered value, it is the unsecured creditors who are financing this sale—interest free.

7. The Bidding Procedures compound the problem. The Debtors ask the Court to approve a $790,000 Break-Up Fee. But a break-up fee is an administrative expense that may be approved ***only if it is actually necessary to preserve the value of the estate***, typically because it induced a bid that otherwise would not have been made. Here, Franchisor needed no inducement. It owns the Outback Steakhouse system, and the Debtors operate more than 60% of all U.S. franchised locations and approximately 10% of all U.S. Outback locations. Indeed, Franchisor approached the Debtors with a letter of interest in May 2026, before the Debtors had even retained an investment banker, and it is bidding to protect the viability of its own brand and overall franchise system.

8. While the Debtors claim that Franchisor would not have served as the stalking horse without the fee, that is not credible: a bidder that is making the DIP loan, will credit every dollar of that loan against its purchase price, and has been working through the Debtors' distress since at least 2020, is not at risk of walking away. Far from promoting competition, the fee chills it. Moreover, any competing bid must exceed the Stalking Horse Bidder's bid by the Break-Up Fee

plus $250,000—roughly $1.04 million, or 4% of the cash purchase price—and must either obtain Franchisor's consent to operate the Restaurants as Outback Steakhouses or face Franchisor's reserved claims under the franchise agreements. In essence, the Break-Up Fee further taxes the very competition it purports to encourage and pays the proceeds to the party that sets the rules.

9. Franchisor would also own, and therefore control, the estates' claims against itself. The Final DIP Order would extend the DIP Liens to Avoidance Actions, and Franchisor—which has required the Debtors to stay current on Franchise Fees, and whose affiliates collect rent as landlords—is a likely defendant with respect to the same claims. At the same time, the Stalking Horse APA would sell Franchisor the Avoidance Actions against itself and the other "Franchisor Parties." Franchisor would also obtain a release of the estates' claims against itself and its affiliates relating to the business and the franchise agreements—and the Stalking Horse APA allocates no portion of the purchase price to any of those claims or releases. If Franchisor wants to own and control the estates' claims against it, it should pay cash for them, at a price tested through a competitive market process, after the Committee has had a full opportunity to assess what those claims are worth.

10. Put simply, the terms of the DIP Motion and the Bidding Procedures are extraordinary, and they were negotiated by and among parties with intricate and longstanding business relationships. For starters, Franchisor is not a traditional third-party DIP lender; it wears numerous hats, including franchisor, significant creditor, landlord, co-defendant, and stalking horse purchaser, and, through its state law consent rights, it controls whether any competing bidder may operate the Restaurants. In addition, the parties that negotiated these Motions have been dealing with one another since at least 2020; the Committee was appointed less than a week ago, its counsel was selected a little over 48 hours ago, and its financial advisor less than 24 hours ago.

Moreover, the Debtors propose that their Schedules will not be filed until after the proposed sale hearing and, if the lenders have it their way, after the expiration of the Committee's challenge period. The estates should not be asked to give those assets away before anyone knows what they are.

11. Accordingly, absent the modifications set forth below, the Motions should be denied.

## BACKGROUND

### A. The Chapter 11 Cases

12. On November 2, 2026 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").[5] The Debtors remain debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code; no trustee or examiner has been appointed.

13. The Debtors operate sixty-one (61) Outback Steakhouse restaurants (the "Restaurants") in five western states and employ approximately 3,669 people.[6]

14. On November 13, 2026, the U.S. Trustee appointed the Committee, consisting of Budderfly, Inc.; Purely Cloud, LLC; InCommercial Net Lease DST 4; 18 West, LLC; and Simon Property Group, L.P.[7] On November 16, 2026, the Committee selected Lowenstein Sandler LLP as its proposed counsel. On November 18, 2026, the Committee selected Province as its proposed financial advisor.

---

5 First Day Decl. ¶ 15.

6 First Day Decl. ¶¶ 1, 25, 27.

7 *See Notice of Appointment of Committee of Unsecured Creditors* [D.I. 103].

15. The Debtors' schedules of assets and liabilities and statements of financial affairs (the "Schedules") are due November 30, 2026.[8] However, the Debtors have proposed to extend that deadline to December 18, 2026.

**B. The Prepetition Secured Debt**

16. The Debtors' principal funded debt arises under the Credit and Guaranty Agreement, dated as of April 25, 2017 (as amended, the "Prepetition Credit Agreement"), among the Debtors, non-Debtor guarantor Cerca Trova Restaurant Group, Inc. ("CT RG"), the lenders party thereto (the "Prepetition Lenders"), and Goldman Sachs Specialty Lending Group, L.P., as agent (the "Prepetition Agent").[9] The Prepetition Lenders are Goldman Sachs Specialty Lending Group, L.P. and its affiliates, Comvest Partners funds, and GSP Steak Finance, LLC.[10]

17. As of the Petition Date, approximately $319.9 million was outstanding—$122.5 million of term loans, $6.5 million of revolving loans, and $190.9 million of accrued and capitalized interest, fees, and other obligations (the "Prepetition Secured Obligations").[11] The Prepetition Secured Obligations are allegedly secured by liens on substantially all of the Debtors' assets, including equity pledges, deposit account control agreements, and leasehold deeds of trust on "certain" restaurant leases (the "Prepetition Collateral").[12]

18. On April 28, 2020, the Prepetition Agent exercised its proxy rights over the Debtors' pledged equity, reconstituted the Debtors' boards and managers—retaining the Chief Executive Officer and appointing John Bittner and David Barr—and has since voted that equity

---

8 *Debtors' Motion for Entry of an Order (I) Extending the Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs, and (II) Granting Related Relief* [D.I. 91] (the "Schedules Extension Motion") ¶ 10.

9 First Day Decl. ¶ 41.

10 *Id.* ¶ 42.

