**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>CERCA TROVA RESTAURANT GROUP HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11749 (CTG)<br><br>(Jointly Administered)<br><br>Ref. Docket No. 14, 15, 16, 51, 120 |

**RESPONSE OF GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P., AS PREPETITION AGENT, TO OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' DIP FINANCING MOTION**

Goldman Sachs Specialty Lending Group, L.P., as Prepetition Agent, responds to the *Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtors' Motions for Entry of Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; and (II) Establishing Bidding Procedures* [D.I. 120] (the "Committee Objection"),[2] and states as follows:[3]

## PRELIMINARY STATEMENT

1. As detailed in the Goronkin Declaration, the Debtors have attempted to sell their business for years. During that time, the Prepetition Secured Creditors agreed to forbear and allow millions and millions of dollars of their collateral to be used to pay unsecured creditors (all the while, the outstanding balance of the Prepetition Obligations increased dramatically). At long last,

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Cerca Trova Restaurant Group Holdings, Inc. (5725); Out West Restaurant Group, Inc. (0849); Cerca Trova Steakhouse, Inc. (8902); Cerca Trova Steakhouse, L.P. (2006); and Cerca Trova Southwest Restaurant Group, LLC (8835). The Debtors' mailing address is 8885 Rio San Diego Drive, Suite 360, San Diego, California 92108.

[2] Following discussions with the Committee and other parties in interest, the Prepetition Secured Creditors believe that material progress has been made with respect to resolving the issues raised in the Committee Objection. However, out of an abundance of caution, the Prepetition Secured Creditors are filing this Response to reserve their rights.

[3] Capitalized terms used but not defined herein shall have the meanings given in the Committee Objection or the Debtors' *Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing from Outback Steakhouse of Florida, LLC, (B) Use Cash Collateral, (C) Provide Adequate Protection to Prepetition Secured Creditors; and (II) Granting Related Relief* [D.I. 14] (the "DIP Motion"), as applicable.

a viable sale transaction exists – not one that will primarily benefit the Prepetition Secured Creditors, however. One that will primarily benefit the landlords for the Debtors' 61 operating locations, numerous vendors and contract counterparties, thousands of employees, and the Debtors' franchisor in respect of an ongoing royalty stream. The Committee's Objection acknowledges that they are aligned with the sale process, but then asks this court to modify the proposed DIP Order in a way that would re-write the priority scheme set forth in the Bankruptcy Code for the benefit of a small subset of landlords and creditors whose liabilities are not being assumed as part of the proposed sale. The Committee's Objection and its transparent attempt to extract hold-up value for this subset of unsecured creditors (excluding the Prepetition Secured Creditors in their capacity as over 90% of the general unsecured creditor pool) should be denied.

2. The Debtors, consistent with their fiduciary duties, commenced these Chapter 11 Cases to consummate a going concern sale of substantially all their assets to the highest bidder, with a stalking horse bid serving as a floor. As more fully set forth in the First Day Declarations, the stalking horse bid resulted from the Debtors' extensive prepetition marketing and sale process, which is continuing postpetition. The proposed stalking horse bidder required that such sale be conducted pursuant to section 363 of the Bankruptcy Code. The Debtors would not have sufficient liquidity to fund such sale process without the DIP Facility from the DIP Lender and without an agreement to use the Prepetition Secured Creditors' cash collateral. Accordingly, the Debtors conducted extensive arms'-length and good faith negotiations with the DIP Lender, who has agreed to provide up to $5.5 million of postpetition financing, contingent upon the DIP Lender or its affiliate being the Stalking Horse Bidder. The DIP Lender was only willing to provide such financing on a first out basis and secured by all assets of the Debtors, including unencumbered assets, if any, including avoidance actions. The Debtors then conducted extensive arms'-length