11 First Day Decl. ¶ 43.

12 *Id.* ¶ 44.

annually, most recently on July 29, 2025.[13][14] By letter agreement dated June 18, 2024, the Prepetition Agent and the Prepetition Lenders agreed to fund the Chief Executive Officer's change-in-control bonus, including upon a sale of substantially all assets.[15]

19. Under the December 2020 Forbearance Agreement and Second Amendment (the "2020 Forbearance Agreement"), the Prepetition Lenders agreed to forbear and capitalize interest, and the Debtors agreed to apply excess cash to the Prepetition Secured Obligations.[16] Later amendments extended forbearance to December 27, 2026,[17] and on April 14, 2026, the Prepetition Agent noticed further events of default.[18]

**C. The Franchisor and the Holistic Resolution Agreement**

20. The Debtors operate the Restaurants under an Amended and Restated Outback Steakhouse Restaurant Territorial Master Franchise Agreement dated as of April 25, 2017 with Outback Steakhouse of Florida, LLC, a subsidiary of Bloomin' Brands, Inc. (together with their affiliates, in all capacities, "Franchisor").[19] The Debtors operate more than 60% of the U.S. Outback Steakhouse restaurants that Franchisor does not own.[20]

21. As the Debtors acknowledge, Franchisor "play[s] several roles in the Debtors' business":[21] franchisor, significant creditor, landlord or sublandlord of fourteen Restaurants, co-defendant in pending putative class actions, proposed stalking horse purchaser, and proposed DIP

---

13 First Day Decl. ¶¶ 38–39.
14 *Id.* ¶ 39.
15 *Id.* ¶ 90.
16 First Day Decl. ¶¶ 45, 56.
17 *Id.* ¶ 57.
18 *Id.* ¶ 59.
19 First Day Decl. ¶¶ 3, 33.
20 *Id.* ¶ 32.
21 First Day Decl. ¶ 36.

Lender.[22] Under a Franchisor Consent and Agreement, Franchisor consented to the Prepetition Agent's liens, agreed to notice, cure, and standstill arrangements, may manage the Restaurants after a foreclosure notice for at least five percent of gross sales, and is "free to confer" with the Prepetition Agent regarding the Debtors' performance.[23]

22. In December 2020, the Debtors and Franchisor entered into a Holistic Resolution Agreement and a Deferred Payment Agreement, each amended and restated effective December 31, 2023 (the "Holistic Resolution Agreement" and the "Deferred Payment Agreement").[24] Approximately $13.9 million remains deferred under the Deferred Payment Agreement (the "Deferred Franchisor Obligations").[25] The Holistic Resolution Agreement divides sale proceeds between the Prepetition Lenders and Franchisor under an agreed waterfall that was negotiated prepetition.[26]

**D. The Debtors' Unsecured Creditors**

23. The Debtors estimate approximately $27 million of unsecured claims, excluding amounts owed to Franchisor, any lender deficiency claim, and contingent or disputed claims,[27] including approximately $5.9 million owed to some 240 vendors and landlords.[28] The Debtors also owe an affiliate of their equity sponsor, H.I.G. Capital, LLC ("H.I.G."), approximately $6.75 million on a subordinated note and $2.1 million in management fees,[29] and face a $1.6 million

[22] *Id.* ¶¶ 29, 36, 63.
[23] *Id.* ¶ 35.
[24] First Day Decl. ¶ 46.
[25] *Id.*
[26] *Id.*
[27] First Day Decl. ¶ 47.
[28] *Id.*
[29] *Id.* ¶¶ 3, 37, 47.

class settlement in one wage-and-hour class action and two additional wage-and-hour class actions.[30]

**E. The Stalking Horse APA**

24. Under the asset purchase agreement dated as of November 1, 2026 (the "Stalking Horse APA"), Franchisor, as stalking horse bidder (the "Stalking Horse Bidder"), would acquire substantially all of the Debtors' restaurant assets for $26.3 million in cash, plus up to $6.1 million to the extent specified assumed liabilities fall below that amount, plus assumed liabilities and certain cure costs.[31] The Stalking Horse APA provides for a $790,000 break-up fee (the "Break-Up Fee"), payable solely from the cash proceeds of an alternative transaction[32] and competing bids must exceed the Stalking Horse Bid by the Break-Up Fee plus $250,000.[33] DIP Facility balances are credited dollar-for-dollar against the purchase price and may be credit bid,[34] and at closing Franchisor will waive its cure costs and release claims under the franchise agreements, the Holistic Resolution Agreement, and the Deferred Payment Agreement.[35]

25. The Prepetition Agent's consent to the sale is conditioned on the Prepetition Lenders receiving at least $15 million in net cash at closing (after a wind-down reserve in an undisclosed amount) and on a mutual release with Franchisor.[36] The estates would release Franchisor from claims relating to, among other things, the acquired assets, the business, and the

---

[30] *Id.* ¶¶ 61–62.

[31] First Day Decl. ¶ 70.

[32] *Id.*

[33] *Id.* ¶ 71.

[34] *Id.* ¶ 70.

[35] *Id.* ¶ 46.

[36] Stalking Horse APA § 9.2(d); Bidding Procedures Motion at 13.

franchise agreements,[37] and closing is conditioned on an as-yet-undisclosed wind-down budget agreed among the Debtors, Franchisor, and the Prepetition Agent.[38]

26. The Stalking Horse APA excludes cash, receivables, Avoidance Actions and other estate claims (including claims against directors, officers, and insiders), and insurance policies—but treats as acquired assets, and thus sells to Franchisor, all Avoidance Actions against the Stalking Horse Bidder and the parties on Schedule 2.1(e) (the "Acquired Avoidance Actions").[39]

27. The Debtors hold a liquor license for each Restaurant and additional licenses for closed restaurants, mostly in California, where such licenses are quota-restricted and carry market value. Prepetition, the Debtors had accepted an offer for one and were negotiating two others.[40][41][42] The Stalking Horse APA transfers the operating licenses, but allocates "no portion of the Purchase Price" to them, even though they may be unencumbered.[43]

**F. The DIP Motion**

28. By the DIP Motion, the Debtors seek authority to obtain a revolving credit facility of up to $5.5 million (the "DIP Facility") from Franchisor (in such capacity, the "DIP Lender"), to use cash collateral, and to grant adequate protection to the Prepetition Agent and the Prepetition Lenders.[44] The Court entered the Interim DIP Order on November 4, 2026,[45] and the Debtors seek

---

37 Stalking Horse APA § 11.3; Bidding Procedures Motion at 16.

38 Stalking Horse APA §§ 9.2(f), 9.3(f); Bidding Procedures Motion at 13, 17.

39 Stalking Horse APA §§ 2.1(e), 2.2(a)–(c); Bidding Procedures Motion at 11, 17.

40 *Debtors' Motion for Entry of an Order (I) Approving Procedures for the Sale of De Minimis Assets, Including Liquor Licenses, Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Payment of Related Fees and Expenses, and (III) Granting Related Relief* [D.I. 95] (the "De Minimis Sale Motion") ¶ 7.