and good faith negotiations with the Prepetition Secured Creditors, whose security interest cannot be primed absent consent or proof of adequate protection. These discussions resulted in the consensual cash collateral use and DIP Facility reflected in the DIP Orders, which benefits the estates by, among other things, providing financing to achieve a value maximizing sale while avoiding expensive litigation. As set forth in the DIP Orders, the Prepetition Secured Creditors have consented to (i) be primed by the DIP Facility solely to the extent that there are not assets otherwise available to satisfy the DIP Facility, as set forth in the DIP Orders and (ii) the use of their cash collateral, including for purposes of funding negotiated "carve-outs"; in each case subject to the term and conditions of the DIP Orders, including the waivers and adequate protection set forth therein, which is being provided solely to the extent of diminution in value in accordance with sections 361 and 363(e) of the Bankruptcy Code..

3. All of the above is expressly contemplated by and consistent with the Bankruptcy Code, and the Committee's attempt to argue otherwise should be rejected. The Court should view the DIP Facility and cash collateral agreement set forth in the proposed Final Order as a good faith effort by the Debtors, the DIP Lender and the Prepetition Secured Creditors to preserve enterprise value and protect not only the Prepetition Secured Creditors' interest, but also the interests of the Debtors' employees, customers, landlords, trade creditors and franchisor.

4. The Committee's argument that the "unsecured creditors are funding a sale process for the benefit of the Prepetition Lenders . . . ." is just wrong. Committee Objection ¶ 3. The Budget, financed fully by the Prepetition Secured Creditors and the DIP Lender, is sufficient to fund these Chapter 11 Cases. *See* Brickley Declaration ¶ 9 ("[T]he Budget is adequate, taking into account all projected cash flows, including the DIP Facility, and the use of cash collateral, to pay administrative expenses as they come due during that period."). Accordingly, the freight will be

paid, but the Bankruptcy Code will not, and should not, be re-written to redirect value solely for the benefit of unsecured creditors in contravention of the priorities set forth in the Bankruptcy Code. The Committee's attempt to turn this priority scheme on its head and elevate certain unsecured claims above more senior claims, including adequate protection claims of the Prepetition Secured Creditors must fail.

5. While it used to be standard practice for parties in the position of the Committee to object to DIP financing used to run a sale process on the grounds that "there must be something in it for general unsecured creditors," that was never required by the Bankruptcy Code, and eventually in *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017), the Supreme Court erased the leverage of a committee to demand a "tip" from a chapter 11, value-maximizing transaction. Now, the cries have shifted to two other constructs which are also not found in the Bankruptcy Code: ensuring "administrative solvency" and "paying the freight" (which the Prepetition Secured Creditors assert they have done here). However, "paying the freight" does *not* require giving a handout to unsecured creditors. *In re Boomerang Tube, LLC*, No. 15-11247 (MFW) (Bankr. D. Del. July 17, 2015) [D.I. 276], Hr'g Tr. 105:21-106:6 ("There's nothing that requires a buyer to pay anything to the unsecureds if it feels that the enterprise does not have that value."); *In re Nova Wildcat Shur-line Holdings, Inc.*, No. 23-10114 (CTG) (Bankr. D. Del. Mar. 2, 2023) [D.I. 212], Hr'g Tr. 87:6-21 ("[W]e take the pre-petition capital structure as we find it. What we do care about is are we maximizing value and if the bankruptcy process is being used for the purpose of maximizing value, then that value falls the way it falls and there's nothing wrong with doing that."). The Committee has no right to compel the Prepetition Secured Creditors to pay a "carve-out" to a committee

providing no value to the Prepetition Secured Creditors, and no right to alter the priorities of the Bankruptcy Code.

6. Moreover, the Committee's argument precipitously glosses over the fact that the Prepetition Agent and Prepetition Lenders, by virtue of their deficiency claims, will likely be the largest general unsecured creditors by far, holding over 90% of the unsecured claims in these Chapter 11 Cases. Even if the Committee were to prevail on their other arguments, which they should not, and soak up assets they are not entitled to, they would possess no right to fence off assets from the reach of the Prepetition Secured Creditors, who would be entitled to their 507(b) claim and then over 90% of any remaining recoveries that may be otherwise available for general unsecured claims.