41 First Day Decl. ¶ 25.

42 De Minimis Sale Motion ¶ 8.

43 Stalking Horse APA §§ 2.1(k), 8.12(c).

44 First Day Decl. ¶ 128.

45 *Interim Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing from Outback Steakhouse of Florida, LLC, (B) Use Cash Collateral, (C) Provide Adequate Protection to Prepetition Secured Creditors; and (II) Granting Related Relief* [D.I. 51] (the "Interim DIP Order") at 47.

entry of a final order (the "Final DIP Order") at the final hearing on November 23, 2026, despite the Committee's request for an adjournment in light of the timing of its appointment.[46]

29. The DIP Facility bears no interest but carries a $50,000 commitment fee and reimbursement of the DIP Lender's professional fees.[47] Up to $2.5 million is available on an interim basis, and only to keep projected cash above $2.0 million;[48] the Debtors project drawing approximately $4.5 million.[49] The DIP Lender has no obligation to advance if it is not the active stalking horse, successful, or back-up bidder, or if an alternative transaction closes.[50] The DIP Facility is secured by liens on all assets priming the Prepetition Agent's liens with its consent (the "DIP Liens") and has superpriority status subject only to the professional fee carve-out (the "Carve-Out").[51] Pending entry of the Final DIP Order, the DIP Liens do not reach avoidance actions or their proceeds ("Avoidance Actions").[52] The Prepetition Lenders declined to provide DIP financing and consented to "priming" only by the DIP Facility.[53]

30. As adequate protection, the Prepetition Secured Creditors receive (i) replacement liens "of the same priority, extent, and amount" as their prepetition interests, (ii) second-priority "Subordinated Adequate Protection Liens" on all DIP Collateral, and (iii) section 507(b) superpriority claims "payable from and having recourse to all prepetition and post-petition

---

46 Interim DIP Order ¶ 40.

47 First Day Decl. ¶ 132.

48 *Id.*

49 *Id.* ¶ 130.

50 Interim DIP Order ¶ 10.

51 *Id.* ¶¶ 6–7, 9.

52 *Id.* ¶ 6.

53 DIP Motion ¶ 16; First Day Decl. ¶ 131.

property of the Debtors."[54] They also receive payment of their counsel's "pre- and post-petition fees and out-of-pocket expenses," subject to recharacterization upon a successful Challenge.[55]

31. The Debtors stipulate to the Prepetition Secured Obligations and liens, subject to a seventy-five-day challenge period that the Debtors, notwithstanding Local Rule 4001-2, will ask the Court to shorten to end at the sale hearing.[56] The Debtors also release the Prepetition Secured Creditors, the DIP Lender, and their affiliates and insiders, and upon entry of the Final DIP Order would waive section 506(c), the section 552(b) "equities of the case" exception, and marshaling rights.[57] The Carve-Out—including any transaction fee payable to the Debtors' investment banker, Brookwood Associates, L.L.C. ("Brookwood"), regardless of the Budget—is funded "first" from unencumbered asset proceeds before any DIP proceeds or Cash Collateral.[58]

### G. The Bidding Procedures Motion

32. The Bidding Procedures Motion contemplates a December 8, 2026 bid deadline, a December 11, 2026 auction, and a December 15, 2026 sale hearing,[59] tracking the Interim DIP Order milestones that also require a sale order by December 17, 2026 and closing by January 4, 2027, subject in certain cases to extension with the Prepetition Agent's consent.[60]

33. Sale objections are due December 8, 2026 at 4:00 p.m. (ET) with a supplemental deadline limited to the conduct of the auction, the successful bidder's identity, and adequate

---

[54] Interim DIP Order ¶¶ 14(a)–(b).

[55] *Id.* ¶ 14(c).

[56] Interim DIP Order ¶ 15(a) & n.4.

[57] *Id.* ¶¶ 16(a)–(c), 26.

[58] *Id.* ¶¶ 18, 18(c).

[59] First Day Decl. ¶ 73.

[60] *Id.* ¶¶ 73, 134.

assurance.[61] Cure notices are due five business days after entry of the Bidding Procedures Order, with cure objections due December 8, 2026 at 4:00 p.m. (ET).[62]

## OMNIBUS OBJECTION

34. The Committee opposes neither the Debtors' entry into a reasonable DIP facility nor a value-maximizing sale. But the Motions, as proposed, would allocate nearly all of the risk of these Chapter 11 Cases to unsecured creditors and nearly all of the benefit to Franchisor and the Prepetition Lenders. Neither the proposed Final DIP Order nor the proposed order approving the Bidding Procedures (the "Bidding Procedures Order") should be entered unless modified as set forth below.

## I. THE PROPOSED FINAL DIP ORDER MUST BE MODIFIED

### A. The DIP Facility Is a Component of Franchisor's Purchase Price, Financed at the Estates' Expense

35. A DIP loan is supposed to preserve estate value and provide the estate time to pursue the best available outcome for all creditors. The DIP Facility does neither. Indeed, the Debtors acknowledge as much—the DIP Facility is a "transaction-specific bridge to the closing of the proposed sale, rather than a traditional chapter 11 financing intended to fund an extended reorganization process."[63] Franchisor only offered it "[i]n connection with [its] stalking horse proposal and proposed acquisition transaction," and agreed to its terms "because, as the stalking horse bidder, it has an interest in the Debtors continuing to operate through the closing of the sale, and because any amounts it advances will be credited against the purchase price if its bid prevails."[64] Consistent with that strategy, Franchisor has no obligation to lend unless it is

61 Bidding Procedures at 3 (Key Dates (g)–(h)); proposed Bidding Procedures Order ¶ 8.

62 Bidding Procedures at 3; Bidding Procedures Motion ¶ 29(a)–(b); proposed Bidding Procedures Order ¶ 25(c).

63 DIP Motion ¶ 19.

64 *Id.* ¶ 16; Gandhi DIP Decl. ¶ 16.

designated the stalking horse, and does not need to continue lending once it ceases to be the active stalking horse, successful, or back-up bidder.[65] In other words, the Debtors could obtain the financing only by selecting Franchisor as stalking horse. Moreover, every dollar outstanding at closing is credited against Franchisor's purchase price, and Franchisor may credit bid every dollar at the auction.[66] The Prepetition Lenders, for their part, declined to lend at all.[67]

36. The Court should evaluate the DIP Facility for what it is—a component of the purchase price—and should not permit the facility to extract unencumbered value that should otherwise be preserved for unsecured creditors. If approved, the DIP Facility will all but guarantee that unsecured creditors do not see any recovery on account of liquor licenses, leasehold interests not subject to the Prepetition Agent's leasehold deeds of trust, Avoidance Actions, D&O claims, and any other unencumbered assets that the Committee identifies in connection with its truncated challenge period.