7. The proposed DIP Facility and the consensual cash collateral arrangement as set forth in the proposed Final DIP Order reflects the financial package negotiated by the Debtors in an exercise of their business judgment. The terms of the proposed Final DIP Order are consistent with the Bankruptcy Code, and should be approved in order to enable the Debtors to obtain the critical funding necessary to consummate a value-maximizing sale.

8. The Committee Objection should be overruled, the DIP Motion should be granted, and the sale process should be allowed to proceed to maximize value, with the sale proceeds then allocated in accordance with the terms and conditions of the DIP Orders and priorities set forth in the Bankruptcy Code.

## RESPONSE

### I. The Terms of the DIP Motion Have Been Negotiated at Arms'-Length and In Good Faith, and the Court Should Not Supplant the Debtors' Business Judgment

9. Although the Committee complains about the terms of the DIP Facility, including the Budget and scope of the protections granted to the Prepetition Agent and Prepetition Lenders

as consented to by the Debtors, the only evidence demonstrates that such terms and protections have been proposed in good faith and are typical of the provisions required by prepetition lenders in exchange for the consensual use of cash collateral and an agreement to subordinate liens to postpetition debt. The Debtors made a business decision to make certain agreements in view of the overall benefits to the Debtors' estates and creditors. The determination for the Court is whether the terms are an appropriate exercise of the Debtors' business judgment. *In re Amerifirst Fin., Inc.*, No. 23-11240 (THM) (Bankr. D. Del. Dec. 19, 2023) [D.I. 564], Hr'g Tr. 6:17-20 (finding that "the final DIP represents an appropriate exercise of the debtors' business judgment under Sections 363 and 364. That business judgment should not be supplanted by this Court."); *see also In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. June 22, 2004) ("Determining whether proceeding with a financing which is subject to conditions makes sense is likewise a classic business decision. No one could, or does, argue otherwise."). Courts consistently refuse "to substitute the judgment of the objecting creditors over the business judgment of [a] [d]ebtor[]." *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 140 (Bankr. D. Del. 2010). The Committee's preferred business terms cannot override the Debtors' business judgment.

10. Here, the Debtors selected the best proposal before them. *See* Goronkin Declaration ¶ 71; Gandhi Declaration ¶ 11. Allowing the Committee to second guess the Debtors would contradict the business judgment rule. *See*, *e.g.*, *In re The Wet Seal Inc.*, No. 15-10081 (Bankr. D. Del. Feb. 5, 2015) [D.I. 335], Hr'g Tr. 52:11-53:21 (finding, over objection, that the debtor "acted in accordance with reasonable business judgment in deciding how to proceed . . . . Either of the [possible outcomes of the competing DIP proposals] might or might not be correct, but they are the judgment of the board. . . ."). Likewise, prepetition secured lenders cannot be primed absent

either a finding of adequate protection or their consent to being primed, and as part of the proposal before the Debtors, the Prepetition Secured Creditors only consented to being primed to the extent that the DIP Obligations could not be satisfied from the proceeds of unencumbered assets. Therefore, the Debtors determined that it was in their best interest to provide DIP Liens and Adequate Protection Liens over their unencumbered assets, as is within their power to do. *See In re Yellow Corp*., No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) [D.I. 571] ¶¶ 7-8 (the DIP lender is granted superpriority claims and liens on unencumbered properties that included all tangible and intangible prepetition and postpetition property of the DIP loan parties); *In re W. Glob. Airlines, Inc*., No. 23-11093 (KBO) (Bankr. D. Del. Sept. 12, 2023) [D.I. 236] ¶ 9 (DIP secured parties are granted superpriority claims and liens on all unencumbered assets)*; In re Southcross Energy Partners*, No. 19-10702 (MFW) (Bankr. D. Del. May 7, 2019) [D.I. 200] ¶ 8 (DIP lender is granted superpriority claims and liens on unencumbered properties, including but not limited to commercial tort claims).