37. Nor is the DIP Facility the "interest free" accommodation the Debtors advertise. The Budget directs approximately $2.67 million to Franchisor in Franchise Fees over nine weeks, including approximately $1.44 million on account of prepetition royalty and marketing fees paid before the final hearing[68]—roughly one-third of the approximately $4.5 million the Debtors project to draw on the DIP Facility.[69] Franchisor thus receives cash payment of its prepetition claims from the very money it is lending, while the vendors, landlords, and utility providers that supported the Outback Steakhouse system for years are left with no path to recovery. The Final DIP Order

---

65 Interim DIP Order ¶ 10.

66 *Id.* ¶ 5; Stalking Horse APA § 3.11.

67 DIP Motion ¶ 16; First Day Decl. ¶ 131.

68 Interim DIP Order, Ex. 1 (the "Budget") at 1 (Franchisor Fees line), n.8; *Declaration of Douglas J. Brickley in Support of the Debtors' DIP Financing and Cash Collateral Motion* [D.I. 16] (the "Brickley Decl.") ¶ 11.

69 Budget at 1 (DIP Advance line); First Day Decl. ¶ 130.

should not authorize payment of any further prepetition Franchise Fees, and all such payments should be without prejudice to the estates' rights.

**B. Franchisor's Many Roles Require Heightened Scrutiny**

38. Franchisor is not a traditional third-party DIP lender. It is the Debtors' franchisor, a significant creditor, landlord or sublandlord at fourteen Restaurants, co-defendant in pending litigation, and proposed stalking horse purchaser.[70] It shares in sale proceeds with the Prepetition Lenders under the Holistic Resolution Agreement,[71] and, through its consent rights, controls whether any competing bidder may operate the Restaurants under the Outback Steakhouse brand.[72] The Debtors go to considerable lengths to argue that Franchisor is not an insider.[73] However, the Committee is not persuaded, and Franchisor has its hands on every aspect of these Chapter 11 Cases.

39. A party so positioned is, at a minimum, a non-statutory insider. The Court should review the terms Franchisor has negotiated with heightened scrutiny and should require the Debtors to demonstrate their entire fairness, rather than defer to the Debtors' business judgment. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (applying entire fairness standard, which "requires proof of fair dealing and fair price and terms," to debtors' decision to accept postpetition financing); *Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts.") (citation omitted).

---

[70] First Day Decl. ¶¶ 29, 36.

[71] *Id.* ¶ 46.

[72] Bidding Procedures Motion ¶ 22(d)(vi); Stalking Horse APA § 4.2(c)(v).

[73] Bidding Procedures Motion ¶ 13.

### C. The Lenders Benefit From the Sale and Should Pay for It

40. One of the most troubling features of the proposed financing is its repayment mechanism. If Franchisor is the winning bidder, the DIP Obligations are credited against its purchase price. If a third party prevails, however, the DIP Obligations are repaid immediately—and *first* from the proceeds of the Debtors' unencumbered assets.[74] This is unprecedented. In other words, if the sale process does exactly what it is supposed to do—produce a higher or otherwise better bid from a third party—the first dollars of unencumbered value go to Franchisor. That provision could wipe out any recovery for unsecured creditors.

41. Entry of the proposed Final DIP Order would make matters worse. Whereas the Interim DIP Order triggers repayment of the DIP Facility only upon a sale or other disposition of "all or substantially all assets of the Debtors" to a purchaser other than the DIP Lender,[75] the proposed Final DIP Order expands the repayment mechanism to "any sale transaction or other disposition of the Debtors' assets other than in the ordinary course of business," expressly including any De Minimis Sale (including liquor licenses), and requires that "all proceeds thereof shall be applied as a permanent reduction of the outstanding DIP Obligations."[76] The liquor licenses held for the Debtors' closed restaurants are not being sold under the Stalking Horse APA and, particularly in California, are quota-restricted and may be very valuable.[77] In other words, they are among the few assets that may generate a recovery for unsecured creditors.[78]

---

[74] Interim DIP Order ¶ 5; *see als*o First Day Decl. ¶¶ 70, 132.

[75] Interim DIP Order ¶ 5.

[76] Proposed Final DIP Order ¶ 5.

[77] De Minimis Sale Motion ¶¶ 7–8.

[78] The De Minimis Sale language was added to the proposed Final DIP Order at the last minute, with minimal notice to the Committee and no notice to other parties in interest. Nor does the De Minimis Sale Motion itself disclose that sale proceeds would be swept to the DIP Lender; it provides only that net proceeds will be "held or applied in accordance with the DIP Order."[78] De Minimis Sale Motion ¶ 11(g). The Final DIP Order should not require that the proceeds of any De Minimis Sale, or of any other disposition of unencumbered assets, be immediately applied to the DIP Obligations.

42. The same mechanic demonstrates that the DIP Facility is priming in name only. The DIP Liens are styled as priming liens, but the Interim DIP Order places them ahead of the Prepetition Liens only "to the extent not secured by unencumbered assets."[79] The economic consequence of priming should fall on the party that actually agreed to be primed. Instead, the Prepetition Collateral is insulated, the DIP Lender is made whole from unencumbered value, and the Debtors would waive marshaling so that no one could ask the Court to rearrange that result.[80]

43. The repayment mechanic is part of a broader effort to shift the cost of these Chapter 11 Cases to unsecured creditors. Section 506(c) of the Bankruptcy Code permits the estate to recover from a secured creditor's collateral the reasonable and necessary costs of preserving or disposing of that collateral, to the extent of the benefit to the secured creditor. 11 U.S.C. § 506(c). "[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . . [t]he rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate." *Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus. Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (internal citation omitted); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should be required to bear the cost of protecting what is not theirs."). Courts in this District have applied that principle where, as here, a case is run to monetize a lender's collateral. *See In re Sports Auth. Holding, Inc.*, No. 16-10527 (MFW) (Bankr. D. Del. Apr. 28, 2016), Hr'g Tr. [D.I. 1463] 194:16–20 ("[I]f a case is being run for the benefit of the lenders in

[79] Interim DIP Order, Ex. 3 (Lien Priority Annex).