11. The DIP Facility offered by the DIP Lender, and the access to cash collateral consented to by the Prepetition Secured Creditors, helps preserve enterprise value of the Debtors and is essential to its survival as a going concern. The Committee has not asked the Court to deny the DIP Facility altogether, but nor have they offered a workable alternative arrangement. They provide no explanation of how, upon the default resulting from the failure of an acceptable final order to be entered, these Chapter 11 Cases would even survive. Cases should not be converted to chapter 7, to the detriment of other creditors (and in this case, most notably the unsecured

creditors), when the debtor has an opportunity to maximize value in furtherance of its fiduciary duties.

## II. The Unencumbered Assets Do Not "Belong" to Unsecured Creditors; Any Property of the Estate May be Used as Collateral to Secure New Financing

12. Granting liens on unencumbered assets to secure DIP financing is not novel. The Bankruptcy Code empowers debtors to encumber estate property, including avoidance actions, in order to obtain postpetition financing. Yet, the Committee argues that the DIP Facility should not be repaid from unencumbered property, arguing that such property "should . . . be preserved for unsecured creditors." Committee Objection ¶ 36. This assertion, is not supported by the Bankruptcy Code, and it is well within the powers of debtors-in-possession to provide liens on unencumbered assets in order to obtain necessary and critical funding, particularly in such circumstances that exist here, where the consensual use of cash collateral and DIP Facility were conditioned on the provision of such liens. Understanding the potential difficulty for distressed debtors to obtain financing in bankruptcy, the Bankruptcy Code expressly authorizes debtors to obtain credit "secured by a lien on property of the estate that is not otherwise subject to a lien" when unsecured credit is unavailable to it. *See* 11 U.S.C. §§ 361(2), 364(c)(2).

13. The United States Supreme Court has rejected the central thesis of the Committee's objection. The Committee cannot circumvent the priorities established under the Bankruptcy Code by reserving unencumbered assets for unsecured creditors. *See Jevic Holding Corp.*, 580 U.S. at 470-71 (emphasizing the importance of the Bankruptcy Code's priority system and refusing to "alter the balance struck by the statute") (citation omitted); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207 (1988) (explaining that courts cannot deviate from procedures "specified by the Code," even when they sincerely "believ[e] that... creditors would be better off").

14. The Committee objects to the Court's granting of liens on avoidance actions, commercial tort claims, and the proceeds thereof. *See* Objection ¶ 54. However, courts in this district have made it clear that avoidance actions, commercial tort claims, and their proceeds are property of the debtor's estate generally – they are not the sole property of the debtor's unsecured creditors. *See*, *e.g.*, *In re Tonopah Solar Energy, LLC*, Case No. 20-11884 (KBO) (Bankr. D. Del. Aug. 24, 2020) [D.I. 130, Hr'g Tr. at pp. 20-21] ("So I also agree with the debtors that, you know, adequate protection liens and superpriority claims in this case are limited to diminution of property and that replacement liens on unencumbered property, including avoidance action proceeds, is expressly contemplated by the Code. And I would go as far as to say that I do not believe that those proceeds are necessarily limited to the unsecured creditor body. I think there's significant case law that suggests otherwise."); *In re Timber Pharm., Inc.*, No. 23-11878 (JKS) (Bankr. D. Del. Dec. 15, 2023) [D.I. 125] ¶ 5 (the DIP lender is granted superpriority claims and liens on DIP collateral, including but not limited to commercial tort claims). Likewise, Section 550 of the Bankruptcy Code provides that the debtor-in-possession may recover property in connection with avoided transfers "for the benefit of the estate." 11 U.S.C. § 550. Section 364 of the Bankruptcy Code, in turn, allows a debtor in possession to encumber "property of the estate" in order to obtain postpetition financing that meets the requirements set forth therein. *See* 11 U.S.C. §§ 364(c)(2), (3) & (d)(1). Thus, on its face, the Bankruptcy Code empowers a chapter 11 debtor to encumber estate property in the form of avoidance actions and other unencumbered assets and the proceeds thereof in connection with court-approved postpetition financings.