[80] *Id.* ¶ 26; First Day Decl. ¶ 134.

order to foreclose upon their collateral, the lenders are going to have to pay the cost of that. And that includes all administrative. It includes the rent. It includes the professional fees."); *see also In re NEC Holdings Corp.*, Hr'g Tr. at 100:17–21, No. 10-11890 (BLS) (Bankr. D. Del. July 13, 2010) [D.I. 224] (secured creditors have "got to the pay the freight, and . . . the freight is certainly an administratively solvent estate."); *In re Townsends, Inc.*, Hr'g Tr. 23:25–24:1, Case No. 10-14092 (BLS) (Bankr. D. Del. Jan. 21, 2011) [D.I. 338] (upon realizing that certain administrative claims would not be paid in full, the Court stated: "Well, we've got a problem. Not going to run an administratively insolvent estate."). The same logic explains why a carve-out for estate professionals is ordinarily carved out of the secured lender's collateral: the lender's collateral bears the cost of the process that liquidates it. This agreement to fund is the quid pro quo for a section 506(c) waiver.

44. The proposed Final DIP Order nonetheless waives the estates' rights under section 506(c), so that the costs of the sale cannot be charged against the collateral being sold.[81] It requires the Carve-Out and the Carve-Out Reserve Account to be funded first from any unencumbered assets of the Debtors before such fees or expenses are funded from proceeds of the DIP Advances or from Cash Collateral.[82]

45. The requested waivers of the section 552(b) "equities of the case" exception and of marshaling compound the problem. Waiving both before any investigation by the Committee would prevent the Court from requiring the lenders to look first to their own collateral before resorting to unencumbered assets that may be the only source of recovery for unsecured creditors.

[81] Interim DIP Order ¶ 16(a).

[82] *Id.* ¶ 18.

46. Unsecured creditors—vendors, landlords, and utility providers that supported this franchise system for years—should not be asked to subsidize the entire DIP Facility. The Committee's requests are narrow and do not threaten the transaction. The Final DIP Order should (i) provide that the DIP Obligations are satisfied first from the Prepetition Collateral and its proceeds—or, at a minimum, ratably based on a Court-approved allocation of sale proceeds between encumbered and unencumbered assets; (ii) provide that the Carve-Out and the Carve-Out Reserve Account are funded from Cash Collateral and the proceeds of Prepetition Collateral, and that any transaction or success fee payable to Brookwood is paid solely from the proceeds of Prepetition Collateral; (iii) remove the section 506(c) waiver or, at a minimum, condition any waiver on a Budget, including a funded wind-down budget, that provides a reasonable assurance of payment of all administrative expenses of these cases; and (iv) remove the waivers of the section 552(b) "equities of the case" exception and of marshaling.

### D. Franchisor Should Not Control Claims Against Itself, and the DIP and Adequate Protection Liens Should Not Reach Avoidance Actions or Other Unencumbered Estate Claims

47. The Interim DIP Order defines the DIP Collateral to include essentially all of the Debtors' assets and provides that, upon entry of the Final DIP Order, the DIP Collateral will include Avoidance Actions and their proceeds.[83] The DIP Collateral would also reach commercial tort claims.[84] These are among the very few assets of these estates that may be unencumbered, and they are the assets most likely to generate a recovery for unsecured creditors. Avoidance Actions and their proceeds are distinct creatures of bankruptcy law designed to facilitate equality of distribution among a debtor's general unsecured creditors; they are not property of a debtor's

---

[83] Interim DIP Order ¶ 6; First Day Decl. ¶ 132.

[84] *See* Interim DIP Order ¶ 6 (DIP Collateral includes all "tangible and intangible" property of the Debtors and their estates).

estate, but rights that the estate holds in trust for the benefit of creditors. *See Off. Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 554 (3d Cir. 2003) ("Cybergenics II"). The avoidance powers exist to recover valuable assets for the benefit of the estate. *See Off. Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 245 (3d Cir. 2000) ("Cybergenics I").

48. For these reasons, bankruptcy courts routinely restrict a debtor in possession's ability to pledge avoidance actions and their proceeds. *See Cybergenics I*, 226 F.3d at 243–45; *Off. Comm. of Unsecured Creditors v. Goold Elec. Corp. (In re Goold Elec. Corp.)*, 1993 WL 408366, at *3–4 (N.D. Ill. Sept. 22, 1993) (vacating DIP financing order to the extent it granted the lender a security interest in the debtor's preference actions); *Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 905 (D.N.J. 1987) (holding that a secured creditor lacked a perfected security interest in preference actions because "to allow [a secured creditor] to claim these preferences would frustrate the policy of equal treatment of creditors under the Code" and because "the debtor never possessed the right to institute a preference action, [and thus the secured creditor] could not have 'acquired' the [right] . . . ."); *see also In re SFX Entm't, Inc.*, No. 16-10238 (MFW) (Bankr. D. Del. Mar. 4, 2016), Hr'g Tr. [D.I. 198] 21:17–20, 26:9–23 (refusing to grant DIP lenders liens on unencumbered assets). Indeed, at least with respect to section 544(b) of the Bankruptcy Code, "empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors." *Cybergenics I*, 226 F.3d at 244 (citations omitted); *see also Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no

right to avoid the transfer.") (citation omitted); *Citicorp Acceptance Co. v. Robinson (In re Sweetwater)*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . . .").

49. Neither the DIP Liens, the DIP Superpriority Claims, nor the adequate protection liens and claims should attach to, or be payable from, (i) Avoidance Actions, (ii) commercial tort claims,[85] (iii) claims against Franchisor, the Prepetition Lenders, or any current or former director, officer, insider, or equity holder, (iv) the Debtors' directors' and officers' insurance policies, or (v) the proceeds of any of the foregoing.

50. Further, no party can responsibly give these assets away today, ***because no party knows what they are***. The Debtors have not filed their Schedules, and they seek to extend the deadline for doing so until ***after the sale hearing***.[86] The Committee's investigation has only just begun. And the Debtors' assertion that they have "no material unencumbered assets"[87] is precisely the kind of conclusion that an official committee is appointed to test.