15. In these Chapter 11 Cases, the Prepetition Secured Creditors are consenting to the use of cash collateral and the DIP Lender is providing postpetition financing. Nothing compels the DIP Collateral to be limited to already encumbered assets. The Debtors made a calculated

business decision to incur the DIP Facility and, consistent with other postpetition financing arrangements in the marketplace, to grant (a) the DIP Lender with (i) DIP Liens on the unencumbered assets and (ii) priming liens on the Prepetition Collateral, only to the extent that the DIP Obligations could not be satisfied from the unencumbered assets, and (b) the Prepetition Secured Creditors with Adequate Protection Liens on all of the Debtors assets to secure the financing necessary to fund these Chapter 11 Cases. The Committee's Objection, therefore, should be overruled.

## III. The Adequate Protection Provided to the Prepetition Secured Creditors is Appropriate under the Circumstances

16. A secured creditor, irrespective of whether it is undersecured, is entitled to adequate protection. More specifically, section 361 of the Bankruptcy Code provides that when adequate protection is required under section 363 or 364, it may include "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(2); *see also In re AppliedTheory Corp.*, Nos. 02-11868-11874, 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. Apr. 24, 2008) ("Of course those assets started out unencumbered. But those assets can thereafter be encumbered (or made available to satisfy superpriority claims), if necessary to provide adequate protection. That's expressly authorized under section 361(2)."). Contrary to the Committee's claim, the adequate protection granted to the Prepetition Lenders in the Interim Order and the proposed Final Order is subject to and consistent with section 361 of the Bankruptcy Code as stated in such orders.

17. The Prepetition Secured Creditors conditioned their consent upon the receipt of such standard and customary adequate protection rights—including to the extent of any diminution in the value of their collateral, postpetition replacement liens on and security interests in the DIP

Collateral and a 507(b) claim to the extent diminution exceeds the adequate protection otherwise provided. Section 361(2) expressly contemplates the imposition of "additional liens" as a form of adequate protection to the extent of any diminution in value. The adequate protection package proposed by the Debtors in the exercise of their sound business judgment is the product of arms'-length, good faith negotiations, and the resulting proposed adequate protection package represents a reasonable, negotiated agreement among the Debtors and their stakeholders and is customary and consistent with the adequate protection routinely required by prepetition lenders and approved by courts.

18. Accordingly, the Committee Objection to the scope of the Adequate Protection Liens and corresponding Adequate Protection Superpriority Claims should be overruled.

## IV. The Budget Sufficiently Covers Administrative Expense Claims Through a Sale and the Prepetition Secured Creditors are Not Legally Required to Guaranty Administrative Claims or a Wind-Down Budget as a Condition to a DIP Financing

19. The Committee demands that the Prepetition Secured Creditors "provide reasonable assurances of an administratively solvent estate." Committee Objection ¶ 3. As more fully set forth in the DIP Motion and the First Day Declarations, the DIP Facility, and the Budget provided for thereunder, covers all anticipated administrative expenses during the budgeted period. The Prepetition Secured Creditors and the DIP Lender have in fact agreed to "pay the freight" of the actual, reasonable and necessary administrative expenses set forth in the Budget that are being incurred in furtherance of the sale process. The Committee also demands that the Prepetition Secured Creditors provide a wind-down budget. *Id.* ¶ 46. The Stalking Horse Agreement contemplates a "Wind-Down Reserve," which is to be negotiated between the parties, including the Committee.