51. Nor does the DIP Lender need these assets. It is lending at most $5.5 million, every dollar of which is credited against its own purchase price if it prevails and is repaid from sale proceeds if it does not.[88] In fact, as discussed above, the DIP Lender could be lending a lot less if the sale-related controls it imposed are approved. The exclusions requested above should therefore

---

[85] Although the Prepetition Agent may assert that its security interest extends to commercial tort claims, a security interest attaches to a commercial tort claim only if the claim is specifically described, and does not attach to after-acquired commercial tort claims. *See* U.C.C. §§ 9-108(e)(1), 9-204(b)(2).

[86] Schedules Extension Motion ¶¶ 7, 13. It is the Committee's understanding that the Debtors intend to propose a new deadline of December 9, 2026—just nine days before the sale hearing.

[87] First Day Decl. ¶ 131.

[88] First Day Decl. ¶¶ 70, 132.

extend to the DIP Liens, the DIP Superpriority Claims, the adequate protection liens, and the adequate protection claims alike.

### E. The Prepetition Lenders Should Not Receive Liens or Claims on Property That Was Never Their Collateral

52. Adequate protection exists for one narrow purpose: to protect a secured creditor against the actual diminution in the value of its interest in its collateral resulting from the automatic stay, the debtor's use of that collateral, or the grant of a priming lien. *See* 11 U.S.C. §§ 361, 363(e), 364(d)(1)(B), 507(b); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988); *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (citation omitted) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy."). It does not permit a secured creditor to improve its prepetition position, expand its lien package, or insulate itself from the economic risks of chapter 11. The Interim DIP Order itself acknowledges as much: the Prepetition Secured Creditors are entitled to adequate protection "solely to the extent of any diminution in the value of their interests in the Prepetition Collateral from and after the Petition Date."[89]

53. In addition to Replacement Liens, however, the Prepetition Lenders would receive "Subordinated Adequate Protection Liens"—second-priority liens on all of the DIP Collateral, which is defined as "all real and personal property and other assets, whether now existing or hereafter arising . . . of the Debtors and their bankruptcy estates," and which, upon entry of the Final DIP Order, would include Avoidance Actions and their proceeds and the proceeds of the sale of leasehold interests.[90] The Adequate Protection Superpriority Claims are likewise "payable from

---

[89] Interim DIP Order ¶ D(8); *see also Id.* ¶ 14 (defining the "Adequate Protection Amount" as the diminution in value of the Prepetition Secured Creditors' interests in the Prepetition Collateral "if any").

[90] Interim DIP Order ¶¶ 6, 14(a).

and having recourse to all prepetition and post-petition property of the Debtors."[91] Because the DIP Collateral includes property that was never subject to the Prepetition Liens, the Prepetition Lenders would obtain liens on previously unencumbered assets in exchange for advancing no new money. This is not preservation of the existing collateral package; it is expansion. If allowed, that expansion would eliminate any meaningful prospect of a recovery for unsecured creditors from unencumbered assets.

54. To preserve the interests of unsecured creditors, these assets must be treated as free and clear of any adequate protection liens or claims. The Final DIP Order should therefore (i) strike the Subordinated Adequate Protection Liens; (ii) limit the Replacement Liens to postpetition property of the same type as the Prepetition Collateral; and (iii) exclude from the Adequate Protection Collateral, and provide that the Adequate Protection Superpriority Claims are not payable from, (a) Avoidance Actions, (b) commercial tort claims not specifically described in the Prepetition Agent's security documents, (c) liquor licenses and leasehold interests that were not subject to the Prepetition Liens, (d) the Debtors' directors' and officers' insurance policies, (e) any other property that was not Prepetition Collateral, and (f) all proceeds of the foregoing. In addition, any Adequate Protection Amount should be determined only after notice and a hearing, with the Prepetition Lenders bearing the burden of proving actual diminution (if any) of the value of their collateral.

55. Finally, the adequate protection package would pay the Prepetition Agent's counsel's "pre- and post-petition fees and out-of-pocket expenses."[92] Section 506(b) of the Bankruptcy Code allows a secured creditor reasonable fees, costs, and charges only to the extent

---

[91] *Id.* ¶ 14(b).

[92] Interim DIP Order ¶ 14(c).

its allowed secured claim is secured by property whose value exceeds the amount of the claim. *See* 11 U.S.C. § 506(b). The Prepetition Lenders are owed approximately $319.9 million,[93] and the stalking horse bid offers $26.3 million in cash. The Prepetition Lenders are materially undersecured by any measure. If the Prepetition Lenders insist on the strict letter of the Bankruptcy Code elsewhere, they must accept it here: the Final DIP Order should not authorize payment of their professional fees and expenses, and any such payments already made should be applied to principal.

### F. Additional Issues with the Proposed Final DIP Order and Budget

56. The Final DIP Order should not be entered until the following issues are resolved:

- **Releases**. The releases of the Prepetition Secured Creditors and the DIP Lender extend to their affiliates, shareholders, directors, and officers.[94] Due to the multiple hats worn by the DIP Lender, the releases must be limited to the released parties solely in their capacities as prepetition lenders and agent or as DIP Lender. Because directors appointed by the Prepetition Agent in 2020 remain on the boards,[95] claims arising from conduct as controlling equity holders or board appointees cannot be released through a financing order, nor can Franchisor be released as franchisor, landlord, or Holistic Resolution Agreement counterparty. Third-party releases are, at most, a plan matter.

- **Prepetition Lender General Release**. The Proposed Final DIP Order requires that, before the release of the Prepetition Liens on the Acquired Assets at closing, "the Debtors shall execute and deliver to the Prepetition Agent and other Prepetition Secured Creditors a general release of any and all claims and causes of action that could have been asserted or raised under or in connection with the Prepetition Loan Documents."[96] No comparable provision appears in the Interim DIP Order, the proposed interim order, the DIP Motion, or the declarations filed in support of it.[97] A general release of the estates' claims against the Prepetition Secured Creditors should not be added to a financing order without notice. At a minimum, any such release must be expressly subject to the Challenge rights and to any other claims and causes of action that the Committee or the estates may assert.

---

[93] First Day Decl. ¶ 43.

[94] Interim DIP Order ¶¶ 16(b)–(c).

[95] First Day Decl. ¶¶ 38–40.

[96] Proposed Final DIP Order ¶ 34.

[97] *Compare id.*, *with* Interim DIP Order ¶ 34 (addressing proofs of claim).