20. Congress contemplated that accrued, unpaid administrative claims must be dealt with in the case of a successful chapter 11 case under section 1129(a)(9) of the Bankruptcy Code or an unsuccessful chapter 11 case under section 726(b) of the Bankruptcy Code. Neither section trumps the priorities provided by sections 361 and 363(e). "Carve-outs" are voluntary exceptions to these rules. *See In re Molycorp, Inc.*, 562 B.R. 67, 76 (Bankr. D. Del. 2017) ("'a secured creditor may, without doing violence to the letter or spirit of the Bankruptcy Code, selectively waive its liens and super-priority claims to permit payment of certain administrative expenses but not others.'") (quoting *In re Am. Res. Mgmt. Corp.*, 51 B.R. 713, 722 (Bankr. D. Utah 1985)); *see also In re Hotel Syracuse, Inc.*, 275 B.R. 679 (Bankr. N.D.N.Y. 2002).

21. In between sections 1129(a)(9) and 726(b) lies the section 363 sale. As the Committee is aware, this Court and other courts in this district have not required guarantees of payment of all other administrative claims as a condition of approving DIP financing. To be sure, some Courts in this district have reserved judgment with respect to the prospect of unpaid administrative claims at the time of a sale hearing, but they have not compelled debtors or secured creditors, at the outset of the case, to guarantee payment for such claimants. *See In re Central Grocers, Inc.*, No. 17-10993 (LSS) (Bankr. D. Del. June 2, 2017) [D.I. 343], Hr'g Tr. 90 ("I do think that the sale process is the best way to maximize recoveries in this case, and therefore the best way to maximize the possibility that 503(b)(9) claims will, in fact, be paid . . . [I]t's clear that the lender is not the guarantor of a case, and is not the guarantor that administrative creditors will be paid.").

22. At this stage of the case (where there are no allowed, unpaid administrative claims) the Committee's argument with respect to a wind-down budget is premature, and the issue need not and should not be addressed at this time. The Debtors need the DIP Facility and access to cash

collateral to complete its sale process and consummate a sale transaction. The Budget provides that the funding contemplated by the DIP Motion is adequate for that purpose. Moreover, the Stalking Horse Agreement specifically contemplates the funding of a "Wind-Down Reserve," which will be negotiated between the parties, and the Committee will have an opportunity to provide input.

## V. The Debtors Have the Right to Waive Sections 506(c) and 552(b) of the Bankruptcy Code, and the Marshaling Provisions as a Material Inducement to Obtain the Professional Fee Carve-Out, Avoid Cash Collateral Disputes, and Incur Additional Commitments Under the DIP Facility

23. The Committee's objections to the sections 506(c) and 552(b) waivers are misplaced. Such waivers are routinely granted as a *quid pro quo* where, as here, the Prepetition Secured Creditors with blanket liens on substantially all of the Debtors' assets have (a) consented to the use of collateral in order to fund the administration of the case through an approved budget, (b) agreed to subordinate their liens and claims to the payment of the Carve-Out, and (c) agreed to subordinate their liens and claims to the DIP Liens and DIP Claims to the extent set forth in the DIP Orders. *See*, *e.g.*, *In re VJGJ, Inc.*, No. 21-11332 (BLS) (Bankr. D. Del. 2021 Nov. 15, 2021) [D.I. 174]; *In re Quorum Health Corp.*, No. 20-10766 (KBO) (Bankr. D. Del. May 6, 2020) [D.I. 286]; *In re True Religion Apparel, Inc.*, No. 20-10941 (CSS) (Bankr. D. Del. May 29, 2020) [D.I. 278]; *In re HDR Holdings, Inc.*, No. 19-11396 (MFW) (Bankr. D. Del. Aug. 7, 2019) [D.I. 164].

24. The Committee fails to acknowledge that the Prepetition Secured Creditors' cash collateral is funding postpetition expenses on a current basis pursuant to the Budget, funding a professional fee Carve-Out, which includes a reasonable carve-out for the Committee's professional fees, and funding all fees and expenses required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee pursuant to 28 U.S.C. §§ 156(c) and 1930(a)(6). As a result, the Prepetition Secured Creditors should not also be subject to surcharge under section 506(c).