- **Challenge Period**. Ending the Challenge Period at the December 15, 2026 sale hearing[98]—thirty-two days after the Committee's appointment and just 29 days since the Committee's advisors were retained—runs counter to Local Rule 4001-2(a)(i)(B), which contemplates at least sixty days from a committee's formation (here, through January 12, 2027). If the deadline is shortened, the Committee should have automatic standing, including as to any Debtor that is a Delaware limited liability company. The Prepetition Lenders cannot have it both ways. In all events, the deadline should be tolled by a standing motion and the "no standing" provision should be deleted.[99] In addition, the Challenge provisions should reach only claims against the DIP Lender and the Prepetition Secured Creditors in their capacities as such, not claims against Franchisor in other capacities or against lender-appointed directors.

- **Committee Professional Fees**. The Committee is a statutory fiduciary charged with investigating the Debtors. *See* 11 U.S.C. § 1103(c). Its counsel is budgeted $218,750, versus approximately $1.82 million for the Debtors' counsel and financial advisor;[100] at a minimum one-third of that amount (approximately $607,000) is appropriate. The $50,000 investigation cap should also be increased to $100,000.[101] The bar on using estate funds to "prosecute any claim, cause of action, objection, or other challenge against the DIP Lender or the Prepetition Secured Creditors" must not bar payment for objecting to the DIP Motion, the Bidding Procedures Motion, the sale, or any plan, or for actions during the Default Notice Period.[102]

- **Carve-Out Reserve Account**. The Carve-Out Reserve Account is to be "held in trust exclusively for the benefit of the Professionals and other beneficiaries of the Carve-Out."[103] The DIP Lender's legal fees are not Carve-Out obligations and should not be included in the professional fee accruals funded into that account. The $150,000 "DIP Lender Legal" line should therefore be removed from the professional fee escrow schedule.

- **Wind-Down Budget and Stub Rent**. Closing is conditioned on an undisclosed wind-down budget agreed among the Debtors, Franchisor, and the Prepetition Agent.[104] The Final DIP Order should require a funded wind-down budget acceptable to the Committee. Approximately $1.1 million of stub rent is reserved only "for payment as a cure cost at the sale closing,"[105] but stub rent

98 Interim DIP Order ¶ 15(a) n.4.

99 *Id.* ¶ 15(c).

100 Budget at 2.

101 Interim DIP Order ¶ 19.

102 *Id.* ¶ 19(a).

103 Proposed Final DIP Order ¶ 20(a).

104 Stalking Horse APA §§ 9.2(f), 9.3(f).

105 Budget at 1, n.7.

is an administrative expense owed whether or not a lease is assumed and, with an interest-free DIP Facility, should be paid in the ordinary course. The Committee understands that the Debtors intend to pay all stub rent and raises this point only out of an abundance of caution.

- **Reporting, Amendments, Defaults, and Remedies**. The Committee should receive all lender reporting contemporaneously;[106] material Budget amendments should require Court approval on notice to the Committee;[107] a Prohibited Variance should be subject to a five-business-day cure period;[108] and the Debtors and the Committee—the only estate fiduciaries—should be free to raise any issue at a Stay Relief Motion hearing.[109] The Court, not the lenders, should decide what is relevant.

## II. THE BIDDING PROCEDURES SHOULD NOT BE APPROVED AS PROPOSED

57. Bidding procedures exist to facilitate an open and fair process that maximizes value for all stakeholders. In this Circuit, bid protections such as break-up fees are evaluated as administrative expenses under section 503(b) of the Bankruptcy Code and may be approved only if actually necessary to preserve the value of the estate. *See Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010). The Committee supports a true sale process subject to higher or otherwise better offers. Since its appointment, the Committee has worked with the Debtors, Franchisor / DIP Lender, and the Prepetition Lenders to address its concerns with the Bidding Procedures, and those discussions are ongoing. The Committee will continue those efforts and will advise the Court of any resolution at or before the hearing.[110] Several issues nonetheless remain open, chief among them the Break-Up Fee. As proposed, the Bidding Procedures award the Stalking Horse Bidder protections it does not need.

---

106 *See* Interim DIP Order ¶ 14(d).

107 *See id.* ¶ 17(a).

108 *See id.* ¶ 23(d).

109 *Id.* ¶ 24(b).

110 The Committee has made meaningful progress with the Debtors and the Stalking Horse Bidder toward resolving a number of its concerns with the Bidding Procedures. Unfortunately, the same cannot be said with respect to the DIP Facility, where the Committee's concerns remain largely unaddressed.

**A. The Break-Up Fee Is Not Necessary to Preserve the Value of the Estates**

58. The Stalking Horse APA provides for a Break-Up Fee of $790,000, or approximately 3.0% of the $26.3 million cash purchase price.[111] Competing bids must exceed the Stalking Horse Bidder's bid by the Break-Up Fee plus $250,000—approximately $1.04 million, or roughly 4.0% of the cash purchase price—before a competing bidder may even be considered.[112]

59. The Break-Up Fee is not necessary to induce Franchisor to bid or to preserve value. Franchisor operates the Outback Steakhouse system and the Debtors operate more than 60% of the U.S. Outback Steakhouse restaurants that Franchisor does not own.[113] In addition, Franchisor's affiliate approached the Debtors with a letter of interest on May 22, 2026, before Brookwood was even engaged.[114] As DIP Lender, it may also credit its advances against its purchase price and credit bid them at the auction.[115] A bidder with that stake in the outcome, and those inherent structural advantages, does not need to be paid to show up. Nor will the Break-Up Fee promote competitive bidding. Competing bidders that wish to operate the Restaurants as Outback Steakhouses must obtain Franchisor's approval, and a bid that requires but lacks evidence of that approval is not a Qualified Bid.[116] And, because Franchisor's lending commitment falls away once it is no longer the stalking horse, successful, or back-up bidder,[117] a third-party bidder must not only top Franchisor, but also account for the risk that its success will end the Debtors' access to DIP liquidity before closing. A true Pyrrhic victory. The Break-Up Fee would thus reward the party that controls whether competing bids can qualify at all.

---

[111] First Day Decl. ¶ 70.

[112] *Id.* ¶ 71.

[113] First Day Decl. ¶ 32.

[114] *Id.* ¶ 69.

[115] First Day Decl. ¶ 70.

[116] Bidding Procedures Motion ¶ 22(d)(vi).

[117] Interim DIP Order ¶ 10.