Indeed, it is standard to permit a debtor to grant a waiver of rights under section 506(c), particularly in situations where, as here, the Prepetition Secured Creditors are funding a significant portion of the Debtors' anticipated postpetition expenses and professional fees and the Debtors' negotiation of a consensual cash collateral order and DIP financing order enables the Debtors to avoid expensive and disruptive litigation. *See*, *e.g.*, *In re The Hertz Corp.*, No. 20-11218 (MFW) (Bankr. D. Del. Oct. 29, 2020) [D.I. 1661]; *In re Lucky Brand Dungarees, LLC*, No. 20-11768 (CSS) (Bankr. D. Del July 30, 2020) [D.I. 246]; *In re Pyxus Int'l, Inc.*, No. 20-11570 (LSS) (Bankr. D. Del. July 20, 2020) [D.I. 195]. This Court should grant the Prepetition Secured Creditors the same relief, given the consent to the use of its cash collateral and the subordination of liens to the Carve-Out and DIP Lender as set forth in the proposed Final Order.

25. The section 552 "equities of the case" waiver is also typical in postpetition financings. The Prepetition Secured Creditors negotiated the waiver in connection with the DIP Facility package to avoid unnecessary and wasteful litigation regarding the scope of its blanket liens on substantially all of the Debtors' assets. The absence of these waivers would substantially increase the cost of DIP financings, generally. In fact, DIP financing and cash collateral packages benefit debtors, at market costs, precisely because bankruptcy courts routinely provide the requested protections for lenders. The section 552 waiver is regularly approved by courts in this district, and there is nothing improper about the Debtors' decision to include it in the proposed Final Order. *See*, *e.g.*, *In re Never Slip Holdings, Inc.*, No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024) [D.I. 133] (approving waiver of section 552(b) "equities of the case" exception upon entry of the final order); *In re Joann Inc.*, No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) [D.I. 224] (same); *In re Lucky Bucks, LLC*, No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) [D.I. 169] (same); *In re Plastiq Inc.*, No. 23-10671 (BLS) (Bankr. D. Del. June 22, 2023) [D.I.

138] (same); *In re Structurlam Mass Timber U.S., Inc.*, No. 23-10497 (CTG) (Bankr. D. Del. May 19, 2023) [D.I. 136] (same).

26. The Committee also takes issue with the marshaling waiver in the proposed DIP Facility. *See* Committee Objection ¶ 4. The Committee has no legal basis to request that the DIP Lender or Prepetition Secured Creditors look first to any specific DIP Collateral before being paid from any other DIP Collateral. The remedy of marshaling is equitable and available only to secured creditors, not the unsecured creditors represented by the Committee. *In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007) (recognizing that "unsecured creditors cannot invoke the equitable doctrine of marshaling"); *see also In re Arico, Inc.*, 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999); *see*, *e.g.*, *In re Exide Techs*., No. 13-11482 (KJC) (Bankr. D. Del. July 25, 2013) [D.I. 427]; *In re Xerium Techs., Inc*., No. 10-11031 (KJC) (Bankr. D. Del. Apr. 28, 2010) [D.I. 156]. In other words, the Committee and its constituents cannot require the Prepetition Secured Creditors or the DIP Lender to equitably marshal their assets.

27. The terms of the DIP Facility would need to be substantially modified if this customary and requested relief is not granted. Most notably, the consensual "Carve-Out" is in exchange for the standard waivers, including under sections 506(c) and 552(b) of the Bankruptcy Code and the marshalling waiver. Without these waivers, the Committee professionals will have no greater rights than as contemplated by the Bankruptcy Code—if there are unencumbered assets, they will have the right to seek allowance of their reasonable fees. If nearly all of the assets are encumbered, then the only recourse is through surcharge, and the Committee well knows that they could not satisfy the requirements of 506(c). Regardless, the Debtors advisors believe there to be "no material unencumbered assets." Gandhi Declaration ¶ 9.