60. If the Court approves any Break-Up Fee, it should not receive superpriority status. As proposed, the Break-Up Fee would be an allowed administrative expense "with priority over any and all other administrative expenses," subject only to the DIP Order and its professional fee carve-out (paid from unencumbered assets), and the Debtors describe both the DIP Superpriority Claims and the adequate protection claims as subject to it.[118] At a minimum, any Break-Up Fee should be expressly junior to the Carve-Out and payable solely from the cash proceeds of an alternative transaction, as the Stalking Horse APA contemplates.[119]

**B. Additional Issues with the Proposed Bidding Procedures**

61. The Committee appreciates its inclusion as a Consultation Party, but further modifications are needed:

- **Bid Materials.** The Committee should receive all Preliminary Bid Documents, bids, bid modifications, and other bid-related materials at the same time as the Debtors, and Committee counsel should be confirmed as a bid notice party.

- **Consultation Parties.** The Debtors should be required to consult with the Consultation Parties before consenting to joint bids.

- **Parity.** The Stalking Horse Bidder should be held to the same bid requirements, deadlines, and disclosure obligations as every other bidder.

- **Credit Bidding.** The Prepetition Agent has agreed not to credit bid, yet the proposed Bidding Procedures Order would permit it to credit bid solely to assign that credit bid right—which is not capped and thus could extend to the full approximately $319.9 million of asserted Prepetition Secured Obligations—to the Stalking Horse Bidder.[120] There is no basis for that right, and it should be eliminated. An assigned credit bid would allow Franchisor to acquire the Debtors' assets using the Prepetition Lenders' claims—whose validity the Committee has not yet investigated—and would further chill competing bids.

---

[118] Stalking Horse APA § 4.5(c); Bidding Procedures Motion at 12 & ¶ 22(i); proposed Bidding Procedures Order ¶ 20; First Day Decl. ¶¶ 132–133. *Compare* Interim DIP Order ¶ 9 (DIP Superpriority Claims subject only to the Carve-Out), *with* First Day Decl. ¶ 132 (DIP Superpriority Claims subject to the Carve-Out "and, to the extent payable, the Break-Up Fee").

[119] Stalking Horse APA § 4.5(b); First Day Decl. ¶ 70.

[120] Proposed Bidding Procedures Order ¶ 14 (permitting assignment of the Prepetition Agent's credit bid without any dollar limitation); *see also* DIP Motion ¶ 8 (Prepetition Obligations of not less than $319,897,490.05 as of the Petition Date).

- **Sale Timeline.** The Committee's financial advisor, which was retained only yesterday, is still reviewing the sale timeline to ensure that it is structured to maximize value.

- **APA**. The Committee reserves all rights to object to the sale, including with respect to the sufficiency of the wind-down budget, the sale of claims and causes of action against Franchisor and any other third parties for no consideration, and the allocation of value between unencumbered assets (*e.g.*, liquor licenses) and encumbered assets.

## RESERVATION OF RIGHTS

62. The Committee reserves all rights with respect to the Motions, including to supplement or amend this Objection at or before the hearing and to be heard on any revised proposed Final DIP Order, Budget, or Bidding Procedures Order. Because the Committee was only recently appointed and has had no chance to investigate the prepetition marketing process, the Prepetition Secured Obligations and related liens, the Holistic Resolution Agreement, or potential estate claims and causes of action, the Committee further reserves the right to object to any further relief sought by the Debtors on any grounds, including approval of the proposed sale.

**WHEREFORE**, the Committee respectfully requests that the Court deny the Motions unless the proposed Final DIP Order, the Bidding Procedures, and the Bidding Procedures Order are modified to address the issues raised in this Objection, and grant such other and further relief as is just and proper.

*[remainder of page intentionally left blank]*

Dated: November 19, 2026
Wilmington, DE

**LOWENSTEIN SANDLER LLP**

*/s/ Katherine Monica Devanney*
Katherine Monica Devanney (No. 6356)
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 498-9614
kdevanney@lowenstein.com

-and-

David Posner (admitted *pro hac vice*)
Gianfranco Finizio (admitted *pro hac vice*)
Brittany M. Clark (admitted *pro hac vice*)
Carolyn Gauvin (admitted *pro hac vice*)
1251 Avenue of the Americas, 17th Floor
New York, NY 10020
Telephone: (212) 262-6700
dposner@lowenstein.com
gfinizio@lowenstein.com
bclark@lowenstein.com
cgauvin@lowenstein.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

**CERTIFICATE OF SERVICE**

I, Katherine M. Devanney, certify that I am not less than 18 years of age, and that service of the foregoing was made on November 19, 2026, via the Court's CM/ECF system on the parties that have consented to electronic service, and upon the parties listed below via email.

| | |
|---|---|
| KTBS Law LLP<br>Michael L. Tuchin<br>Nir Maoz<br>1801 Century Park East<br>Twenty-Sixth Floor<br>Los Angeles, California 90067<br>mtuchin@ktbslaw.com<br>nmaoz@ktbslaw.com<br><br>*Proposed Counsel to the Debtors* | Pachulski Stang Ziehl & Jones LLP<br>Bradford J. Sandler<br>Peter J. Keane<br>919 North Market Street, 17th Floor<br>Wilmington, Delaware 19801<br>bsandler@pszjlaw.com<br>pkeane@pszjlaw.com<br><br>*Proposed Counsel to the Debtors* |
| Goldberg Kohn Ltd.<br>Danielle Juhle<br>Drake Saffell<br>55 East Monroe Street, Suite 3300<br>Chicago, Illinois 60603<br>danielle.juhle@goldbergkohn.com<br>drake.saffell@goldbergkohn.com<br><br>*Counsel to the Prepetition Agent* | Richards, Layton & Finger, P.A.<br>John H. Knight<br>920 North King Street<br>Wilmington, Delaware 19801<br>knight@rlf.com<br><br>*Counsel to the Prepetition Agent* |
| BakerHostetler LLP<br>Michael A. VanNiel<br>Alexis Beachdell<br>127 Public Square, Suite 2000<br>Cleveland, Ohio 44114<br>mvanniel@bakerlaw.com<br>abeachdell@bakerlaw.com<br><br>*Counsel to the Franchisor and DIP Lender* | Office of the United States Trustee<br>for the District of Delaware<br>Linda J. Casey<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, Delaware 19801<br>linda.casey@usdoj.gov<br><br>*US Trustee* |

Under penalty of perjury, I declare that the foregoing is true and correct.

11/19/2026 *\/s/ Katherine M. Devanney*

Date Signature