28. Without a consensual deal, the Debtors will need to resort to an expensive cash collateral fight, a section 506(c) surcharge hearing, a 507(b) dispute, and an emergency hearing to approve DIP financing, which might not be obtainable at all, and the carefully negotiated Stalking Horse Agreement would be in danger of falling through. Such a sequence of events would be most damaging for none other than the constituents the Committee purports to represent.

## VI. The Committee is Not Entitled to Accept the Benefits of the Carve-Out Without the Limitations Both as to Amount and Scope, and the Current Challenge Period Gives the Committee Enough Time to Investigate the Claims of the Prepetition Lenders

29. The Committee also suggests that the Challenge Period (as defined in the Interim Order) (which, per the proposed Final Order, will expire concurrently with the date of entry of the Sale Order) is inadequate and that the budget of $50,000 to investigate potential claims against the DIP Lender and Prepetition Secured Creditors is insufficient. Committee Objection ¶ 56. The Committee has no reasonable basis to suggest more time is needed to investigate. The Local Rules permit deviation from the 75-day requirement when circumstances permit. *See* Del. L. Bankr. R. 4001-2(a)(i)(Q). The circumstances of these Chapter 11 Cases, as detailed in the DIP Motion and the First Day Declarations, warrant an abbreviated challenge period. The Debtors' financing is only sufficient to fund a sale process on the timeline proposed in the Bidding Procedures, and additional delay will only disrupt the Debtors' businesses and drive-up costs to the detriment of the Debtors' estates and their stakeholders. The Prepetition Secured Creditors require certainty with respect any Challenges, and as such the Challenge Deadline must coincide with the Sale Hearing.

30. Further, the Committee argues that the Final Order should grant the Committee with automatic standing to pursue challenges. Committee Objection ¶ 56. The Committee's objection to the proposed Final Order disregards prevailing authority regarding creditor committee

standing, which provides that creditors' committees are granted standing to sue under limited circumstances. *See Off. Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 566 (3d Cir. 2003) ("Sections 1103(c)(5) and 1109(b) 'impl[y] a qualified right for creditors' committees to initiate adversary proceedings where the trustee or debtor in possession unjustifiably failed to bring suit.'") (quoting *In re Caldor Corp.*, 303 F.3d 161, 166 (2d Cir. 2002)); *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) ("[T]he entitlement to derivative standing requires (1) a colorable claim; (2) that the trustee unjustifiably refused to pursue the claim, and (3) permission of the bankruptcy court to initiate the action."). The Final Order properly allows the Committee the ability to seek standing with the Court.

## CONCLUSION

31. The proposed use of cash collateral and postpetition financing represent a negotiated arms'-length agreement among the Debtors, DIP Lender and Prepetition Secured Creditors, as contemplated by the Bankruptcy Code and Bankruptcy Rule 4001. The Committee's requests to ring-fence any unencumbered value solely for the benefit of unsecured creditors and ignore the Prepetition Secured Creditors' rights to adequate protection should be denied, and the Court should approve the Final Order as an exercise of the Debtors' business judgment to obtain funds in pursuit of a value-maximizing transaction. Other objections, most notably pertaining to the wind-down budget, are premature and more appropriately addressed in connection with a hearing to approve the sale. For the foregoing reasons, the Court should grant the Debtors' DIP Motion and enter the form of order requested by the Debtors.

32. In addition to the specific issues discussed herein, the Prepetition Agent reserves the right to supplement this Response or make additional or different arguments at the Final Hearing.

Dated: November 23, 2026

By: */s/ Paul N. Heath*

**RICHARDS, LAYTON & FINGER, P.A.**
John H. Knight (No. 3848)
Paul N. Heath (No. 3704)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: 302.651.7700
Fax: 302.651.7701
Email: knight@rlf.com
heath@rlf.com

-and-

**GOLDBERG KOHN LTD.**
Danielle Juhle (admitted *pro hac vice*)
Drake Saffell (admitted *pro hac vice*)
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
Tel: 312.201.4000
Fax: 312.332.2196
Email: danielle.juhle@goldbergkohn.com
drake.saffell@goldbergkohn.com